In the
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| FREE PRESS, *et al.*,<br>Petitioners,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br>Respondents. | ) | No. 17-1129 |

**EMERGENCY MOTION FOR STAY PENDING REVIEW**

Andrew Jay Schwartzman
Angela J. Campbell
Drew T. Simshaw
Institute for Public Representations
Georgetown University Law Center
600 New Jersey Avenue, NW
Room 312
Washington, DC 20001
(202) 662-9535
ajs339@law.georgetown.edu

*Counsel for Free Press, et al.*

May 26, 2017

## TABLE OF CONTENTS


Introduction and Summary ..........2

Background ..........3

A. The Origins of the UHF Discount ..........3
B. Subsequent Reviews of the UHF Discount ..........4
C. Repeal of the UHF Discount ..........7
D. Reinstatement of the UHF Discount ..........9

Argument ..........11

I. Petitioners are Likely to Prevail on the Merits ..........12

A. The Commission acted arbitrarily and capriciously in reinstating a rule that is concededly obsolete and does not serve the public interest ..........12

B. It is arbitrary and capricious to reinstate the UHF Discount on the assumption the FCC will conduct a future proceeding to consider raising the cap and modifying the UHF Discount at the same time ..........14

C. The Commission lacks statutory authority to modify the national ownership cap ..........16

II. Petitioners and the Viewers they Represent Face Irreparable Harm in the Absence of a Stay ..........17

III. Issuance of the Stay would Not Substantially Harm Other Parties ..........20

IV. Grant of a Stay Pending Judicial Review Would Serve the Public Interest ..........21

Conclusion ..........22

In the
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| FREE PRESS, *et al*., Petitioners, | ) | |
| v. | ) | No. 17-1129 |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, Respondents. | ) | |

**EMERGENCY MOTION FOR STAY PENDING REVIEW**

Pursuant to 28 U.S.C. §2112(a)(4), FRAP 18 and Circuit Rule 18(a), Petitioners Free Press, *et al.* move for a stay pending review of Respondent FCC's *Order on Reconsideration*, Docket No. 13-326, released April 21, 2017, 82 Fed. Reg. 21124 (May 5, 2017)("*Reinstatement Order*")(Attachment A). Petitioners asked the Commission to stay this order on May 10, 2017. As of May 26, 2017, the Commission has not acted on that request and, in the absence of a Court-issued stay, the *Reinstatement Order* will take effect June 5, 2017.[1] Accordingly, Petitioners also ask for an immediate administrative stay if necessary to afford time for consideration of this motion.[2]

---

[1] Counsel for the parties have been notified by telephone of this filing.
[2] *See* D.C. Circuit Handbook of Practice and Internal Procedures 33 (2017).

## INTRODUCTION AND SUMMARY

In the decision under review, the FCC voted 2-1 to grant a petition for reconsideration and reinstate the so-called "UHF Discount," a provision that affects how broadcasters calculate their compliance with the statutory cap on television station ownership. Large broadcasters constrained by that cap would be able to acquire many additional televisions stations by taking advantage of the UHF Discount.

Petitioners, which represent the interests of television viewers, demonstrate below that they are likely to prevail on the merits. The *Reinstatement Order* is arbitrary and capricious because it reinstates a concededly obsolete rule that, not only does not serve the public interest but undermines the public interest goals of diversity, competition and localism. It is also arbitrary and capricious for the Commission to reinstate this rule on the basis that a future Commission will consider the need for the UHF Discount at the same time it considers whether to modify or repeal the 39% cap, because the Commission lacks statutory authority to modify that cap. In the absence of a stay, Petitioners and the viewers they represent will face irreparable harm within a few weeks after the *Reinstatement Order* becomes effective. At that time, the Commission will have approved mergers and acquisitions, some of which have already been announced, resulting in

substantial consolidation of television station ownership. A stay would maintain the *status quo* pending judicial review. For this reason, broadcasters in this proceeding will not be harmed. Because of the very substantial impact such consolidation would have on the diversity of voices in the marketplace of ideas, grant of a stay would protect the public interest during the course of this proceeding.

## BACKGROUND

To understand why the FCC's *Reinstatement Order* is arbitrary and capricious, it is important to understand the history of the UHF Discount.

### A. The Origins of the UHF Discount

To promote the public interest goals of diversity and competition, the FCC has long limited the number of television stations commonly controlled both locally and nationally. In 1941, the FCC capped the number of stations that could be owned nationally at three.[3] Over time, the cap increased to five, seven (no more than five VHF), and eventually to twelve stations. In 1985, the FCC added an audience reach cap that allowed group owners to expand up to the point where their TV stations had access to 25% of the national audience. It found that because "networked owned and operated stations are generally concentrated in highly

[3] *Rules Applicable to Chain Broadcasting*, 6 Fed. Reg. 2284 (May 6, 1941).

populated areas and therefore already have significant penetration, this reach restriction will preclude substantial network expansion."[4]

At the same time, the FCC recognized that UHF stations inherently reached a more limited audience than VHF stations. Thus, to provide "a measure of the actual voice handicap," the FCC created the UHF Discount, which attributes to a UHF station only half of a market's audience reach.[5] Thus, the UHF Discount is not part of the cap, but sets forth how to measure the reach of UHF stations.

### B. Subsequent Reviews of the UHF Discount

Section 202(c) of the Telecommunications Act of 1996 directed the FCC to eliminate the numerical restriction on television station ownership and to increase the audience reach cap to 35%.[6] Section 202(h) directed the FCC to review all broadcast ownership rules, including the national cap, biennially to determine whether they remained necessary in the public interest.[7]

The FCC reviewed the UHF Discount in the *1998 Biennial Review*, but decided to retain it because it found that the handicap faced by UHF stations had not yet been overcome. It observed, however, that the UHF Discount would no longer be needed once all television stations were broadcasting digitally, and thus

---

[4] *Amendment of Section 73.3555*, 100 FCC2d 74, 87, 89 (1985).

[5] *Id.* at 93-94.

[6] Telecommunications Act of 1996, P.L. 104-104 ("1996 Act")(Attachment B).

[7] *Id.*, §202(h).

it planned to begin a rulemaking to phase out the UHF Discount before the transition was completed.[8]

In the *2002 Biennial Review*, the FCC reviewed the national cap and voted to increase it from 35% to 45%. Again, it found that "it is clear that the digital transition will largely eliminate the technical basis for the UHF discount because UHF and VHF signals will be substantially equalized." Thus, it decided to "sunset the application of the UHF discount for the stations owned by the top four broadcast networks (*i.e.*, CBS, NBC, ABC and Fox) as the digital transition is completed on a market by market basis."[9]

Neither the 45% cap nor the sunset provisions took effect, however, because the U.S. Court of Appeals for the Third Circuit stayed the Commission's *2002 Biennial Review* decision.[10] Before that Court could complete its review of the Commission's decision, Congress intervened. Responding to broad public concern about the excessive media consolidation that would result from raising the cap, Congress enacted the Consolidated Appropriations Act of 2004 ("CAA"),[11]

---

[8] *1998 Biennial Review*, 15 FCCRcd 11058, 11080 (2000).

[9] *2002 Biennial Review*, 18 FCCRcd 13620, 13847 (2003).

[10] *Prometheus Radio Project v. FCC*, 2003 WL22052896, 22052897 (3rd Cir. 2003)(Attachment C)("*Prometheus Stay*").

[11] Consolidated Appropriations Act of 2004, P.L. 108-199 ("CAA")(Attachment D).

directing the FCC to roll the cap back to 39%.[12] The 39% level was selected so that Fox and CBS, which had received temporary waivers to exceed the cap pending the outcome of the agency's rulemaking, would not have to divest any stations.[13] The CAA also excluded the national ownership cap from consideration in future Commission ownership reviews under §202(h) and changed the timing for these reviews from every two to four years.[14]

Congress adopted the CAA after briefs challenging the *2002 Biennial Review* were filed in the Third Circuit. The Court sought supplementary briefing on the effect of the CAA, and ultimately concluded in *Prometheus I* that "[b]ecause the Commission is under a statutory directive to modify the national television ownership cap to 39%, challenges to the Commission's decision to raise the cap to 45% cap are moot." [15] Further, it found that although the CAA "did not expressly mention the UHF discount," the challenges to the Commission's decision to phase it out were moot as well. [16] It left the future of the UHF Discount to the Commission, concluding that "the Commission may decide, in the first instance,

---

[12] CAA, §629(1).

[13] *See* 150 Cong.Rec. S78 (January 21, 2004)(statement of Senator Byrd).

[14] CAA, §629(3).

[15] *Prometheus Radio Project v. FCC*, 373 F.3d 372, 396-97 (3rd Cir. 2004)("*Prometheus I*").

[16] *Id.*

the scope of its authority to modify or eliminate the UHF Discount outside the context of §202(h).”[17]

### C. Repeal of the UHF Discount

The transition to digital television was completed in 2009. In September 2013, the FCC proposed to eliminate the UHF Discount on the basis that it was “obsolete.”[18] The rulemaking proposal observed that the Commission had “recognized for more than a decade that the underlying basis for the UHF discount would likely disappear following the transition to digital television.” Moreover, it found that digital UHF stations did not suffer from the technical deficiencies that analog UHF stations did, and in fact, “the disparity between UHF and VHF channels has if anything been reversed.”[19]

In September 2016, the Commission voted three to two to eliminate the Discount and grandfather existing station groups. It found:

> The record is absolutely clear: UHF stations are no longer technically inferior in any way to VHF stations. Therefore, we find that the DTV transition has rendered the UHF discount technically obsolete, and we hereby

---

[17] *Id.* The FCC subsequently concluded that “the UHF discount is insulated from review under Section 202(h)” as a result of the CAA, and thus beyond the parameters of the quadrennial review. *2006 Quadrennial Review*, 23 FCCRcd 2010, 2084-85 (2008).

[18] *Amendment of Section 73.3555(e)*, 28 FCCRcd 14324, 14331 (2013).

[19] *Id.*, 28 FCCRcd at 14330.

> eliminate it from the calculation of the national audience reach cap. [20]

The Commission also "the continued application of the UHF discount distorts the calculation of a licensee's national audience reach and undermines the intent of the cap."[21] Moreovcr, "as a result of the [digital] transition, many stations that were broadcasting on VHF channels at the time the 39 percent cap was instituted have shifted to UHF channels. Despite having signal coverage that is equal to, or even better than, its previous VHF channel, the former VHF station now receives–for the first time–the benefit of the UHF discount."[22] Thus, the Commission observed that "solely as a result of the [digital] transition, the national cap is effectively 78 percent for a station group that includes only UHF stations" and the UHF Discount "serves only to confer a factually unwarranted benefit on owners of UHF television stations."[23] The Commission found no continuing competitive disparity between UHF and VHF stations or any other reason that would justify retaining the UHF Discount. Finally, the Commission found that

---

[20] *Amendment of Section 73.3555(e) of the Commission's Rules*, 31 FCCRcd 10213, 10226 (2016)("*Repeal Order*")(Attachment E).

[21] *Id.*, 31 FCCRcd. at 10228.

[22] *Id.*, 31 FCCRcd at 10229. For example, Fox, which had been the beneficiary of Congressional action to allow it to stay near 39%, transitioned VHF stations to UHF. This "suddenly decreased" Fox's audience reach from 37.10% to 24.75% "despite the fact that Fox still owned the same number of stations in the same markets reaching the same audiences." *Id.*

[23] *Id.*, 31 FCCRcd. at 10226.

reexamining the cap was beyond the scope of the rulemaking and no party had presented persuasive reasons to revisit the cap.[24]

Commissioners Pai and O'Rielly issued separate dissents. Commissioner O'Rielly agreed that the UHF Discount was obsolete, but stated:

> I reject the assertion that the Commission has authority to modify the National Television Ownership Rule in any way, including eliminating the UHF discount,...The [CAA] was heavily negotiated and painstakingly crafted in order to settle a recurring and particularly contentious media ownership issue. I know since I was there at the time and helped reach the agreement….The result was a national ownership cap that remains one of the few media ownership rules specifically set by statute and the only one exempted from the Quadrennial Review process governing the other ownership rules....Since enactment, many parties have advocated changes in different elements of this compromise...But the only acceptable venue for these arguments is Congress.[25]

### D. Reinstatement of the UHF Discount

Two broadcasters jointly petitioned for reconsideration of the *Repeal Order*. By the time the Commission acted upon the petition, its composition changed. Two had Commissioners left, and Commissioner Pai became Chairman. On April 20, 2017, the FCC granted reconsideration, adopting the *Reinstatement Order* by a vote of two to one.

---

[24] *Id.*, 31 FCCRcd. at 10232.

[25] *Repeal Order*, 31 FCCRcd at 10251 (O'Rielly dissent).

The *Reinstatement Order* did not identify any legal or factual errors in the *Repeal Order*. Rather, the sole basis given for reinstating the UHF Discount was that two Commissioners believed that that the Commission should not have repealed the UHF Discount without considering at the same time whether to modify the national ownership cap.[26] The *Reinstatement Order* stated that the Commission would open a rulemaking proceeding later this year to review the cap and the UHF Discount at the same time.[27] Commissioner O'Rielly, one of the two-member majority, noted in his separate statement that he continued to believe, as expressed in his prior dissent, the Commission lacked authority to repeal or modify the cap as well as the UHF Discount.[28] Commissioner Clyburn forcefully dissented, criticizing the majority for ignoring the "broad, industry-wide agreement that the UHF discount has outlived its purpose" and for "making an about face, [that] is firmly embracing the past, and is reinstating a relic of a bygone era, for the benefit of a few large media companies."[29]

---

[26] *Reinstatement Order* at 5.

[27] *Id.*

[28] *Id.*, at 21 (O'Rielly dissent).

[29] *See, e.g., Reinstatement Order* at 17 (Clyburn dissent)(citation omitted)(decision "invite[s] broadcast station groups to actually distort the calculation of national audience reach, and take advantage of 'a loophole that allows owners to fail to count audience that their stations actually reach.'")

## ARGUMENT

Strong and highly relevant precedent supports a stay in this matter. As discussed above, in 2003 the Third Circuit stayed implementation of an FCC decision that similarly would have relaxed broadcast ownership limits and resulted in increased consolidation. It found that the substantial "harm to petitioners absent a stay would be the likely loss of an adequate remedy should the new ownership rules be declared invalid in whole or in part."[30] By contrast, it found that "there is little indication that a stay pending appeal will result in substantial harm to the Commission or other interested parties."[31] The Court did not find it necessary to undertake an extensive analysis of the likelihood of success on the merits because "these harms could outweigh the effect of a stay on Respondent [FCC] and relevant third parties."[32] It concluded that "[g]iven the magnitude of this matter and the public's interest in reaching the proper resolution, a stay is warranted pending thorough and efficient judicial review."[33]

The harms that Petitioners face in this case are precisely the same as those faced in the *Prometheus Stay* order. And just as the *Prometheus* Court found an absence of harm to third parties, there is no significant harm to third parties here.

---

[30] *Prometheus Stay*, 2003 WL at 22052897.
[31] *Id.*
[32] *Id.*
[33] *Id.*

The only real difference in this case is that Petitioners here also demonstrate an unusually strong likelihood of success on the merits, making the case for a stay even more compelling than it was in *Prometheus*.

## I. Petitioners are Likely to Prevail on the Merits

Under 5 U.S.C. §706, a "reviewing court shall...hold unlawful and set aside agency action, findings, and conclusions found to be...arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Here, the decision to reinstate the UHF Discount was arbitrary and capricious on several grounds.

### A. The Commission acted arbitrarily and capriciously in reinstating a rule that is concededly obsolete and does not serve the public interest

When the Commission eliminated the UHF Discount in 2016, it found the provision was obsolete and undermined the purposes of the national cap. When it reinstated the UHF Discount in 2017, the Commission conceded that "we do not disagree with Opponents' assertion that the UHF Discount no longer has a sound technical basis."[34] Moreover, it acknowledged that "experience has confirmed that UHF channels are equal, if not superior to, VHF channels for" reaching an audience with digital transmissions.[35] Reinstating the UHF Discount while admitting that it no longer serves any purpose, is the epitome of arbitrary and capricious decisionmaking.

---

[34] *Reinstatement Order* at 6.
[35] *Id.* at 4.

The APA's requirement for rational decisionmaking "dictates that the agency simply cannot employ means that actually undercut its own purported goals."[36] In the *Repeal Order*, the Commission found that "without any current technological justification, the continued application of the UHF discount distorts the calculation of a licensee's national audience reach and undermines the intent of the cap."[37] The *Reinstatement Order* does not find these conclusions flawed or make any contrary findings.

Furthermore, the Commission may only adopt rules that if finds will serve the public interest.[38] The Commission's public interest standard in broadcasting embodies the objectives of competition, localism, and diversity.[39] Reinstating the UHF Discount will result in decreased competition, because it induces smaller companies to sell to larger competitors and discourages new entry.[40] Smaller station owners driven out of the market or unable to enter in the first place, often

---

[36] *Office of Communication of United Church of Christ v. FCC*, 779 F.2d 702, 707 (D.C. Cir. 1985).

[37] *Repeal Order*, 31 FCCRcd at 10228. See also *id.*, 31 FCCRcd at 10247 (Pai dissent)("To be sure, the technical basis for the UHF discount no longer exists.)

[38] *See* 47 U.S.C. §303(r).

[39] *See, e.g., 2002 Biennial Regulatory Review–Review of the Commission's Broadcast Ownership Rules*, 18 FCCRcd 13620, 13624 (2003)("2002 BR").

[40] *See* Comments of Free Press at 4, MB Docket No. 13-236 (Dec. 16, 2013)(*citing* Turner, *Out of the Picture 2007: Minority & Female TV Station Ownership in the United States* (2007)(stations owned by women and people of color are more likely to thrive in less concentrated local and national markets).

diverse programs and viewpoints.[41] In contrast, large group owners tend to distribute the same programming to all of their stations and are less likely to provide programming targeted to local needs. Because the UHF Discount undermines the Commission's public interest goals of competition, diversity and localism, reinstating the UHF Discount is arbitrary and capricious.

### B. It is arbitrary and capricious to reinstate the UHF Discount on the assumption the FCC will conduct a future proceeding to consider both raising the cap and modifying the UHF Discount at the same time

The Commission's sole justification for reinstating the UHF Discount is that it should be "consider[ed]...as part of a broader reassessment of the national audience reach cap, which we will begin later this year."[42] This rationale is as extraordinary as it is arbitrary and capricious: the majority is restoring a concededly unjustifiable provision, not because the prior Commission was wrong, but because the prior Commission did not simultaneously revisit the 39% cap, something that one of the two Commissioners in the current majority believes the Commission lacks the statutory authority to do.

---

[41] Specifically addressing the impact of the *Repeal Order* on smaller businesses, the Commission said "Given that the technical justification for the UHF discount no longer exists, continued application of the discount stifles competition by encouraging consolidation instead of promoting new entrants in local broadcast television markets. Therefore, the Commission believes the rule change adopted in this *Report and Order* will benefit small entities, not burden them." *Repeal Order*, 31 FCCRcd at 10245.

[42] *Reinstatement Order* at 7.

As discussed in the next section, Petitioners also believe that the CAA prohibits the Commission from adjusting the percentage cap. But even assuming for purposes of argument that the Commission has the legal power to modify the national cap, today's Commission majority cannot predict how a future FCC might proceed. Because the national cap has been excluded from recent periodic reviews of the broadcast ownership rules, there is currently no factual record on whether national limits serve the public interest.

Moreover, there are currently two vacancies on the Commission, and another Commissioner's term expires on June 30, 2017. While it is impossible to know what the makeup of the FCC will be at the time it makes a decision in this as-of-yet uninitiated proceeding, it is plausible that there will be at least three new members. Even if a majority of this future Commission finds that it has authority to modify the 39% cap, notwithstanding Commissioner O'Rielly's often-repeated opinion to the contrary, no one can predict whether it would vote to do so as a matter of policy. The APA contemplates that the Commission approach each case with an open mind; no one, including the current majority, can prejudge whether a non-existent record in would support modification of the national cap. Basing a major policy change that will have immediate and dramatic impact on such a highly speculative basis is utterly irrational.

### C. The Commission lacks statutory authority to modify the national ownership cap.

The plain language of the CAA shows that Congress intended to make the 39% cap permanent, but not to preclude modification of how the Commission defines "audience reach." Section 629(1) does not mention the UHF Discount. Rather, it simply changes the cap:

> The Telecommunications Act of 1996 is amended as follows-
> (1) in Section 202(c)(I)(B) by striking "35 percent" and inserting "39 percent"

This language cannot be reconciled with any notion that Congress intended the 39% cap to be temporary, since, if the FCC changed the number, there would then be no such thing as a "39 percent" limitation. Moreover, it would make no sense to establish a precise numerical limit and preclude its alteration in a review of all the other broadcast ownership rules, only to allow the Commission to change that number through a separate rulemaking proceeding. This view is reinforced by the fact that Section 629(2) also precluded the FCC from using its forbearance powers under Section 10 of the 1996 Act to repeal the ownership cap.[43]

Additional extrinsic evidence supports this view. The FCC decision that prompted enactment of the CAA had ruled that the Discount should be to phased out after the digital transition, something that Congress well understood, and which

---

[43] 47 U.S.C. §160.

was considered at a hearing just a few months earlier.[44] Because of this, if Congress had intended to lock in the UHF Discount as well as the 39% cap, it surely would have said so.

### II. Petitioners and the Viewers they Represent Face Irreparable Harm in the Absence of a Stay

The announcement that the Commission was considering reinstatement of the UHF Discount led to a flurry of news[45] and investment analysts' reports[46] that this would generate numerous otherwise prohibited transactions.[47] Even before the Commission's decision was published in the Federal Register, Sinclair Broadcast Group, which already owns and/or operates 173 stations, announced that it would take advantage of the reinstatement of the UHF Discount to buy Bonten Media's 14 owned TV stations as well as its right to operate four more stations.[48] Absent the UHF Discount, this acquisition would place Sinclair at or above the 39% cap. Then, on May 8, 2017, Sinclair announced that it would purchase Tribune Media's

---

[44] *See, e.g*, "FCC Oversight: Media Ownership and FCC Reauthorizartion," S. Hrg. 108-938 (June 4, 2003).

[45] *See, e.g.*, "FCC Tees Up Rule Change That Could Spur Wave of TV Industry Mergers," Wall Street Journal, Mar. 30, 2017, https://www.wsj.com/articles/fcc-to-vote-on-relaxing-obama-era-rule-on-tv-ownership-1490825750.

[46] *See, e.g.*, "Fitch: TV Broadcast Consolidation to Begin (Again)," Apr. 24, 2017, https://www.fitchsolutions.com/site/pr/1022617.

[47] *See* Attachment F.

[48] Deadline.com, "Sinclair Agrees To Buy Bonten Media After FCC Eases TV Station Mergers," Apr. 21, 2017, http://deadline.com/2017/04/sinclair-agrees-buy-bonten-media-fcc-ease-tv-station-merger-1202073744/.

42 owned or operated stations to create what would be–by far–the nation's most powerful TV group. Exact details, including likely divestiture of a few stations, of the transaction have not been announced, but if approved, Sinclair would have a national reach of perhaps 70%, including a presence in almost all the largest U.S. markets. The Sinclair/Tribune transaction is the beginning of what is likely to be a wave of consolidation.[49] As Bloomberg reported it, the "deal to acquire Tribune Media Co. marks the first in what's expected to be a frenzy of media and telecom dealmaking...."[50]

Commission policy is that, in the absence of opposition, facially complete applications for transfer or assignment will be granted.[51] Staff does not undertake independent review of such applications once it is determined that an applicant is

---

[49] *See Reinstatement Order*, at 19 (Clyburn dissent)(quoting CBS CEO and citing to Sinclair SEC filing); *id.* ("[T]his Order will have an immediate impact , on the purchase and sale of television stations"); *id.*, at 20, n.22 (quoting Nexstar CEO saying company is "already in discussions should the rules change about opportunities that might be available to us...").

[50] "Sinclair Gobbles Up Tribune in First Big Media Deal of Trump Era," May 8, 2017, https://www.bloombergquint.com/business/2017/05/08/sinclair-gobbles-up-tribune-in-first-big-media-deal-of-trump-era. *See also*, Communications Daily, May 9, 2017 ("'The UHF discount returning to status quo helps a number of parties, they have room to acquire stations,' said TV station lawyer David O'Neil of Rini O'Neil, which isn't involved in Sinclair/Tribune. 'This is obviously the largest one, but I think there will be many deals like this over the course of this year.'").

[51] *See* Attachment G.

qualified and approval will not violate any Commission rule or policy.[52] Thus, absent a stay, these transactions will likely be approved shortly after the 30 day public notice period has passed.[53] Because this consolidation will reduce competition and diminish the diversity of voices in the marketplace of ideas, Petitioners and the viewers they represent will be irreparably harmed if the new rules are not stayed. Even if the Commission were to condition approval upon the outcome of judicial review, history demonstrates that the Commission has repeatedly failed to enforce previously-mandated divestures.[54]

The race to snap up the most attractive properties mirrors what happened after the 1996 Telecommunications Act rescinded the national limit on radio station ownership.

> This overhaul of the ownership restrictions triggered an unprecedented merger and product-repositioning wave that completely reshaped the radio industry. In the first week after the

---

[52] *See Committee To Save WEAM v. FCC*, 808 F.2d 113, 118 (D.C. Cir. 1986)("By requiring a proposed assignee to address the relevant facets of the public interest, convenience, and necessity on FCC Form 314, the Commission has incorporated the consideration of these issues into its application process. Therefore, the FCC's approval of WEAM's application implies a finding on ample information that the public interest will be served by the assignment.").

[53] *See* Attachment G.

[54] *See, e.g, Fox Television Stations, Inc*. 29 FCCRcd 9578-99, 9583 (2014)(repeated "temporary waivers" from 2001 through the present); *2006 Quadrennial Review*, 26 FCCRcd 11149, n. 5 (2011) (17 successive extensions of divestiture requirement)*; Counterpoint Communications Inc*., 20 FCCRcd 8582 (2005)(describing history of repeated extensions of divestiture requirement; the matter was ultimately mooted by the sale of the licensee's parent company for unrelated reasons).

> Telecommunications Act of 1996 was passed, radio station owners closed nearly $700 million in merger deals.[55]

By 2005, the ten largest radio owners increased their holdings by 900%. The largest company, Clear Channel, owned about 1,200 stations nationwide, and seven other companies owned 100 or more stations. The number of stations changing hands each from 1996 through 2001 doubled compared to the prior period.[56]

Facing similar conditions, the Third Circuit issued the *Prometheus Stay* after the FCC adopted rules that would have authorized substantial relaxation of the Commission's local TV and cross-ownership rules.[57] This Court should take a similar course.

### III. Issuance of the Stay would Not Substantially Harm Other Parties.

Grant of a stay will maintain the *status quo*. It will not harm broadcasters, as they can continue to operate their businesses as before pending judicial review. Smaller broadcasters and new entrants could actually benefit from a stay because if the *Reinstatement Order* is reversed, stations that would otherwise been sold to the largest broadcasters would be available for them to purchase. Thus, as was the case

---

[55] Jeziorski, "Estimation of cost efficiencies from mergers: application to U.S. radio," 45 RAND Journal of Economics 816, 818 (2014).

[56] *See* Future of Music Coalition, *A Quantitative History of Ownership Consolidation in the Radio Industry* (2006). https://futureofmusic.org/sites/default/files/FMCradiostudy06.pdf

[57] *See Prometheus Stay*, *supra*, n.9.

in 2004, "there is little indication that a stay pending appeal will result in substantial harm to the Commission or other interested parties."[58]

## IV. Grant of a Stay Pending Judicial Review Would Serve the Public Interest.

Application of the *Virginia Petroleum* test typically places the greatest weight on the likelihood of success on the merits and the possibility of immediate and irreparable harm to the moving parties. As shown above, these factors, along with the absence of harm to third parties, strongly favor grant of a stay. However, in this case, the fourth factor–whether a stay is in the public interest–provides an unusually strong additional basis for staying the new rules. Here, a stay would prevent immediate consolidation in ownership. Maintaining a diversity of voices in the broadcast media goes to the heart of the FCC's statutory obligation to regulate in the public interest. This affects all Americans, not just those represented by Petitioners.

Members of the public have a First Amendment right "to receive suitable access to social, political, esthetic, moral, and other ideas and experiences...." [59] Section 257(b) of the 1996 Telecommunications Act declares that the "policies and purposes of this Act [are to] favor[] diversity of media voices, vigorous economic

---

[58] *Id.*

[59] *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969). *See also* 1992 Cable Act, §2(a)(finding that "a substantial governmental and First Amendment interest exists in promoting a diversity of views,...").

competition, technological advancement, and promotion of the public interest, convenience, and necessity." As the Supreme Court has held,

> In setting its licensing policies, the Commission has long acted on the theory that diversification of mass media ownership serves the public interest by promoting diversity of program and service viewpoints, as well as by preventing undue concentration of economic power.[60]

Accordingly, the FCC has said that

> Traditional media outlets,...are still of vital importance to their local communities and essential to achieving the Commission's goals of competition, localism, and viewpoint diversity. This is particularly true with respect to local news and public interest programming, with traditional media outlets continuing to serve as the primary sources on which consumers rely.[61]

For this reason, the public interest factor unquestionably dictates that a stay should be granted.

## CONCLUSION

The Court should issue an administrative stay, if necessary, and stay the effectiveness of the *Reinstatement Order* pending judicial review, and grant all such other relief as may be just and proper.

---

[60] *FCC v. NCCB*, 436 U.S. 775, 780 (1978). *See also Turner Broadcasting System v. FCC*, 512 U.S. 622, 663 (1994) "[A]ssuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment. Indeed, '"it has long been a basic tenet of national communications policy that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public."'")(citations omitted).

[61] *2014 Quadrennial Review*, 31 FCCRcd 9864, 9865 (2016).

Respectfully submitted,

/s/ Angela J. Campbell

Angela J. Campbell
Andrew Jay Schwartzman
Drew Simshaw
Institute for Public Representation
Georgetown Law
600 New Jersey Ave. NW
Washington, DC 20001
202-662-9535
campbeaj@georgetown.edu
*Counsel for Petitioners*

May 25, 2017

In the
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| FREE PRESS, *et al.*, | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 17-1129 |
| FEDERAL COMMUNICATIONS | ) | |
| COMMISSION and UNITED | ) | |
| STATES OF AMERICA, | ) | |
| Respondents. | ) | |

**CERTIFICATE OF COMPLIANCE**

1. This Emergency Motion for Stay complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5022 words, which is less than the 5200 maximum, excluding the accompanying documents authorized by Fed. R. App. P. 27(a)(2)(B).

2. This Emergency Motion for Stay complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word with a proportionally spaced typeface in 14-point font.

Respectfully submitted,

/s/ Andrew Jay Schwartzman

______________________

Andrew Jay Schwartzman
Institute for Public Representations
Georgetown University Law Center
600 New Jersey Avenue, NW
Room 312
Washington, DC 20001
(202) 662-9535
*Counsel for Free Press, et al.*

May 26, 2017

In the

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| FREE PRESS, *et al.*, | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 17-1129 |
| FEDERAL COMMUNICATIONS | ) | |
| COMMISSION and UNITED | ) | |
| STATES OF AMERICA, | ) | |
| Respondents. | | |

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to the United States Court of Appeals for the District of Columbia Rule 26.1 and Federal Rule of Appellate Procedure 26.1, Free Press, Office of Communication, Inc. of the United Church of Christ, Prometheus Radio Project, Media Mobilizing Project, Media Alliance, National Hispanic Media Coalition, and Common Cause respectfully state that each of them is a non-profit organization with no parent companies, subsidiaries or affiliates and that none of them have issued shares to the public.

Respectfully submitted,

/s/ Andrew Jay Schwartzman
Andrew Jay Schwartzman
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW
Room 312
Washington, DC 20001
(202) 662-9535
*Counsel for Petitioners*

May 26, 2017

In the
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| FREE PRESS, *et al.*, | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 17-1129 |
| FEDERAL COMMUNICATIONS | ) | |
| COMMISSION and UNITED | ) | |
| STATES OF AMERICA, | ) | |
| Respondents. | ) | |

## CERTIFICATE AS TO PARTIES

Pursuant to the United States Court of Appeals for the District of Columbia Circuit Rules 8(a)(4) and 28(a)(1)(A), Free Press *et al*. hereby certify that the following parties participated in the reconsideration proceeding and agency stay pleadings that gave rise to this motion:

American Cable Association

Bristlecone Broadcasting LLC

Broadcasting Licenses, L.P.

CBS Corporation

Comcast Corporation

Common Cause

ION Media Networks, Inc.

Media Alliance

Media Mobilizing Project

Mountain Licenses, L.P.

National Association of Broadcasters

National Hispanic Media Coalition

NBCUniversal

Nexstar Media Group, Inc.

Office of Communication, Inc. of the United Church of Christ

PMCM TV, LLC

Prometheus Radio Project

Sinclair Broadcast Group, Inc.

Stainless Broadcasting, L.P.

Tribune Media Company

Trinity Christian Center of Santa Ana, Inc.

Univision Communications, Inc.

The Respondents in this case are the Federal Communications Commission and the United States.

The following parties have moved to intervene in this proceeding:

Sinclair Broadcast Group, Inc.

Twenty-First Century Fox, Inc.

Trinity Christian Center of Santa Ana, Inc.

Univision Communications, Inc.

Respectfully submitted,

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman
Institute for Public Representations
Georgetown University Law Center
600 New Jersey Avenue, NW
Room 312
Washington, DC 20001
(202) 662-9535
*Counsel for Free Press, et al.*

May 26, 2017

# Attachment A

*Order on Reconsideration*, Docket No. 13-326, released April 21, 2017, 82 Fed. Reg. 21124 (May 5, 2017)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule | ) | MB Docket No. 13-236 |
| | ) | |
| | ) | |

# ORDER ON RECONSIDERATION

**Adopted: April 20, 2017** **Released: April 21, 2017**

By the Commission: Chairman Pai and Commissioner O'Rielly issuing separate statements; Commissioner Clyburn dissenting and issuing a statement.

## TABLE OF CONTENTS

Heading Paragraph #

I. INTRODUCTION .......... 1
II. BACKGROUND .......... 2
III. DISCUSSION .......... 10
A. The UHF Discount and National Cap Should Have Been Considered In Tandem .......... 11
B. Grounds for Reconsideration .......... 17
IV. PROCEDURAL MATTERS .......... 19
A. Supplemental Final Regulatory Flexibility Analysis .......... 19
B. Paperwork Reduction Analysis .......... 20
C. Congressional Review Act .......... 21
V. ORDERING CLAUSES .......... 22
APPENDIX A – Final Rule
APPENDIX B – Supplemental Final Regulatory Flexibility Analysis

## I. INTRODUCTION

1. This Order on Reconsideration (Order) grants in part a Petition for Reconsideration (Petition) filed by ION Media Networks, Inc. (ION) and Trinity Christian Center of Santa Ana, Inc. (Trinity) (together, the Petitioners)[1] of the Report and Order eliminating the UHF discount[2] and reinstates the UHF discount. The UHF discount allows commercial broadcast television station owners to discount the audience reach of UHF stations when calculating their compliance with the national television ownership rule.[3] It is thus inextricably linked to the national ownership cap. When the Commission voted to get rid of the discount, however, it failed to consider whether this *de facto* tightening of the national cap was in the public interest and justified by current marketplace conditions. This mistake

[1] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Petition for Reconsideration of ION Media Networks and Trinity Christian Center of Santa Ana, Inc., MB Docket No. 13-236 (filed Nov. 23, 2016) (Petition). *See also Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Public Notice, 81 Fed. Reg. 89421 (Dec. 12, 2016).

[2] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, Report and Order, 31 FCC Rcd 10213 (2016) (*UHF Discount Order*).

[3] 47 CFR § 73.3555(e)(1).

renders our past action arbitrary and capricious. It also means that it was unwise from a public policy perspective. We thus are reinstating the UHF discount for the time being and will launch a comprehensive rulemaking proceeding later this year to determine whether to retain it and/or modify the national cap. Because we are reinstating the UHF discount, requests to reconsider and modify the grandfathering provisions applicable to broadcast station combinations affected by elimination of the discount are dismissed as moot.[4] For the same reason, the claim that failure to consider the need for a VHF discount in conjunction with elimination of the UHF discount is in error is also dismissed as moot.[5]

## II. BACKGROUND

2. The national television ownership rule prohibits a single entity from owning television stations that, in the aggregate, reach more than 39 percent of the total television households in the United States.[6] "Reach" is defined as the number of television households in the television Designated Market Area (DMA) to which each owned station is assigned.[7] No market is counted more than once, even if a station owner holds more than one station in the market.[8] In determining compliance with the 39 percent national audience reach cap, stations broadcasting in the VHF spectrum have been attributed with all television households in their DMAs, while UHF stations have been attributed with only 50 percent of the households in their DMAs (*i.e.*, the "UHF discount"), in recognition of technical limitations that restricted the audience reach of analog UHF stations.

3. The Commission first adopted national ownership restrictions for television broadcast stations in 1941, with the imposition of a numerical cap on the number of stations that could be commonly owned.[9] The numerical cap was increased several times, and the Commission eventually established a 12 station multiple ownership rule in 1984.[10]

4. In 1985, the Commission determined that both a station limit, restricting the total number of television stations a single entity could own, and a national television audience reach limit were necessary to protect localism, diversity, and competition.[11] Thus, in addition to reaffirming its prior decision to limit the number of television stations that a single entity could own, operate, or control to 12 stations, the Commission revised the national television multiple ownership rule to prohibit a single entity from owning television stations that collectively exceeded 25 percent of the total nationwide audience.[12] At the same time, the Commission adopted a 50 percent UHF discount to reflect the coverage limitations

---

[4] Petition at 5-9; Univision Communications Inc., Reply Comments in Support of Petition for Reconsideration at 7-9 (filed Jan. 27, 2017) (Univision Reply).

[5] Sinclair Broadcast Group, Inc., Reply to Oppositions to, and in Support of Petition for Reconsideration of ION Media Networks, Inc. and Trinity Christian Center of Santa Ana, Inc. at 5 (filed Jan. 27, 2017) (Sinclair Reply).

[6] 47 CFR § 73.3555(e)(1).

[7] *Id.* § 73.3555(e)(2)(i).

[8] *Id.* § 73.3555(e)(2)(ii).

[9] *Broadcast Services Other Than Standard Broadcast*, 6 Fed. Reg. 2282, 2284-85 (May 6, 1941) (prohibiting common ownership of more than three television stations).

[10] *Amendment of Section 73.3555 [formerly Sections 73.35, 73.240, and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations,* Report and Order, 100 FCC 2d 17, 54-56, paras. 108-12 (1984).

[11] *Amendment of Section 73.3555 [formerly Sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations,* Memorandum Opinion and Order, 100 FCC 2d 74, 87-92, paras. 30-41 (1985) (explaining that a numerical cap would prevent the acquisition of a substantial number of stations in small markets, while an audience reach cap would temper the ability of a single group owner to increase its audience base substantially by acquiring stations in the largest markets).

[12] *Id.* at 90-92, paras. 38-40.

faced by analog UHF stations.[13] The discount was intended to mitigate the competitive disadvantage that UHF stations suffered in comparison to VHF stations, as UHF stations were technically inferior, producing weaker over-the-air signals, reaching smaller audiences, and costing more to build and operate.[14] This technical inferiority, inherent in analog television broadcasting, was significant in 1985 because the vast majority of viewers received programming from broadcast television stations via over-the-air signals.

5. Eleven years later, in the Telecommunications Act of 1996 (1996 Act), Congress directed the Commission to modify its national television multiple ownership rule to increase the national audience reach cap from 25 percent to 35 percent.[15] Congress also directed the Commission to eliminate the restriction on the number of stations that an entity could own, operate or control nationwide.[16] Subsequently, the Commission reaffirmed the 35 percent national audience reach cap in its *1998 Biennial Review Order*, reasoning that it was premature to revise the cap until it had more time to observe the effects of raising the cap from 25 to 35 percent.[17] The United States Court of Appeals for the District of Columbia (D.C. Circuit) later remanded the *1998 Biennial Review Order* after finding that the decision to retain the national ownership rule was arbitrary and capricious. The D.C. Circuit found the Commission's "wait-and-see" approach to be inconsistent with its mandate to determine on a biennial basis whether the rules were in the public interest. In addition, the court found that the Commission failed to demonstrate that the national audience reach cap advanced competition, diversity, or localism.[18] In the *2002 Biennial Review Order*, the Commission determined the cap should be raised to 45 percent.[19] In both of these *Orders*, the Commission also considered and retained the UHF discount.

6. Following adoption of the *2002 Biennial Review Order* and while an appeal of that order was pending, Congress rolled back the cap increase by including a provision in the 2004 Consolidated Appropriations Act (CAA) directing the Commission to modify its rules to set the cap at 39 percent of national television households.[20] The CAA further amended Section 202(h) of the 1996 Act to require a quadrennial review of the Commission's broadcast ownership rules, rather than the previously mandated biennial review. In doing so, however, Congress excluded consideration of "any rules relating to the 39 percent national audience reach limitation" from the quadrennial review requirement.[21]

7. Prior to the enactment of the CAA, several parties had appealed the Commission's *2002 Biennial Review Order* to the U.S. Court of Appeals for the Third Circuit (Third Circuit). In June 2004, the Third Circuit found that the challenges to the Commission's actions with respect to the national

---

[13] *Id.* at 88-94, paras. 33-44.

[14] *Id.*

[15] Telecommunications Act of 1996, Pub. L. No. 104-04, § 202(c)(1), 110 Stat. 56, 111 (1996) (1996 Act); *see also Implementation of Sections 202(c)(1) and 202(e) of the Telecommunications Act of 1996 (National Broadcast Television Ownership and Dual Network Operations)*, Order, 11 FCC Rcd 12374 (1996). The 1996 Act did not direct the Commission to amend the UHF discount. *Id.* at 12375, para. 4.

[16] Telecommunications Act of 1996, Pub. L. No. 104-04, § 202(c)(1), 110 Stat. 56, 111 (1996).

[17] *1998 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Biennial Review Report, 15 FCC Rcd 11058, 11072-75, paras. 25-30 (2000) (*1998 Biennial Review Order*).

[18] *See Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1040-49, *modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002).

[19] *2002 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13814, para. 499 (2003) (*2002 Biennial Review Order*).

[20] Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (CAA).

[21] *Id.*

audience reach cap and the UHF discount were moot as a result of Congress's action.[22] Specifically, the court held that the CAA rendered moot the challenges to the Commission's decision to retain the UHF discount.[23] The court found that the CAA insulated the national audience reach cap, including the UHF discount, from the Commission's quadrennial review of its media ownership rules.[24] In February 2008, the Commission similarly concluded in the *2006 Quadrennial Review Order* that "the UHF discount is insulated from review under Section 202(h)" as a result of the CAA, and thus beyond the parameters of the quadrennial review requirement.[25]

8. On June 13, 2009, the Commission completed the transition from analog to digital television broadcasting for full-power stations. While UHF channels were inferior for purposes of broadcasting in analog, the DTV transition affirmed the Commission's longstanding belief that digital broadcasting would eliminate the technical disparity between UHF and VHF signals. In fact, experience has confirmed that UHF channels are equal, if not superior, to VHF channels for the transmission of digital television signals.[26] Therefore, the Commission opened this proceeding to consider eliminating the UHF discount in 2013.[27] Then-Commissioner Pai dissented from the *UHF Discount NPRM*. He contended that while it was appropriate to examine eliminating the UHF discount, any such rulemaking should and must also evaluate whether the national cap should be modified.[28] The *UHF Discount NPRM*, however, did not seek comment on that topic.

9. The Commission eliminated the UHF discount in August 2016, finding that UHF stations are no longer technically inferior to VHF stations following the digital television transition and that the competitive disparity between UHF and VHF stations had disappeared. Then-Commissioner Pai and Commissioner O'Rielly dissented from this decision. Then-Commissioner Pai noted, "It is undeniable that eliminating the UHF discount has the effect of expanding the scope of the national cap rule. Companies . . . that are currently in compliance with the national cap ownership rule will be above the cap once the UHF discount is terminated. Yet, the Commission has refused to review whether the current national cap ownership rule is sound or whether there is a need to make it more stringent, which is precisely what [the *UHF Discount Order*] does."[29] On November 23, 2016, ION and Trinity filed their Petition for Reconsideration (Petition).[30] Free Press, the National Hispanic Media Coalition, Common Cause, Media Alliance and the United Church of Christ Office of Communication, Inc. (Public Interest Opponents) and the American Cable Association (ACA) filed Oppositions to the Petition on January 10,

---

[22] *Prometheus Radio Project v. FCC*, 373 F.3d 372, 395-97 (3d Cir. 2004) (*Prometheus I*).

[23] *Id.*

[24] *Prometheus I*, 373 F. 3d at 396-97.

[25] *2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2084-85, para. 143 (2008) (*2006 Quadrennial Review Order*), *aff'd in part, rev'd in part sub nom. Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011).

[26] *See, e.g.*, *Innovation in the Broadcast Television Bands: Allocations, Channel Sharing and Improvements to VHF*, Notice of Proposed Rulemaking, 25 FCC Rcd 16498, 16511, para. 42 (2010) (recognizing the utility of the digital UHF band while seeking comment on ways to improve reception of digital VHF channels); *2002 Biennial Review Order*, 18 FCC Rcd at 13847, para. 591; *1998 Biennial Review Order*, 15 FCC Rcd at 11080, para. 38.

[27] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 28 FCC Rcd 14324, 14327, para. 9 (2013) (*UHF Discount NPRM*).

[28] *Id.* at 14344.

[29] *UHF Discount Order,* 31 FCC Rcd at 10248.

[30] *See supra* note 2.

2017.[31] The National Association of Broadcasters (NAB), Sinclair Broadcast Group, Inc. (Sinclair), Nexstar Broadcasting, Inc. (Nexstar), Univision Communications Inc. (Univision), and various TV licensees filed comments or replies supporting the Petition[32] on January 10 and 23, 2017.[33]

## III. DISCUSSION

10. We find that the Petitioners and their supporters provide valid reasons to reconsider our decision to eliminate the UHF discount. The UHF discount and the national audience reach cap are closely linked, and we find that the Commission failed to provide a reasoned basis to eliminate the discount in isolation without also fully considering whether the cap should be modified. Accordingly, we reinstate the UHF discount. We will open a rulemaking proceeding later this year to consider whether the national audience reach cap should be modified and the UHF discount should be eliminated.

### A. The UHF Discount and National Cap Should Have Been Considered In Tandem

11. Petitioners and others supporting reconsideration assert that the Commission should not have eliminated the UHF discount without adducing further evidence that this action would be in the public interest.[34] The Petitioners argue that in eliminating the discount the Commission actually harmed the public interest by increasing the competitive disparity between broadcasters and other video programming distributors.[35] CBS and Sinclair point further to a lack of evidence that the public interest would be harmed by retaining the UHF discount.[36] In addition, NAB argues that, by eliminating the UHF discount in isolation, the Commission was not able to determine whether the change promotes the public interest purposes of the cap itself.[37]

12. The history of the UHF discount and national audience reach cap demonstrates that, with the exception of the *UHF Discount Order*, the Commission has always considered the UHF discount together with the national cap.[38] Referring to this history, Nexstar argues that, because the cap establishes

---

[31] Free Press, the National Hispanic Media Coalition, Common Cause, Media Alliance and the United Church of Christ Office of Communication, Inc., Opposition of Public Interest Commenters to Petition for Reconsideration of ION Media Networks and Trinity Christian Center of Santa Ana, Inc. (filed Jan. 10, 2017) (Public Interest Opp.); American Cable Association, Opposition to Reconsideration (filed Jan. 10, 2017) (ACA Opp.).

[32] National Association of Broadcasters, Reply to Oppositions to Petition for Reconsideration (filed Jan. 27, 2017) (NAB Reply); Nexstar Broadcasting Inc., Comments in Support of Petition for Reconsideration (filed Jan. 10, 2017) (Nexstar Comments), Reply Comments in Support of Petition for Reconsideration (filed Jan. 27, 2017) (Nexstar Reply); Mountain Licenses, L.P., Broadcasting Licenses, L.P., Stainless Broadcasting L.P., and Bristlecone Broadcasting LLC (TV Licensees), Comments (filed Jan. 10, 2017) (TV Licensee Comments). *See also* Sinclair Reply, Univision Reply.

[33] Separate from this proceeding, Twenty-First Century Fox filed two petitions for review of the *UHF Discount Order* with the District of Columbia Circuit Court of Appeals. *Twenty-First Century Fox, Inc. v. FCC*, No. 16-1324, D.C. Cir. (filed Sept. 16, 2016); *Twenty-First Century Fox, Inc. v. FCC*, No. 16-1375, D.C. Cir. (filed Oct. 28, 2016). The Court has granted the Commission's motion to hold its review in abeyance until the Commission acts on this Petition. Order, *Twenty-First Century Fox, Inc. v. FCC*, No. 16-1375, D.C. Cir. (Dec. 21, 2016).

[34] Petition at 4. *See also* Nexstar Reply at 4.

[35] Letter from Robert M. McDowell, Counsel to ION Media Networks to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236 at 2 (filed Jan. 11, 2017) (ION Jan. 11, 2017, *Ex Parte* Letter).

[36] Letter from Anne Lucey, CBS Government Affairs to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236 at 1 (filed Jan. 17, 2017) (CBS Jan. 17, 2017, *Ex Parte* Letter), Letter from Anne Lucey, CBS Government Affairs to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236 at 1 (filed Jan. 23, 2017) (CBS Jan. 23, 2017, *Ex Parte* Letter); Sinclair Reply at 2, 4.

[37] NAB Reply at 2-3; Letter from Rick Kaplan, General Counsel and Executive Vice President, National Association of Broadcasters to Marlene H. Dortch, Secretary, FCC at 1 (filed Feb. 9, 2017) (NAB Feb. 9, 2017, *Ex Parte* Letter).

[38] *See supra* paras 2-8; NAB Reply at 3.

a limit and the discount defines how to calculate whether the limit is reached, the cap and discount are "inextricably intertwined."[39] Petitioners assert that the national cap and discount "go hand-in-hand; the FCC has no authority to change one without at least reviewing the impact that the change will have on the other."[40] Sinclair similarly asserts that the Commission erred in eliminating the UHF discount without reviewing the national audience reach cap, and urges the Commission, in any review of the cap, to eliminate it entirely.[41]

13. While the Commission determined in the *UHF Discount Order* that it should eliminate the discount without simultaneously reassessing the cap,[42] arguments presented by Petitioners and their supporters persuade us that the Commission erred. Any adjustment to the UHF discount affects compliance with the national audience reach cap, and the elimination of the discount has the effect of substantially tightening the cap in some cases.[43] In the *UHF Discount Order*, however, the Commission never explained why tightening the cap was in the public interest or justified by current marketplace conditions. It presented no examples of how the current cap, including the UHF discount, was harming competition, diversity, or localism. We therefore believe that eliminating the UHF discount on a piecemeal basis, without considering the national cap as a whole, was arbitrary and capricious. We also conclude that it was unwise from a public policy perspective.

14. Contrary to ACA's claims that consideration of the discount without consideration of the cap was appropriate,[44] we find that the Commission erred by eliminating the discount and thus substantially tightening the impact of the cap, without considering whether the cap should be raised to mitigate the regulatory impact of eliminating the UHF discount. While we do not disagree with Opponents' assertion that the UHF discount no longer has a sound technical basis following the digital television transition,[45] the Commission failed to provide a reasoned explanation for eliminating the discount without conducting a broader review of the cap, which it deferred indefinitely. Reliance on the self-imposed narrow scope of the *UHF Discount NPRM* was not a sound basis for the Commission to conclude that it could not consider the broader public interest issues posed by retaining the national cap while eliminating the UHF discount, which had the effect of substantially tightening the national cap.[46] Nothing prevented the Commission from issuing a broader notice at the outset or broadening the scope of the proceeding by issuing a further notice to consider whether the public interest would be served by

---

[39] Nexstar Reply at 7; *see also* Nexstar Comments at 2-3; NAB Reply at 3, NAB Feb. 9, 2017, *Ex Parte* Letter at 1; Univision Reply at 4-5.

[40] Petition at 2.

[41] Sinclair Reply at 1-2. We dismiss as moot the further claim that the Third Circuit's recent decision vacating the Commission's joint sales agreement (JSA) attribution rule requires the Commission to review the discount and cap together. Petition at 3-4; NAB Reply at 4; Sinclair Reply at 6-7; Nexstar Reply at 8; TV Licensee Comments at 4; *UHF Discount Order*, dissenting statement of then-Commissioner Pai, 31 FCC Rcd at 10247-48, dissenting statement of Commissioner O'Rielly, 31 FCC Rcd at 10251, citing *Prometheus Radio Project v. FCC*, 824 F. 3d 33 (3d Cir. 2016) (*Prometheus III*). As we intend to review the discount and cap together as a matter of sound policy and logic, we need not reach the question of whether we are required do so as a result of *Prometheus III.*

[42] *UHF Discount Order*, 31 FCC Rcd at 10232-33, para. 40 ("Continued application of the discount absent its technical justification simply distorts the operation of the national audience reach cap by exempting the portions of the audience that are receiving a signal from being counted and allowing licensees that operate on UHF channels to reach more than 39 percent of viewers nationwide. Removal of the analog-era discount thus maintains the efficacy of the national cap.").

[43] *See UHF Discount Order*, dissenting statement of then-Commissioner Pai, 31 FCC Rcd at 10248.

[44] ACA Opp. at 5, 8-10, citing *UHF Discount Order,* 31 FCC Rcd at 10232-33, para 40.

[45] Public Interest Opp. at 1, 6; ACA Opp. at 6, 9-10.

[46] *See UHF Discount Order,* 31 FCC Rcd at 10232, para. 40, 10249, dissenting statement of then-Commissioner Pai.

retaining the cap while eliminating the UHF discount.[47] Indeed, one Commissioner at the time asked for these issues to be teed up in the *UHF Discount NPRM*.[48]

15. This error is all the more problematic because, as Univision notes, the Commission has acknowledged, both in the record of this proceeding and in the most recent quadrennial media ownership review, the greatly increased options for consumers in the selection and viewing of video programming since Congress directed the Commission to modify the cap in 2004.[49] The *UHF Discount Order*, however, failed to adequately consider the impact of those changes on the appropriateness of eliminating the UHF discount while not adjusting the national cap. We agree with Nexstar that the Commission should have considered these changes and assessed the current need for a 39 percent national cap before eliminating the UHF discount and tightening the cap for some station groups, particularly in view of the industry's reliance on the UHF discount to develop long-term business strategies.[50] Although the Commission concluded that the digital transition eliminated the audience reach disadvantage for UHF stations, it failed to consider current marketplace conditions or whether taking an action that would have the impact of substantially tightening the cap was in the public interest.[51] Accordingly, we find it necessary to rectify the Commission's error by reinstating the discount so that we can consider it as part of a broader reassessment of the national audience reach cap, which we will begin later this year.[52]

### B. Grounds for Reconsideration

16. The record in response to the Petition demonstrates disagreement on the factors that can support granting a petition for reconsideration. The Opponents claim that the Petition must be denied because it fails to present new facts or arguments not already considered and answered by the Commission in the underlying *UHF Discount Order*.[53] On the other hand, Nexstar claims that Section

---

[47] NAB Reply at 7-8; Sinclair Reply at 4-5; Nexstar Reply at 4-6, 7-8, Nexstar Comments at 2, 4. *See also UHF Discount Order*, dissenting statement of then-Commissioner Pai, 31 FCC Rcd at 10247-48.

[48] *See supra* para. 8.

[49] Univision Reply at 5-6, citing *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996,* Second Report and Order, 31 FCC Rcd 9864 (2016). Univision claims that consideration of this competition would be consistent with the D.C. Circuit ruling overturning the Commission's ownership limit for cable operators. Univision Reply at 6-7, citing *Comcast Corp. v. FCC*, 579 F. 3d 1 (D.C. Cir. 2009). *See also* Petition at 3-4; Sinclair Reply at 2; Nexstar Comments at 5, Nexstar Reply at 4.

[50] Nexstar Comments at 5-6, citing *UHF Discount Order*, dissenting statement of then-Commissioner Pai, 31 FCC Rcd at 10249; ION Jan. 11, 2017, *Ex Parte* Letter at 1 (asserting that the elimination of the UHF discount without adequate grandfathering relief "was entirely inconsistent with the Commission's decades-long policy of encouraging competition and diversity in the video marketplace by allowing and urging groups such as ION and Trinity to utilize the UHF Discount to create new broadcast stations and networks to challenge the big established players").

[51] The argument that VHF-to-UHF conversions at the end of the digital transition afforded some station groups additional "headroom" to acquire more stations is more appropriately considered in the rulemaking that will be initiated later this year and is not relevant to the question of whether we should have considered eliminating the UHF discount in tandem with a broader evaluation of the national ownership cap. *See* Letter from Andrew Schwartzman, Institute for Public Representation to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236 at 2, 7-11 (filed April 13, 2017)(IPR April 13, 2017, *Ex Parte* Letter). Moreover, as noted above, the *UHF Discount Order* failed to evaluate whether current marketplace conditions justified implementing a policy that would have the impact of tightening the cap, even though the *UHF Discount Order* was adopted more than seven years after the digital transition.

[52] We note that this is consistent with the approach advocated by CBS and Univision to avoid delay in reinstating the UHF discount, but still consider the discount and the national audience reach cap in tandem. CBS Jan. 17, 2017, *Ex Parte* Letter at 1, CBS Jan. 23, 2017, *Ex Parte* Letter at 1; Univision Reply at 7. *See also* NAB Feb. 9, 2017, *Ex Parte* Letter at 1.

[53] Public Interest Opp. at 1, 6, 7; ACA Opp. at 2, 4-5, 8, 11.

1.429 of our rules, which governs petitions for reconsideration, should not be interpreted to "preclude a petitioner for reconsideration from raising any argument that was mentioned in the underlying Commission order or a dissenting statement."[54] Neither the Communications Act nor Commission rules preclude the Commission from granting petitions for reconsideration that fail to rely on new arguments.[55] Commission precedent establishes that reconsideration is generally appropriate where the petitioner shows either a material error or omission in the original order or raises additional facts not known or not existing until after the petitioner's last opportunity to respond.[56]

17. The Petition, while reiterating some arguments made in response to the *UHF NPRM*, nonetheless provides valid grounds for the Commission to reconsider its previous action eliminating the UHF discount.[57] As discussed above, we find that the Commission failed to fully consider important arguments and lacked a reasoned basis for its conclusion that action on the discount should not be combined with a broader review of the national cap. These are sufficient grounds under Section 1.429 for the Commission to reconsider its previous action even absent new facts or arguments.[58] We therefore

---

[54] Nexstar Reply at 2.

[55] *See* 47 U.S.C. §405 ("[I]t shall be lawful for . . . the Commission . . ., in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. . . . The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate . . . ."); 47 CFR § 1.429 (i) ("The Commission may grant the petition for reconsideration in whole or in part or may deny or dismiss the petition. Its order will contain a concise statement of the reasons for the action taken.").

[56] *See, e.g., Petition for Reconsideration by Acadiana Cellular General Partnership*, Order on Reconsideration, 20 FCC Rcd 8660, 8663, para. 8 (2006); *Universal Serv. Contribution Methodology Fed.-State Joint Bd. on Universal Serv. Glob. Conference Partners, A+ Conference Ltd., Free Conferencing Corp., & the Conference Grp*., 27 FCC Rcd 898, 901 (2012), *rev. dismissed in part and denied in part, Conference Grp., LLC v. FCC*, 720 F.3d 957, 958 (D.C. Cir. 2013) ("Reconsideration of a Commission's decision may be appropriate when the petitioner demonstrates that the original order contains a material error or omission, or raises additional facts that were not known or did not exist until after the petitioner's last opportunity to present such matters. If a petition simply repeats arguments that were previously considered and rejected in the proceeding, the Commission may deny them for the reasons already provided."). Even if a petition is repetitious, the Commission can, in its discretion, consider it. *See id.* (Commission "may deny" repetitious petition); *Application of Paging Sys., Inc.*, 22 FCC Rcd 4602, 4604 n.23 (WTB 2007) (considering repetitious petition on the merits, even though staff could dismiss it); *Sequoia Cablevision*, 58 FCC 2d 669 (1976) (decision by the full Commission partially granting a repetitious petition for reconsideration of an order denying reconsideration despite the alleged procedural defect because "the language of Section 1.106(k)(3) of the Rules [applicable to petitions for reconsideration of orders denying reconsideration] is permissive, not mandatory"). *See also* NAB Reply at 8 (stating that dismissal of "repetitious" petitions is permissive, not mandatory).

[57] We note that NAB, Sinclair and Nexstar analyze Section 1.429(l) of the Commission's rules, which states that, among other reasons, petitions for reconsideration may be denied by the relevant bureau if they "[f]ail to identify any material error, omission, or reason warranting reconsideration", or "[r]ely on arguments that have been fully considered and rejected by the Commission within the same proceeding." 47 CFR § 1.429(l). The parties supporting reconsideration argue that this section permits, but does not require, Commission bureaus and offices to deny petitions on such procedural grounds. NAB Reply at 8; Sinclair Reply at 3-4; Nexstar Reply at 2-3. Section 1.429(l) delegates authority to the relevant bureau or office to dismiss petitions for reconsideration of Commission action "that plainly do not warrant consideration by the Commission," and provides examples of such petitions. That section has no relevance here, where the full Commission is reviewing a petition for reconsideration and finds that it provides valid reasons for reconsideration.

[58] 47 CFR § 1.429.

reinstate the UHF discount,[59] and will open a proceeding later this year to consider whether it is in the public interest to modify the national audience reach rule, including the UHF discount.[60]

---

[59] Because we are reinstating the UHF discount, we also consider moot and do not address in this Order the suggestion made in Sinclair's Reply to Opposition that we establish a VHF discount in connection with the elimination of the UHF discount. Sinclair Reply at 5. PMCM opposes reinstatement of the UHF discount but states that, if it is reinstated, the Commission should also adopt a VHF discount. *Ex Parte* Comments of PMCM TV, LLC, at 1, 2-3, MB Docket No. 13-236, filed April 3, 2017. Letter from Donald J. Evans, Counsel for PMCM TV, LLC to Marlene H. Dortch, Secretary, FCC at 1-2, MB Docket No. 13-236, filed April 13, 2017. PMCM has not previously participated in this proceeding and raises a new argument for the first time in an *ex parte* comment filed well after the close of the pleading cycle on the petition for reconsideration. In effect, PMCM's *ex parte* is an out-of-time opposition to the petition for reconsideration, and we reject it for that reason. 47 CFR 1.429(f) (oppositions to a petition for reconsideration must be filed no later than 15 days after public notice of the petition). PMCM offers no reason it could not have raised this issue in a timely manner. Moreover, PMCM's proposal that the Commission adopt a VHF discount in conjunction with reinstatement of the UHF discount is inconsistent with our conclusion above that the Commission should consider the UHF discount in the context of a broader review of the national cap in a rulemaking proceeding to be initiated later this year. We are reinstating the UHF discount for that purpose. We will not prejudge that review by adopting a VHF discount in conjunction with our reinstatement of the UHF discount.

[60] The Institute for Public Representation (IPR), Common Cause, and the United Church of Christ Office of Communication, Inc., (UCC) Prometheus Radio Project, and Media Mobilizing Project belatedly assert that the Commission lacks authority to modify the cap and that therefore it would be arbitrary and capricious for the Commission to reinstate the discount in order to consider in a future rulemaking proceeding whether the cap and discount should be modified. Letter from Andrew Schwartzman, IPR to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236 at 1 (filed April 11, 2017)(IPR April 11, 2017, *Ex Parte* Letter); IPR April 13, 2017 Ex Parte Letter at 2-3. These parties raise this argument and others for the first time well after the close of the pleading cycle on the petition for reconsideration and offer no reason why they could not have raised these arguments earlier. Prometheus Radio Project and Media Mobilizing Project have not previously participated in this proceeding. In effect, these *ex parte* filings are out-of-time oppositions, and we reject them for that reason. 47 CFR 1.429(f). Alternatively and independently, however, we find that these new arguments lack merit. First, the parties fail to support their assertion that the Commission lacks authority to modify the cap, ignoring the Commission's prior analysis and conclusion that it has such authority, which remains undisturbed. IPR April 11, *Ex Parte* Letter at 1; Eshoo Letter at 1. *See also UHF Discount Order*, 31 FCC Rcd at 10222-24, paras. 21-24. Furthermore, if the Commission was wrong about its authority to modify the cap, then it follows that the Commission does not have authority to eliminate the discount, which was part of the cap, and the *UHF Discount Order* would need to be vacated for that reason. Indeed, while the parties principally cite Commissioner O'Rielly's dissenting statement in support of their argument, they fail to mention that Commissioner O'Rielly specifically said in his statement that the Commission lacked the authority to eliminate the UHF discount. IPR April 11, 2017, *Ex Parte Letter* at 1. *See also UHF Discount Order*, dissenting statement of Commissioner O'Rielly, 31 FCC Rcd at 10251. Second, we disagree with the argument that, even if the Commission has authority to modify the cap, it would be arbitrary and capricious to reinstate the UHF discount when the Commission may decide at the conclusion of the new rulemaking proceeding not to adjust the cap. IPR April 11, 2017, *Ex Parte* Letter at 1-2. As IPR, Common Cause and UCC suggest, the full Commission may decide not to adjust the cap, but they fail to show that our rationale for considering these issues in tandem is flawed. *Id*. Further, we are unpersuaded by the unsupported claim that reinstating the UHF discount pending a broader review of the cap is analogous to deciding whether to waive a rule based on hypothetical future decisions and therefore would conflict with our waiver policies. *Id.* at 2. The two situations are readily distinguishable. In this case, we are reconsidering the elimination of one part of a rule so that we can re-assess the rule in light of relevant factors that the Commission erroneously failed to consider earlier. When we consider waiver petitions, in contrast, we must determine whether to forgo enforcement of a rule based on a balancing of public interest considerations weighing for and against waiver. The IPR, Common Cause and UCC analogy is inapposite. Finally, the prospect of additional consolidation following reinstatement of the cap (IPR April 13, 2017, *Ex Parte* letter at 2, 7-11; Eshoo Letter at 1) does not negate the rationale for our action, as explained above at paras. 14-15. The relative harms and benefits of future consolidation will be addressed in the rulemaking proceeding to be initiated later this year. Moreover, it is important to note that the Commission did not examine marketplace conditions when it decided to eliminate the UHF discount.

## IV. PROCEDURAL MATTERS

### A. Supplemental Final Regulatory Flexibility Analysis

18. As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[61] the Commission has prepared a Supplemental Final Regulatory Flexibility Analysis (FRFA) relating to this Report and Order in MB Docket No. 13-236. The Supplemental FRFA is set forth in Appendix B.

### B. Paperwork Reduction Analysis

19. This document does not contain proposed information collection(s) subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. In addition, therefore, it does not contain any new or modified information collection burden for small business concerns with fewer than 25 employees, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4).

### C. Congressional Review Act

20. The Commission will send a copy of this Order on Reconsideration to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

## V. ORDERING CLAUSES

21. Accordingly, **IT IS ORDERED** that, pursuant to the authority contained in Section 405(a) of the Communications Act of 1934, 47 U.S.C. § 405(a), and Section 1.429 of the Commission's rules, 47 C.F.R. § 1.429, the Petition for Reconsideration filed by ION Media Networks, Inc. and Trinity Christian Center of Santa Ana, Inc. on November 23, 2016, **IS GRANTED IN PART** and otherwise **IS DISMISSED AS MOOT,** to the extent provided herein.

**22. IT IS FURTHER ORDERED** that pursuant to the authority contained in Sections 1, 2(a), 4(i), 4(j), 303(r), 307, 309, and 310 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 154(j), 303(r), 307, 309, and 310, this Order on Reconsideration **IS ADOPTED**. The rule modification discussed in this Order on Reconsideration and set forth in Appendix A attached hereto shall be effective thirty (30) days after publication of the text or summary thereof in the *Federal Register*.

23. **IT IS FURTHER ORDERED** that the Commission **SHALL SEND** a copy of this Order on Reconsideration to Congress and to the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

24. **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this Order on Reconsideration, including the Supplemental Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[61] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. § 601 *et seq.*, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996). The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996 (CWAAA).

# APPENDIX A

## Final Rule

**PART 73 – RADIO BROADCAST SERVICES**

1. The authority citation for Part 73 continues to read as follows:

AUTHORITY: 47 U.S.C. 154, 303, 334, 336 and 339.

2. Amend § 73.3555 by revising paragraph (e) to read as follows:

**§ 73.3555 Multiple ownership.**

* * * * *

(e) National television multiple ownership rule.

(1) No license for a commercial television broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners, members, officers or directors having a cognizable interest in television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent.

(2) For purposes of this paragraph (e):

(i) National audience reach means the total number of television households in the Nielsen Designated Market Areas (DMAs) in which the relevant stations are located divided by the total national television households as measured by DMA data at the time of a grant, transfer, or assignment of a license. For purposes of making this calculation, UHF television stations shall be attributed with 50 percent of the television households in their DMA market.

* * * * *

## APPENDIX B

### Supplemental Final Regulatory Flexibility Analysis

1. In compliance with the Regulatory Flexibility Act (RFA),[1] this Supplemental Final Regulatory Flexibility Analysis (SFRFA) supplements the Final Regulatory Flexibility Analysis (FRFA) included in the *UHF Discount Order*,[2] to the extent that changes adopted on reconsideration require changes in the conclusions reached in the FRFA. As required by the RFA,[3] the FRFA was preceded by an Initial Regulatory Flexibility Analysis (IRFA) incorporated in the *UHF Discount NPRM*, which sought public comment on the proposals in the *UHF Discount NPRM*.[4]

**A. Need for, and Objective of, the Order**

2. This Order on Reconsideration reinstates the UHF discount in the Commission's national television multiple ownership rule. The national television multiple ownership rule currently prohibits a single entity from owning television stations that, in the aggregate, reach more than 39 percent of the total television households in the nation.[5] At the time the cap was first established, when all broadcasting used analog technology, UHF broadcasting was considered technically inferior to VHF broadcasting. Therefore, the UHF discount provided television stations broadcasting in the UHF spectrum with a discount by attributing those stations with only 50 percent of the television households in their Designated Market Areas.[6] The *UHF Discount Order* eliminated the UHF discount, finding that UHF stations are no longer technically inferior to VHF stations following the transition to digital television broadcasting, and that the competitive disparity between UHF and VHF stations had disappeared.[7]

3. In this Order on Reconsideration we reinstate the UHF discount, finding that it impacts the 39 percent national audience reach cap established by Congress in 2004.[8] We further determine that, because the UHF discount affects calculation of compliance with the national audience reach cap, the discount and cap are linked and the public interest is better served by considering the discount and cap in tandem.[9] Rather than potentially tightening the national audience reach cap in some cases by eliminating the UHF discount, the reinstatement of the discount returns broadcasters to the status quo ante for purposes of calculating their compliance with the cap. The Commission will initiate a rulemaking proceeding later this year to consider whether it is in the public interest to modify the national audience reach rule, including the UHF discount.

---

[1] *See* 5 U.S.C. § 604.

[2] *UHF Discount Order*, 31 FCC Rcd at 10242-45, App. B, paras 1-13.

[3] 5 U.S.C. § 603.

[4] *UHF Discount NPRM*, 28 FCC Rcd at 14337-40, App. B, paras. 1-11.

[5] 47 CFR § 73.3555(e)(1).

[6] *See Amendment of Section 73.3555 [formerly Sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations,* Memorandum Opinion and Order, 100 FCC 2d 74, 92-94, paras. 42-44 (1985).

[7] *UHF Discount Order*, 31 FCC Rcd at 10213, para. 1, 10214, para. 3, 10219, para.14, 10220, para. 16, 10226, para. 28, 10227-28, para. 33, 10230-31, para. 37.

[8] Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (CAA). *See also supra* para. 11.

[9] *See supra* para. 11.

### B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA and FRFA

4. No public comments were submitted in response to the IRFA or FRFA.

### C. Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

5. The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

### D. Description and Estimate of the Number of Small Entities to Which this Order will Apply

6. The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted in this Order on Reconsideration.[10] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[11] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[12] A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[13] The FRFA accompanying the *UHF Discount Order* described and estimated the number of small entities that would be affected by elimination of the UHF discount.[14] Reinstatement of the UHF discount in this Order on Reconsideration applies to the same entities affected by elimination of the discount.

7. *Television Broadcasting*. This Economic Census category "comprises establishments primarily engaged in broadcasting images together with sound."[15] These establishments operate television broadcast studios and facilities for the programming and transmission of programs to the public.[16] These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule. Programming may originate in their own studio, from an affiliated network, or from external sources. The SBA has created the following small business size standard for such businesses: those having $38.5 million or less in annual receipts.[17] The 2012 Economic Census reports that 751 firms in this category operated in that year. Of that number, 656 had annual receipts of $25,000,000 or less, 25 had annual receipts between $25,000,000 and $49,999,999 and 70 had annual receipts of $50,000,000 or more.[18]

---

[10] 5 U.S.C. § 603(b)(3).

[11] *Id.* § 601(6).

[12] *Id.* § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632). Pursuant to the RFA, the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register." 5 U.S.C. § 601(3).

[13] 15 U.S.C. § 632.

[14] 31 FCC Rcd at 10243-44, App. B, paras. 7-9.

[15] U.S. Census Bureau, 2017 NAICS Definitions, "515120 Television Broadcasting," http://www.census.gov./cgi-bin/sssd/naics/naicsrch (last viewed Feb. 28, 2017).

[16] *Id.*

[17] 13 CFR § 121.201; 2017 NAICS code 515120.

[18] U.S. Census Bureau, Table No. EC1251SSSZ4, *Information: Subject Series - Establishment and Firm Size: Receipts Size of Firms for the United States: 2012* (515120 Television Broadcasting). https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2012_US_51SSSZ4&prodType=table (visited Feb. 28, 2017).

Based on this data we therefore estimate that the majority of commercial television broadcasters are small entities under the applicable SBA size.

8. The Commission has estimated the number of licensed commercial television stations to be 1,384.[19] Of this total, 1,275 stations (or about 92 percent) had revenues of $38.5 million or less, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on February 24, 2017, and therefore these licensees qualify as small entities under the SBA definition. In addition, the Commission has estimated the number of licensed noncommercial educational (NCE) television stations to be 394.[20] Notwithstanding, the Commission does not compile and otherwise does not have access to information on the revenue of NCE stations that would permit it to determine how many such stations would qualify as small entities.

9. We note, however, that in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[21] must be included. Our estimate, therefore, likely overstates the number of small entities that might be affected by our action because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. In addition, an element of the definition of "small business" is that the entity not be dominant in its field of operation. We are unable at this time to define or quantify the criteria that would establish whether a specific television station is dominant in its field of operation. Accordingly, the estimate of small businesses to which rules may apply does not exclude any television station from the definition of a small business on this basis and is therefore possibly over-inclusive.

### E. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements

10. The FRFA accompanying the *UHF Discount Order* stated that elimination of the UHF discount modified calculation of compliance with the national audience reach cap and would affect reporting, recordkeeping, or other compliance requirements.[22] Specifically, the Commission would have potentially needed to modify FCC forms or related instructions pursuant to the *UHF Discount Order*.[23] This Order on Reconsideration reinstates the UHF discount, thereby maintaining the current methodology for calculating compliance with the cap. Therefore, no changes to FCC forms or instructions will be necessary and the reporting, recordkeeping, and other compliance requirements will not be affected. Thus, reinstatement of the UHF discount will not impose additional obligations or expenditure of resources on small businesses.

### F. Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

11. In this Order on Reconsideration we reinstate our previous rule allowing television stations broadcasting in the UHF spectrum a discount in calculating compliance with the national audience reach cap. This action reinstates prior reporting, recordkeeping and other compliance requirements for all television broadcasters, including small entities.

---

[19] *Broadcast Station Totals as of December 31, 2016*, Press Release (MB, rel. January 5, 2017) https://www.fcc.gov/document/broadcast-station-totals-december-31-2016 (visited Feb. 28, 2017).

[20] *Id.*

[21] "[Business concerns] are affiliates of each other when one [concern] controls or has the power to control the other, or a third party or parties controls or has to power to control both." 13 CFR § 121.103(a)(1).

[22] *UHF Discount Order*, 31 FCC Rcd at 10243, App. B, para. 10. The FRFA further stated that the impact of these changes would be the same on all entities, compliance was not anticipated to require the expenditure of any additional resources, or place any additional obligations on small businesses. *Id.*

[23] *Id.*

12. We will open a new proceeding within the year to consider the UHF discount and national cap in tandem. We determined in this Order on Reconsideration that the discount and cap were linked and that considering them in tandem would better serve the public interest than simply eliminating the discount alone.[24] We anticipate that examining the discount and cap together will positively impact broadcasters, including small entities, and avoid the potential harms described by Petitioners and their supporters.[25]

### G. Report to Congress

13. The Commission will send a copy of this Order on Reconsideration, including this Supplemental FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act[26] and to the Chief Counsel for Advocacy of the Small Business Administration. A copy of this Order on Reconsideration and Supplemental FRFA (or summaries thereof) will also be published in the Federal Register.[27]

---

[24] *See supra* paras. 11, 14-15.

[25] *See supra* paras. 14-15. We note that one of the two Petitioners, Trinity, may qualify as a small entity. *See* Small Business Size Standards: Information, 77 Fed. Reg. 72702, 72705 (Dec. 6, 2012). *See also* 13 CFR § 121.201, NAICS code 515120.

[26] 5 U.S.C. § 801(a)(1)(A).

[27] 5 U.S.C. § 604(b).

## STATEMENT OF
## CHAIRMAN AJIT PAI

Re: *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236.

Some things are inextricably linked. Penn Jillette will be forever tied to Teller. Daryl Hall will forever be tied to John Oates. Toni Tennille will forever be tied to the Captain. And the Cleveland Browns will forever be tied to . . . well, not-success, shall we say.

So, too, is the Ultra High Frequency (UHF) discount inextricably linked to the national television ownership cap. The FCC's national television multiple ownership rule prohibits a single entity from owning television stations that, in the aggregate, reach more than 39% of the total television households in the United States.[1] And until late last year, for purposes of calculating compliance with the 39% cap, a UHF television station was attributed with 50% of the television households in its market. For decades, this UHF discount was a critical component of the national cap. As one party pointed out in the record, the cap establishes a limit, and the discount defines how to calculate whether the limit is reached.[2]

In 2016, the FCC eliminated the UHF discount on a party-line vote. This effectively tightened the rule.[3] For example, companies that were previously under the national cap suddenly went over it. But in reaching this decision, the Commission did not examine whether the facts justified a more stringent cap. Nor did it analyze whether the cap should have been raised at the same time as the UHF discount was eliminated. This was illogical and likely unlawful.

This situation was avoidable. Back in 2013, when the Commission began this proceeding, I had a simple request. I asked my colleagues to seek comment on both eliminating the UHF discount *and* adjusting the national television ownership cap.[4] I specifically argued that we could not do one without the other.[5] Unfortunately, my plea fell on deaf ears. Among other things, I was told that the proceeding would take too long to complete if it included a broader examination of the national cap. Ironically, it then took the Commission almost three years to take action and release an *Order* actually eliminating the UHF discount. We easily could have reviewed the national cap during those three years.

Today, the FCC is wiping the slate clean. And later this year, we will begin a new proceeding to review comprehensively the future of the national cap, including the UHF discount. Going forward, I will do everything within my power to ensure that this review does not similarly take three years to complete. And to get that done, we will be relying heavily on the dedicated staff of the Media Bureau, including Michelle Carey, Brendan Holland, Mary Beth Murphy, and Julie Saulnier, whose hard work made today's *Order* possible.

---

[1] 47 CFR § 73.3555(e)(1).

[2] Nexstar Broadcasting Inc., Reply Comments in Support of Petition for Reconsideration (Jan. 27, 2017).

[3] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, Report and Order, 31 FCC Rcd 10213 (2016) (Dissenting Statement of Commissioner Ajit Pai).

[4] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, Notice of Proposed Rulemaking, 28 FCC Rcd 14324, 14343–44 (2013) (Dissenting Statement of Commission Ajit Pai).

[5] *Id.* at 14343 (stating that the FCC cannot "modify the UHF discount without simultaneously reviewing the national cap").

## DISSENTING STATEMENT OF COMMISSIONER MIGNON L. CLYBURN

Re: *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236.

Earlier this year, Chairman Pai stated that one of his primary goals is "to remove unnecessary or counterproductive regulations from the books," and "make sure that our regulations match the realities of the modern marketplace."[1] Just last month, citing to Section 11 of the Communications Act, he stressed the importance of "modernizing our rules" by eliminating regulations when "the policy [is] not only superfluous but counterproductive,"[2] and promised to ensure going forward, that "requirements are functions of actual need, not agency inertia."[3] The Chairman was so energized, and so eloquent as he declared that "times are changing,"[4] that even I got a little excited, and for a fleeting moment was somewhat hopeful.

But just like beauty, change is in the eye of the beholder. Take the UHF discount, a rule that everyone, including the majority, admits has no place in a post-digital transition era. Lo and behold, it has been snatched from the regulatory crypt. Outdated and divorced from the technical realities of broadcast television in the digital age, the UHF discount has been resurrected and in just a few moments, it will be reinstated. Inertia is not the culprit here, rather it is an overzealous, misguided willingness to ignore the realities of today's marketplace, to the detriment of the viewing public.

There is broad, industry-wide agreement that the UHF discount has outlived its purpose. Yet, the oft-heard rallying cries for eliminating outdated rules, are muzzled this morning. The Commission is making an about face, is firmly embracing the past, and is reinstating a relic of a bygone era, for the benefit of a few large media companies. If you failed to catch my greeting on social media last week, allow me to welcome you all, once again, to Industry Consolidation Month at the FCC.

For those who do not follow us closely, back in 1985, the FCC adopted the UHF discount, to address the competitive disadvantages facing UHF stations, including being technically inferior, producing weaker over-the-air signals, reaching smaller audiences, and costing more to build and operate compared to VHF stations. Fast forward to nearly eight years after the completion of the transition for full-power television stations to digital broadcasting, and the technical shortcomings of UHF signals no longer exist. In fact, UHF is now equal, if not superior to VHF channels.

Simply put, in just a few minutes, this agency will flash its deregulatory neon lights, inviting broadcast station groups to actually distort the calculation of their national audience reach, and take advantage of "a loophole that allows owners to fail to count audience that the stations actually do reach."[5] In other words, when you hear the majority voting yea on MB Docket No. 13-236, station groups will be able to buy scores of stations and "undermine[] the intent of the [existing media ownership] cap."[6] This

---

[1] David Shepardson, New FCC Chair Vows to Shrink Industry Regulations, Reuters (Jan. 31, 2017), http://www.reuters.com/article/us-fcc-regulations-idUSKBN15F26Z.

[2] *Section 43.62 of Reporting Requirements of U.S. Providers of International Services*; *2016 Biennial Review of Telecommunications Regulations*, IB Docket Nos. 17-55, 16-131, Notice of Proposed Rulemaking (2017), Statement of Chairman Pai.

[3] *Id.*

[4] *Id.*

[5] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, Report and Order, 31 FCC Rcd 10213, 10228, para. 34 (2016) (*UHF Discount Order*).

[6] *Id.*

will have the effect of increasing the cap well beyond the 39 percent level, established by Congress in 2004.

The result of "stretching the national audience reach cap, [could] allow a station group to actually reach up to 78 percent of television households,"[7] though the discount would lead you to believe that the reach is much lower. This absurd result is not hyperbole or a hypothetical. In fact, after the digital television (DTV) transition, stations moved some of their VHF stations to UHF channels, in order to take advantage of both the technical superiority of UHF channels, as well as the 50 percent reduction in audience reach attributed to UHF stations by the discount.[8] This type of practice was clearly not the intent.

I mentioned earlier that the Commissioners unanimously agree that the "technical basis for the UHF discount no longer exists."[9] Indeed, as Commissioner O'Rielly acknowledged last year, "the stations are rather interchangeable and shouldn't be treated differently for purposes [of] our market audience reach calculations."[10] Why then is the UHF discount being reinstated?

From a procedural, legal, and policy perspective, this action is extremely troubling. Chairman Pai has repeatedly made clear that the "video industry has undergone revolutionary change."[11] I do not disagree with this assertion. Yet, rather than issue a notice of proposed rulemaking to seek comment on adjusting the national audience reach cap, as Chairman Pai has called for since 2013,[12] the Commission returns us to an outdated state of play, with rules made for the analog era.

This Order argues that the Commission's decision in 2016 to eliminate the UHF discount was flawed, because the agency did not examine the UHF discount and national audience reach cap in tandem. In advancing this argument however, the majority performs in the words of Chairman Pai, "convoluted gymnastics."[13]

Although repeatedly stating, that the UHF discount and national audience reach cap are "inextricably linked," and must be examined in tandem, the Commission here fails to cite a single legal authority that limits review or modification of the UHF discount to simultaneous review of the national audience reach cap. Instead, the majority relies on a selective history of the UHF discount, and unsupported arguments of petitioners, that "the FCC has no authority to change one without at least reviewing the impact the change will have on the other."[14]

With respect to "grandfathering," Representatives Fred Upton and Greg Walden urged the Commission in a 2013 letter, "to ensure that any changes it [made] to the UHF discount rule respect the

---

[7] *Id*.

[8] *Id*. at 10229-30, para. 36.

[9] *UHF Discount Order*, dissenting statement of then-Commissioner Pai, 31 FCC Rcd at 10247. *See UHF Discount Order*, dissenting statement of Commissioner O'Rielly, 31 FCC Rcd at 10251.

[10] *UHF Discount Order*, dissenting statement of Commissioner O'Rielly, 31 FCC Rcd at 10251.

[11] *UHF Discount Order*, dissenting statement of then-Commissioner Pai, 31 FCC Rcd at 10249. *See also Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, Notice of Proposed Rulemaking, 28 FCC Rcd 14324 (2013) (*Notice)*, dissenting statement of then-Commissioner Pai, 31 FCC Rcd at 14344.

[12] *See Notice,* dissenting statement of then-Commissioner Pai, 31 FCC Rcd at 14344. *See also UHF Discount Order*, dissenting statement of then-Commissioner Pai, 31 FCC Rcd at 10249.

[13] Statement of FCC Chairman Ajit Pai, FCC, On the Latest D.C. Circuit Rebuke of FCC Overreach (Mar. 31, 2017), https://apps.fcc.gov/edocs_public/attachmatch/DOC-344186A1.pdf.

[14] Order on Reconsideration, para. 12.

holdings of existing licensees and applications pending."[15] And the Commission took this very action in 2016. To prevent broadcast station ownership groups from being harmed by elimination of the UHF discount, the Commission grandfathered broadcast station ownership groups that exceeded the 39 percent national audience reach cap, as well as proposed station combinations, for which an assignment or transfer application was pending. The grandfathering provision ensured that broadcast station ownership groups in existence as of September 26, 2013, would not be required to divest stations, because they exceeded the national audience reach cap solely, as a result of elimination of the UHF discount.

The grandfathering included in the *UHF Discount Order,* undercuts the Commission's argument in today's Order, that the elimination of the UHF discount was all the more problematic, given the industry's reliance on the UHF discount to develop long-term strategies. For nearly 20 years, the industry has been on notice, that the Commission may eliminate the UHF discount.[16] On more than one occasion, the Commission has sought comment on the modification or elimination of the UHF discount.[17] Indeed, in 2004, broadcasters acknowledged that the UHF discount may need to be modified, in light of the DTV transition.[18] Even the Chairman himself acknowledged that since 2013, broadcasters have been operating as if the UHF discount had been eliminated.[19]

But the Commission goes one step further than simply reinstating the UHF discount – it attempts to create a new purpose for the UHF discount to justify its reinstatement. The UHF discount was never intended to address competitive disparity, between broadcasters and other operators, such as video programming distributors. The sole purpose of the UHF discount was to remedy a technological disparity between two types of broadcast stations.[20] By rebirthing the UHF discount for this new purpose, the Commission is working hard to ensure that the UHF discount benefits a select group of broadcasters, in a manner that neither the Commission nor Congress, ever intended.

Perhaps most troubling about the Commission's action today, is that besides there being no legal basis for such action, reinstatement of the discount will actually harm the public interest, by reducing diversity, competition and localism. The Commission just wrapped up and put a bow on a huge gift for those large broadcasters with ambitious dreams of more consolidation.

Now I am not a betting woman, but mark my word: this Order will have an immediate impact, on the purchase and sale of television stations. In the words of Leslie Moonves, Chairman, President and CEO of CBS Corporation, "Look, we know Ajit Pai very well. I think he will be very beneficial to our business. As you said, he's deregulation, and we would be very interested in the cap moving up . . . I can

---

[15] Letter from Representatives Fred Upton and Henry Waxman, to Mignon Clyburn, Acting Chairwoman, Federal Communications Commission (Sept. 13, 2013).

[16] *See Notice*, 31 FCC Rcd at 14330, para. 16.

[17] *See Notice,* FCC Rcd at 14328, para. 11, nn. 35-36.

[18] In comments submitted in 2004, the National Association of Broadcasters ("NAB") stated: "This does not mean that the UHF discount should not be modified in light of future changes in television assignments . . . It would be appropriate for the Commission to consider whether a station that has moved to a UHF channel that replicates the coverage area it had with a VHF channel would suffer from the same handicap as many UHF analog stations do today. In those circumstances, the Commission would have to modify the UHF discount so that the change in channel assignments would not have the unintended effect of allowing an increase in station ownership beyond those existing today. Indeed, failure to do so-it could be argued-would equally violate Congress' intent to leave national ownership levels as they are today." NAB Comments, MB Docket No. 02-277, at 2 (Mar. 19, 2004).

[19] "Following adoption of the Notice, the private sector behaved as if the UHF discount had already been eliminated. No company sought to purchase any television station that would have put it over the 39% cap as calculated without the UHF discount." *UHF Discount Order*, dissenting statement of then-Commissioner Pai, 31 FCC Rcd at 10250.

[20] *See Amendment of Sections 73.3555 [formerly Sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations,* GN Docket No. 83-1009, Memorandum Opinion and Order, 100 FCC 2d 74, 93-94, paras. 43-44 (1985).

tell you in the right circumstance, if the cap is lifted ,we would strategically want to buy some more stations . . .[21] And Mr. Moonves is far from alone in that sentiment.[22] In a recent filing before the U.S. Securities and Exchange Commission, Sinclair Broadcast Group disclosed that "[i]f the UHF discount is restored … it would expand our ability, to make televisions station acquisitions in the future."[23]

Broadcast television continues to play a vital role in communities around the country, but this Order will enable the largest broadcast station owners to grow even larger. And those aspiring station owners that we meet and try to give hope to at conferences and everywhere I travel, in just a matter of minutes, your dream of owning and competing as a new entrant or a smaller broadcast owner will become a nightmare.

Because no justification exists for this Order, I strongly dissent. I dissent because I recognize that consumers benefit from competition, which motivates broadcast stations to invest in higher quality programming, and provide programming tailored to their local communities. I also recognize, that communities are enriched by a diversity of viewpoints and that consolidation would limit programming options for viewers, and impact local news editorial operations. And as regulators, we are supposed to be the public interest torchbearer for this nation. Today I am sad to report that we have failed miserably.

And while I strongly disagree with the outcome of this Order, thanks are due to the hard-working staff of the Media Bureau. Additionally, I want to recognize and thank Jaime Petenko, one of our law clerks this semester, for her extensive work on this item.

[21] Leslie Moonves, Chairman, President and Chief Executive Officer of CBS Corporation, Q4 2016 CBS Corp. Earnings Call, Edited Transcript, Feb. 15, 2017.

[22] *See, e.g.*, Perry Sook, Chief Executive Officer of Nexstar Media Group, Inc., stated, "The UHF discount being re-imposed and then ultimately a raising or elimination of the national ownership cap would be very helpful to growing our scale." Nexstar Media Group, Q4 2016 Earnings Call Transcript, Feb. 28, 2017. He also told investors and analysts that Nextsar is "already in discussions should the rules change about opportunities that might be available to us..." *Id.*

[23] Sinclair Broadcast Group, Inc. (SBGI), Form 10-K, Annual Report (Feb. 28, 2017).

## STATEMENT OF COMMISSIONER MICHAEL O'RIELLY

Re: *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236.

In recognition of the busy day, I'm not going to rehash all of the arguments I made when the previous Commission addressed this issue just last year.[1] Suffice it to say, I do not believe the Commission has authority presently to alter the UHF Discount, and certainly not separate from the National Television Ownership rule. I appreciate this item reverting the Commission's rule back to its proper position.

[1] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, 31 FCC Rcd 10213, 10251-52 (2016), https://apps.fcc.gov/edocs_public/attachmatch/FCC-16-116A3.pdf.

# Attachment B

## TELECOMMUNICATIONS ACT OF 1996
## P.L. 104-104, 110 Stat. 56

**TELECOMMUNICATIONS ACT OF 1996**
**P.L. 104-104, 110 Stat. 56**

**Sec. 202. BROADCAST OWNERSHIP.**

* * * *

(c) Television Ownership Limitations.--

(1) National ownership limitations.-- The Commission shall modify its rules for multiple ownership set forth in section 73.3555 of its regulations (47 C.F.R. 73.3555)--

(A) by eliminating the restrictions on the number of television stations that a person or entity may directly or indirectly own, operate, or control, or have a cognizable interest in, nationwide; and

(B) by increasing the national audience reach limitation for television stations to 35 percent.

* * * *

(h) Further Commission Review.--The Commission shall review its rules adopted pursuant to this section and all of its ownership rules biennially as part of its regulatory reform review under section 11 of the Communications Act of 1934 and shall determine whether any of such rules are necessary in the public interest as the result of competition. The Commission shall repeal or modify any regulation it determines to be no longer in the public interest.

# Attachment C

## *Prometheus Radio Project v. FCC*, 2003 WL22052896 (3rd Cir. 2003)

2003 WL 22052896
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

PROMETHEUS RADIO PROJECT, Petitioner
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents
*FOX ENTERTAINMENT GROUP, INC., Fox Television Stations, Inc., National Broadcasting Company, Inc., Telemundo Communications Group, Inc. and Viacom, Inc., Intervenors, *(Pursuant to Clerk's Order dated 8/22/03) (FCC No. 03-127)
No. 03-3388.
|
Sept. 3, 2003.

Radio broadcasting company brought motion to stay the effective date of new ownership rules promulgated by Federal Communications Commission (FCC), which would alter ownership rules for multiple media properties including television and radio station networks, pending judicial review. The Court of Appeals held that even though it was currently difficult to predict likelihood of success on merits, potential harms outweighed effect of stay on FCC and relevant third parties so as to warrant stay of effective date of rules pending judicial review.

Motion granted.

West Headnotes (1)

[1] Telecommunications
Equitable Relief; Injunction

Radio broadcasting company was entitled to injunctive relief to stay effective date of new ownership rules promulgated by Federal Communications Commission (FCC) which would substantially alter ownership rules for multi-media properties including television and radio networks, pending thorough judicial review of rules, even though it was difficult to predict likelihood of success on merits; company alleged that harm from rules' industry consolidation would be widespread and irreversible if they occurred, that harm in absence of stay would likely be loss of adequate remedy if rules were declared invalid in whole or in part, and that stay would maintain status quo, and there was little indication that stay pending appeal would result in substantial harm to FCC or other interested parties.

3 Cases that cite this headnote

Attorneys and Law Firms

Samuel L. Spear, Spear, Wilderman, Borish, Endy, Spear & Runckel, Philadelphia, PA, Andrew J. Schwartzman, Media Access Project, Washington, DC, for Petitioner.

Jacob M. Lewis, John A. Rogovin, C. Grey Pash, Jr., Daniel M. Armstrong, Nandan Joshi, Federal Communications Commission, Nancy C. Garrison, Catherine G. O'Sullivan, Washington, DC, for Respondents.

Henk Brands, Paul, Weiss, Rifkind, Wharton & Garrison, Mark L. Evans, Michael K. Kellogg, Kellogg, Huber, Hansen, Todd & Evans, Donald B. Verrilli, Jr., Jenner & Block, Washington, DC, for Intervenors.

Present: SCIRICA, Chief Judge, AMBRO and FUENTES, Circuit Judges.

ORDER

PER CURIAM.

*1 Before the Court is Petitioner's motion to stay the effective date of Respondent Federal Communication Commission's new ownership rules, 2002 Biennial Regulatory Review, 68 Fed.Reg. 46,286 (Aug. 5, 2003), pending judicial review.[1] Extensive oral argument was heard on September 3, 2003.[2]

We consider four factors in determining whether to grant the motion to stay: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the request is denied; (3) whether third parties will be harmed by the stay; and (4) whether granting the stay will serve the public interest. *E.g., Susquenita Sch. Dist. v. Raelee,* 96 F.3d 78, 80 (3d Cir.1996); *In re Penn Cent. Transp. Co.,* 457 F.2d 381, 384-85 (3d Cir.1972).

At issue in this litigation are changes adopted by the FCC that would significantly alter the agency's ownership rules for multiple media properties, including national television networks, local broadcast affiliates, radio stations, and newspapers. Petitioner has alleged harms from industry consolidation contending they would be widespread and irreversible if they occurred. The harm to petitioners absent a stay would be the likely loss of an adequate remedy should the new ownership rules be declared invalid in whole or in part. In contrast to this irreparable harm, there is little indication that a stay pending appeal will result in substantial harm to the Commission or to other interested parties. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977). Granting the stay pending judicial review would maintain the status quo in order to permit appellate review after briefing on the merits. While it is difficult to predict the likelihood of success on the merits at this stage of the proceedings,[3] these harms could outweigh the effect of a stay on Respondent and relevant third parties. Given the magnitude of this matter and the public's interest in reaching the proper resolution, a stay is warranted pending thorough and efficient judicial review.

For the foregoing reasons, we will grant Petitioner's motion to stay the effective date of the FCC's new ownership rules and order that the prior ownership rules remain in effect pending resolution of these proceedings.

Subject to the Court's decision on the motion to transfer venue, the Clerk shall issue a briefing schedule.

All Citations

Not Reported in F.3d, 2003 WL 22052896

Footnotes

1 Under 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation has designated this Court to hear this and related petitions for review.

2 Ordinarily, we would require strict adherence to Federal Rule of Appellate Procedure 18 that petitioner "move first before the agency for a stay of its decision or order." Fed. R.App. P. 18(a)(1). Nonetheless, under the unique circumstances of this case, it appears virtually certain that the Commission would not grant a stay in this matter.

3 An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity and need for judicial protection, whether or not movant has shown a mathematical probability of success.
*Holiday Tours,* 559 F.2d at 844.

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# Attachment D

# CONSOLIDATED APPROPRIATIONS ACT OF 2004
# P.L. 108-199, 118 Stat. 3

**CONSOLIDATED APPROPRIATIONS ACT, 2004,
P.L. 108-199, 118 Stat. 3**

**Sec. 629.**

The Telecommunications Act of 1996 is amended as follows–

(1) in section 202(c)(1)(B) by striking "35 percent" and inserting "39 percent";

(2) in section 202(c) by adding the following new paragraphs at the end:

"(3) Divestiture.-- A person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B) through grant, transfer, or assignment of an additional license for a commercial television broadcast station shall have not more than 2 years after exceeding such limitation to come into compliance with such limitation. This divestiture requirement shall not apply to persons or entities that exceed the 39 percent national audience reach limitation through population growth.

"(4) Forbearance.-- Section 10 of the Communications Act of 1934 ( 47 U.S.C. 160) shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B);"; and

(3) in section 202(h) by striking "biennially" and inserting "quadrennially" and by adding the following new flush sentence at the end:"This subsection does not apply to any rules relating to the 39 percent national audience reach limitation in subsection (c)(1)(B).".

# Attachment E

*Amendment of Section 73.3555(e) of the Commission's Rules*, 31 FCCRcd 10213(2016)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule | ) ) ) | MB Docket No. 13-236 |

**REPORT AND ORDER**

**Adopted: August 24, 2016** **Released: September 7, 2016**

By the Commission: Commissioners Pai and O'Rielly dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Heading Paragraph #


I. INTRODUCTION ... 1
II. BACKGROUND ... 4
III. DISCUSSION ... 16
  A. Authority to Modify the UHF Discount ... 17
  B. Elimination of the UHF Discount ... 25
  C. Grandfathering of Existing Broadcast Station Combinations ... 41
  D. VHF Discount ... 54
IV. PROCEDURAL MATTERS ... 57
  A. Final Regulatory Flexibility Analysis ... 57
  B. Paperwork Reduction Act Analysis ... 58
  C. Congressional Review Act ... 59
V. ORDERING CLAUSES ... 60
APPENDIX A – Final Rule
APPENDIX B – Final Regulatory Flexibility Analysis
APPENDIX C – List of Commenters and Reply Commenters


## I. INTRODUCTION

1. Today we take an important step to ensure that our broadcast rules remain relevant in the digital age by eliminating an outdated portion of those rules premised on the constraints of old technology. Abolishing the 30-year-old UHF discount, which allowed commercial broadcast television station owners to discount the coverage of certain stations when calculating their compliance with the national audience reach cap,[1] restores meaning to the rule in today's marketplace where technological change has eliminated the justification for the discount. The discount has outlived its purpose and intent

[1] This rule prohibits a single entity from owning television stations that, in total, reach more than 39 percent of all the television households in the nation. 47 CFR § 73.3555(e)(1). The rule provides a discount, called the "UHF discount," to television stations broadcasting in the UHF spectrum, attributing them with only 50 percent of the television households in their Designated Market Areas (DMAs). *Id.* § 73.3555(e)(2)(i). In contrast, VHF stations are attributed with 100 percent of the number of households in the DMA. VHF television stations broadcast on channels 2-13; UHF stations broadcast on channels 14-51.

and, in the current world, acts only to undermine the national audience reach cap. Today's action should come as no surprise to industry participants. The Commission has indicated repeatedly over the past two decades that the transition to DTV, completed for full-power broadcast television stations in June 2009,[2] would undermine the basis for the UHF discount.

2. Adopted in 1985, the UHF discount was intended to mitigate the competitive disadvantage that UHF broadcast television stations suffered in comparison to VHF broadcast television stations.[3] At that time, UHF stations were technically inferior, producing weaker over-the-air signals, reaching smaller audiences, and costing more to build and operate than VHF stations.[4] But while UHF channels may have been inferior for purposes of broadcasting in analog, experience since the DTV transition demonstrates that UHF channels are equal, if not superior, to VHF channels for the digital transmission of television signals.[5] Thus, as a result of the DTV transition, the UHF discount can no longer be supported on technical grounds.

3. Accordingly, we eliminate the discount from the calculation of the national audience reach cap to preserve the effectiveness of this rule. To avoid imposing undue harm on existing broadcast television station groups that exceed the national audience reach cap without the benefit of the UHF discount, we will grandfather the following such combinations: (a) combinations in existence on September 26, 2013 (Grandfather Date), the release date of the Notice of Proposed Rulemaking in this proceeding; (b) combinations created by a transaction that had received Commission approval on or before the Grandfather Date; and (c) combinations proposed in applications pending before the Commission on the Grandfather Date.[6] Any ownership combination so grandfathered but subsequently assigned or transferred must comply with the national audience cap in existence at the time of the transaction. We find that this approach is fair to affected licensees and consistent with Commission precedent. Finally, we decline at this time to adopt a VHF discount. The current record and circumstances do not convince us that digital television operations in the VHF band are technically inferior to UHF in a manner that would warrant the creation of a new discount.

## II. BACKGROUND

4. Three decades ago, to protect localism, diversity, and competition, the Commission reaffirmed its rule restricting the total number of commercial broadcast stations a single entity could own nationwide, and adopted a national audience reach cap, restricting the total percentage of households a single entity could reach nationwide.[7] Specifically, the Commission reaffirmed a prior ruling limiting the number of broadcast stations in each service (AM, FM, and television) that a single entity could own to

---

[2] *See* 47 U.S.C. § 309(j)(14)(A).

[3] *Amendment of Section 73.3555 [formerly Sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations*, Memorandum Opinion and Order, 100 FCC 2d 74, 88-94, paras. 33-44 (1985) (*1985 TV Ownership Reconsideration*).

[4] *Id.* at 92-94, paras. 42-44 (finding that the "inherent physical limitations" of UHF broadcasting should be reflected in the national TV ownership rules).

[5] *See, e.g.*, *Innovation in the Broadcast Television Bands: Allocations, Channel Sharing and Improvements to VHF*, Notice of Proposed Rulemaking, 25 FCC Rcd 16498, 16511, para. 42 (2010) (*Broadcast Innovation NPRM*) (recognizing the utility of the digital UHF band while seeking comment on ways to improve reception of digital VHF channels).

[6] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 28 FCC Rcd 14324, 14331-32, para. 20 (2013) (*Notice*).

[7] *1985 TV Ownership Reconsideration*, 100 FCC 2d at 88-92, paras. 33-41. *See also Amendment of Section 73.3555 [formerly Sections 73.35, 73.240, and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations*, Report and Order, 100 FCC 2d 17, 54-56, paras. 108-12 (1984) (establishing a 12 station multiple ownership rule).

12, and amended the rule to include a national audience reach cap, which prohibited a single entity from owning television stations that collectively reached more than 25 percent of the total nationwide audience.[8] The Commission explained that the cap was intended to temper the ability of the largest group owners to dramatically increase their national coverage areas in response to the relaxation of the previous seven station limit.[9] The Commission found it essential to impose an audience reach limitation to limit the growth of the largest group owners while giving smaller group owners some opportunity to expand.[10]

5. At that time, the Commission recognized the "inherent physical limitations" of the UHF television band and sought to account for these limitations in constructing its national audience reach cap.[11] The Commission specifically found that the delivery of television signals was more difficult in the UHF band because the strength of UHF television signals decreased more rapidly with distance in comparison to the signals of stations broadcasting in the VHF band, resulting in significantly smaller coverage areas and smaller audience reach.[12] This was particularly significant because, at the time, the vast majority of viewers received programming from broadcast television stations via over-the-air signals. Thus, a smaller over-the-air signal made it harder for UHF stations to compete with incumbent VHF stations which maintained greater coverage areas. To account for this coverage disparity, the Commission determined that the licensee of a UHF station should be attributed with only 50 percent of the television households in its market area for purposes of calculating the national audience reach cap. The Commission concluded that this "UHF discount" provided a measure of the actual reduction in audience reach experienced by UHF stations.[13] It also concluded that the discount supported the viability of UHF television, which was consistent with traditional diversity objectives.[14]

6. Eleven years later, in the Telecommunications Act of 1996 (1996 Act), Congress directed the Commission to modify its national television station multiple ownership rule to increase the national audience reach cap from 25 percent to 35 percent and to eliminate the restriction forbidding an entity to own more than 12 broadcast television stations nationwide.[15] The 1996 Act did not address the UHF discount.[16]

---

[8] *1985 TV Ownership Reconsideration*, 100 FCC 2d at 90-92, paras. 38-40.

[9] *Id.* at 91, para. 40 ("We believe, however, that the 25 percent reach cap adopted herein is a reasonable limit given our traditional policy concerns and in light of our expectations as to the potential economic response of the industry once the current . . . station limit is relaxed. […] In addition, the 25 percent limit will temper dramatic changes in the ownership structure by the largest group owners in the largest markets. Alternatively, the smaller multiple owners would be given a greater opportunity to expand.") (footnotes omitted).

[10] *Id.*

[11] *Id.* at 93, para. 43.

[12] *Id.*

[13] *Id.* at 93-94, para. 44

[14] *Id.* When the Commission adopted the UHF discount in 1985, calculation of national coverage was based on the television households and market rankings defined by Arbitron's Area of Dominant Influence (ADI). Currently, the Commission relies on DMAs defined by the Nielsen Company (Nielsen) to calculate national audience reach. Nielsen delineates television markets by assigning each U.S. county (except for certain counties in Alaska) to one market based on measured viewing patterns. The United States is divided into 210 DMAs.

[15] Telecommunications Act of 1996, Pub. L. No. 104-04, § 202(c)(1), 110 Stat. 56, 111 (1996) (1996 Act); *see also Implementation of Sections 202(c)(1) and 202(e) of the Telecommunications Act of 1996 (National Broadcast Television Ownership and Dual Network Operations)*, Order, 11 FCC Rcd 12374 (1996) (*Implementation Order of Section 202(c)(1) of 1996 Act*).

[16] *Implementation Order of Section 202(c)(1) of 1996 Act*, 11 FCC Rcd at 12375, para. 4.

7. Although the 1996 Act did not address the UHF discount, in 1996 the Commission noted that the UHF discount was then under consideration in a pending Commission proceeding.[17] Specifically, in the *1996 Act Implementation Order*, the Commission noted that it was reviewing the UHF discount in the context of its television broadcast ownership rules.[18] The Commission explicitly cautioned that any entity that acquired stations during this interim period and complied with the 35 percent audience reach cap only by virtue of the UHF discount would be subject to the outcome of the pending television ownership proceeding.[19] Subsequently, the Commission decided to consider modifications to the UHF discount in the Commission's 1998 biennial review of its broadcast ownership rules.[20]

8. The Commission subsequently reaffirmed the 35 percent national audience reach cap in its *1998 Biennial Review Order*.[21] The Commission reasoned that it was premature to revise the national audience reach cap because it had not had sufficient time to fully observe the effects of raising the cap from 25 to 35 percent.[22] The Commission retained the UHF discount, finding that it remained in the public interest at that time,[23] but indicated that it would likely be unnecessary after the anticipated transition to digital television.[24] The Commission stated that a Notice of Proposed Rulemaking would be issued in the future to propose phasing out the discount once the digital transition was complete.[25]

---

[17] *Id.* (citing *Review of the Commission's Regulations Governing Television Broadcasting*, Further Notice of Proposed Rule Making, 10 FCC Rcd 3524, 3568-69, para. 102 (1995) (*TV Ownership Further Notice*) (seeking comment on whether the UHF discount should be modified or eliminated).

[18] *Id.* (citing *TV Ownership Further Notice*, 10 FCC Rcd at 3568-69, para. 102).

[19] *Id.*

[20] *Broadcast Television National Ownership Rules et al.*, Notice of Proposed Rule Making, 11 FCC Rcd 19949, 19950, para. 1 (1996).

[21] *1998 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Biennial Review Report, 15 FCC Rcd 11058, 11072-75, paras. 25-30 (2000) (*1998 Biennial Review Order*).

[22] *1998 Biennial Review Order*, 15 FCC Rcd at 11072, para. 25. The United States Court of Appeals for the District of Columbia (D.C. Circuit) later remanded the *1998 Biennial Review Order* after finding that the decision to retain the national audience reach cap was arbitrary and capricious. The D.C. Circuit found the Commission's "wait-and-see" approach to be inconsistent with its mandate to determine on a biennial basis whether the rules were in the public interest. In addition, the court found that the Commission failed to demonstrate that the national audience reach cap advanced competition, diversity, or localism. *See Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1040-49 (D.C. Cir. 2002). On remand, the Commission determined that the national ownership cap should be raised to 45 percent. 2002 *Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13842, 13843-44, paras. 578, 580-83 (2003) (*2002 Biennial Review Order*).

[23] *1998 Biennial Review Order*, 15 FCC Rcd at 11078, para. 35.

[24] *Id.* at 11079-80, para. 38. We note that as early as 1992 the Commission anticipated the possibility that the transition to digital television would obviate the need for the UHF discount. *See Review of the Commission's Regulations Governing Television Broadcasting*, Notice of Proposed Rule Making, 7 FCC Rcd 4111, 4115 n.37 (1992) (*TV Ownership NPRM*) (seeking comment on whether any distinction between UHF and VHF stations would be appropriate in light of the potential transition to advanced television technology).

[25] *1998 Biennial Review Order*, 15 FCC Rcd at 11079-80, para. 38. The Commission reiterated its previous statement that while the UHF discount was under review any entity that acquired stations during the interim period, between implementation of the 35 percent audience reach cap pursuant to the 1996 Act and any Commission decision on the UHF Discount, and that complied with the 35 percent audience reach cap only by virtue of the UHF discount would be subject to the outcome of the Commission's decision on the UHF discount. *Id.* at 11080 n.108 (citing *Implementation Order of Section 202(c)(1) of 1996 Act*, 11 FCC Rcd at 12375, para. 4). The Commission

(continued….)

9. The Commission subsequently reexamined the issues in its *2002 Biennial Review Order*.[26] At that time, the Commission found that the national audience reach cap, while not necessary to promote competition and diversity, nonetheless remained necessary to promote localism.[27] Further, the Commission decided that an increase in the cap to 45 percent was justified.[28] The Commission concluded that a 45 percent cap would strike an appropriate balance by permitting some growth for the Big Four broadcast networks (ABC, CBS, NBC, and Fox) and allowing them to achieve greater economies of scale, while at the same time ensuring that the network-owned stations could not reach a larger national audience than their affiliates collectively.[29] The Commission also found that setting the cap at 45 percent was consistent with Congress's action in the 1996 Act, in which Congress raised the ownership limit by 10 percentage points.[30]

10. At the same time, the Commission again reaffirmed the UHF discount, finding that there continued to be a technical disparity between the reach of UHF and VHF signals, which diminished the ability of UHF stations to compete effectively.[31] The Commission concluded, however, that "the digital [television] transition [would] largely eliminate the technical basis for the UHF discount because UHF and VHF signals [would] be substantially equalized."[32] Accordingly, the *2002 Biennial Review Order* adopted rules to phase out the UHF discount for broadcast stations owned by the Big Four networks on a market-by-market basis at the time the markets transitioned to DTV (as the transition was contemplated at the time).[33] The Commission noted that this phase-out of the UHF discount would apply unless it made an affirmative determination that the discount continued to serve the public interest beyond the digital transition. The Commission indicated further that, for networks and station groups other than those stations owned and operated by the Big Four networks, it would review the status of the UHF discount in a subsequent biennial ownership review and decide at that time whether to extend the sunset to all other networks and station group owners.[34]

11. Following adoption of the *2002 Biennial Review Order*, Congress subsequently rolled back the increase in the national audience reach cap. Specifically, Congress included a provision in the

(Continued from previous page)
stated that it would "continue to follow this policy until such time as the UHF discount is modified or eliminated." *1998 Biennial Review Order*, 15 FCC Rcd at 11080 n.108.

[26] *2002 Biennial Review Order*, 18 FCC Rcd at 13845-47, paras. 585-91 (2003).

[27] *Id.* at 13842, para. 578.

[28] *Id.* at 13814, para. 499.

[29] *Id.* at 13843-44, paras. 581-83.

[30] *Id.* at 13843-44, para. 582.

[31] *Id.* at 13845-46, paras. 586-87. The Commission also determined that UHF stations required more expensive transmitters and incurred higher electricity costs, as much as 1.5 to 3 times greater than the electricity needed for a VHF station. The Commission concluded further that the UHF discount was still needed, in part, to encourage entry and competition among broadcast networks. *Id.* at 13846-47, paras. 588-89.

[32] *Id.* at 13847, para. 591.

[33] The rules in existence at the time contemplated a gradual, market-by-market transition from analog broadcasting to digital broadcasting as the penetration of digital television viewing capability reached a sufficient threshold in each market. That approach was subsequently replaced by a hard deadline set by Congress; the deadline was initially February 17, 2009, and later extended to June 12, 2009. Digital Television Transition and Public Safety Act of 2005, Pub. L. No. 109-171, § 3002, 120 Stat. 4, 21-22 (2006) (setting DTV transition deadline as February 17, 2009); DTV Delay Act of 2009, Pub. L. No. 111-4, § 2(a)(1), 123 Stat. 112 (2009) (extending DTV transition deadline to June 12, 2009) (both codified at 47 U.S.C. § 309 note). *See also* 47 U.S.C. § 309(j)(14)(A).

[34] *2002 Biennial Review Order*, 18 FCC Rcd at 13847, para. 591. In phasing out the UHF discount for broadcast stations owned by the Big Four broadcast networks, the Commission noted that they owned relatively few UHF stations (12 out of 67). *Id.*

2004 Consolidated Appropriations Act (CAA) directing the Commission to modify its ownership rules to set the national audience reach cap at 39 percent of national television households.[35] The CAA further amended Section 202(h) of the 1996 Act to require a quadrennial review of the Commission's broadcast ownership rules rather than the previously mandated biennial review. In doing so, Congress removed the requirement to review "any rules relating to the 39 percent national audience reach limitation" from the quadrennial review requirement.[36] The CAA did not mention the UHF discount, nor did it address the potential impact of the DTV transition on the calculation of the national audience reach cap.

12. Prior to the enactment of the CAA, several parties had appealed the Commission's *2002 Biennial Review Order* to the U.S. Court of Appeals for the Third Circuit (Third Circuit). In June 2004, the Third Circuit found that the challenges to the Commission's actions with respect to the national audience reach cap and the UHF discount were moot as a result of Congress's action.[37] The court determined that the Commission was under a statutory directive, following the CAA, to modify the national audience reach cap to 39 percent, and that, as a result, challenges to the Commission's decision to raise the cap to 45 percent were no longer justiciable.[38] The court held that the CAA similarly rendered moot the challenges to the Commission's decision to retain the UHF discount.[39] The court found that the CAA insulated the national audience reach cap, including the UHF discount rule, from the Commission's quadrennial review of its media ownership rules.[40] At the same time, the court stated that its decision did not "foreclose the Commission's consideration of its regulation defining the UHF discount in a rulemaking outside the context of Section 202(h)."[41] The court concluded that, barring congressional intervention, "the Commission may decide, in the first instance, the scope of its authority to modify or eliminate the UHF discount outside the context of [Section] 202(h)."[42]

13. In July 2006, the Commission issued a Further Notice of Proposed Rulemaking as part of its 2006 quadrennial review of the media ownership rules.[43] Among other things, the *Further Notice* sought comment on the UHF discount rule in light of the Third Circuit's holding and queried whether the

---

[35] Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (CAA).

[36] *Id.*

[37] *Prometheus Radio Project v. FCC*, 373 F.3d 372, 395-97 (3d Cir. 2004) (*Prometheus I*).

[38] *Id.* at 396.

[39] *Id.* Because Congress superseded the Commission's decision to set the national audience reach cap at 45 percent without considering or addressing specifically the Commission's authority to amend the UHF discount, the CAA did not have any implications concerning the Commission's authority to amend the UHF discount. The *Notice's* reference to the CAA superseding the *2002 Biennial Review Order* refers to the 45 percent national audience reach cap and the Commission's ability to act on the cap and the UHF discount in the context of the quadrennial review, not the Commission's authority outside the quadrennial review. *See Notice*, 28 FCC Rcd at 14327, para. 9.

[40] *Prometheus I*, 373 F. 3d at 396-97.

[41] *Id.* at 397. Prior to the court's decision, in February 2004, the Media Bureau issued a Public Notice specifically seeking comment on the Commission's authority to modify or eliminate the UHF discount in light of the CAA. In particular, the Media Bureau sought comment on whether the "passage of the 39 [percent] cap [signifies] congressional approval, adoption, or ratification of the 50 [percent] UHF discount." The comments and replies were filed in the docket for the *2002 Biennial Review Order*. *Media Bureau Seeks Additional Comment on UHF Discount in Light of Recent Legislation Affecting National Television Ownership Cap*, Public Notice, 19 FCC Rcd 2599, 2600 (2004). *See also Comment and Reply Comment Dates Set for Comments on UHF Discount In Light of Recent Legislation Affecting National Television Ownership Cap*, Public Notice, 19 FCC Rcd 3917 (2004).

[42] *Prometheus I*, 373 F.3d at 397.

[43] *2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Further Notice of Proposed Rulemaking, 21 FCC Rcd 8834 (2006) (*Further Notice*).

Commission "should retain, modify, or eliminate the UHF discount."[44] In February 2008, the Commission concluded in the *2006 Quadrennial Review Order* that "the UHF discount is insulated from review under Section 202(h)" as a result of the CAA, and thus beyond the parameters of the quadrennial review.[45] But the Commission noted that the Third Circuit's 2004 decision had left it to the Commission to decide the scope of its authority to modify or eliminate the UHF discount outside the context of Section 202(h).[46] Accordingly, the Commission indicated that it would address the petitions, comments, and replies filed with respect to the alteration, retention, or elimination of the UHF discount in a separate proceeding, which would be commenced at a future date.[47]

14. Since June 13, 2009, all full-power television stations have broadcast their over-the-air signals exclusively in digital form.[48] The DTV transition has enabled broadcasters to provide multiple programming choices, higher quality video, and enhanced capabilities to consumers.[49] Yet the transition has posed more challenges for VHF channels than UHF channels because VHF spectrum has proven to have characteristics that make it less desirable for providing digital television service.[50] For instance, nearby electrical devices tend to emit noise that can cause interference to DTV signals within the VHF band, creating reception difficulties in urban areas even a short distance from the TV transmitter. The reception of VHF signals also requires physically larger antennas compared to UHF signals.[51] For these reasons, among others, television broadcasters generally have faced greater challenges providing consistent reception on VHF signals than UHF signals in the digital environment, and some station owners have therefore opted to migrate their signals from VHF to UHF.[52]

15. On September 26, 2013, the Commission issued the *Notice* in this proceeding seeking comment on the Commission's authority to modify the national audience reach cap contained in Section 73.3555(e)[53] and proposing to eliminate the UHF discount.[54] The *Notice* also tentatively proposed, in the

---

[44] *Id.* at 8848-49, paras. 34-35. The *Further Notice* refreshed the Commission's record on its authority to alter the UHF discount.

[45] *2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2084-85, para. 143 (2008) (*2006 Quadrennial Review Order*), *aff'd in part, rev'd in part sub nom. Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011).

[46] *2006 Quadrennial Review Order*, 23 FCC Rcd at 2085, para. 144.

[47] *Id.* Although the Commission indicated in 2008 that a rulemaking addressing the UHF discount would be forthcoming, such a proceeding was not commenced until the issuance of the *Notice* on September 26, 2013.

[48] FCC, *Digital Television*, http://www.fcc.gov/general/digital-television (visited June 20, 2016) (DTV Website).

[49] *Id.* *See also 2 Days and Counting to DTV Transition*, Press Release (rel. June 10, 2009) ("In addition to more channels and more programs, the switch to digital will also reward most viewers with better sound and a better picture."), *available at* https://apps.fcc.gov/edocs_public/Query.do;jsessionid=GVGbXybCt0P42DQvJ7Myc7mtvXrlMxRZvnBk2ylPb27JFrT2p0fv!1910990845!1500434201?numberFld=&numberFld2=&docket=&dateFld=06%2F10%2F2009&docTitleDesc=DTV+Transition (visited June 20, 2016).

[50] *See, e.g.*, *Broadcast Innovation NPRM*, 25 FCC Rcd at 16511, para. 42.

[51] *Id.*

[52] *Id.* *See also infra* para. 33. The Commission has also taken a number of actions to help individual VHF stations cope with these difficulties. *See, e.g.*, Letter from Barbara A. Kreisman, Chief, Video Division, Media Bureau, to ABC, Inc. and Freedom Broadcasting of New York Licensee, LLC (March 16, 2011), at http://licensing.fcc.gov/cgi-bin/prod/cdbs/forms/prod/getimportletter_exh.cgi?import_letter_id=24962 (visited June 21, 2016) (Video Division March 16, 2011, Letter) (permitting two television broadcasters to operate facilities exceeding the maximum power and antenna height in an attempt to resolve VHF reception issues).

[53] 47 CFR § 73.3555(e).

event that the Commission eliminated the UHF discount, to grandfather existing television station combinations that would exceed the 39 percent national audience reach cap in the absence of the UHF discount. Finally, the *Notice* sought comment on whether a "VHF discount" should be adopted.[55]

## III. DISCUSSION

16. As described below, we conclude that the Commission has the authority to eliminate the UHF discount, and in doing so, we eliminate an obsolete mechanism that undermines the regulation it was originally designed to promote.[56] We grandfather certain existing station combinations that would otherwise violate the national audience reach cap solely as a result of our action. We find that the benefits of our decision to eliminate the UHF discount outweigh any costs or other burdens that may result from our action. Finally, we decline to adopt a VHF discount at this time.

### A. Authority to Modify the UHF Discount

17. In the *Notice*, the Commission tentatively concluded that it has the authority to revise the national audience reach cap as well as to alter or eliminate the UHF discount and requested comment on these conclusions.[57] Many commenters, including NAB, Free Press, and the Public Interest Commenters, filed comments in support of the Commission's conclusion.[58] Specifically, NAB agrees with the Commission's conclusion that it maintains the authority to reexamine its national audience reach cap and the methodologies for calculating compliance with the rule.[59] In addition, Free Press argues that the Communications Act as well as the Commission's public interest standard provide the Commission with ample authority to revisit the UHF discount.[60] Free Press asserts that the Commission has the ability to decide the scope of its authority to reexamine the UHF discount outside the Commission's quadrennial review.[61] The Public Interest Commenters submit that the Commission has discretion under the CAA to decide its own authority to modify or eliminate the UHF discount outside of the quadrennial review process.[62]

18. A few commenters, however, challenge the Commission's authority to revise or eliminate either the national audience reach cap or the UHF discount.[63] Fox asserts that Congress expressly insulated the cap from any alteration by carving the rule out from the Commission's periodic review under Section 202(h) of the 1996 Act and shielding it from the Commission's forbearance authority.[64]

(Continued from previous page)
[54] *Notice*, 28 FCC Rcd at 14331-32, para. 20.

[55] *Id.* at 14332-33, para. 23.

[56] *See* Exec. Order No. 13579, 76 Fed. Reg. 41587 (July 14, 2011) (directing independent regulatory agencies to review their regulations to "determine whether any such regulations should be modified, streamlined, expanded, or repealed.").

[57] *Notice*, 28 FCC Rcd at 14329-30, paras. 13-15.

[58] *See, e.g.*, NAB Comments at 1; Free Press Comments at 1-2.

[59] NAB Comments at 1; Free Press Comments at 1-2; Public Interest Commenters Reply 4-6.

[60] Free Press Comments at 1-2.

[61] *Id.* at 2.

[62] Public Interest Commenters Reply at 4-6.

[63] *See, e.g.*, Fox Comments at 4-12; Letter from Jared S. Sher, Senior Vice President and Associate General Counsel, 21st Century Fox, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-326, at 1 (filed June 9, 2016) (Fox June 9, 2016, *Ex Parte* Letter); Sinclair Comments at 5-8; ION Comments at 11-14; Trinity Comments at 1-5.

[64] Fox Comments at 7-10. Fox also points to Third Circuit precedent and legislative history for support that adjusting the discount would undermine the congressionally established 39 percent national audience reach cap. *Id.* at 10-12.

Fox contends that modification of the cap outside of Section 202(h) would violate the CAA because Congress intended "to ensure that the FCC would have no further independent authority to modify the cap."[65]

19. Similarly, Sinclair, ION, and Trinity argue that the CAA stripped the Commission of its authority to modify the 39 percent national audience reach cap by removing it from the scope of the Commission's statutorily mandated quadrennial review.[66] Sinclair suggests further that, under principles of statutory construction, the CAA taken as a whole demonstrates that Congress did not intend the Commission to have the authority to modify or eliminate either the UHF discount or the cap.[67] Trinity asserts that, absent a specific directive from Congress, the Commission lacks the substantive and procedural authority to eliminate or modify the national audience reach cap or the UHF discount.[68]

20. Other commenters assert that the Commission lacks authority to eliminate the discount except in the context of a larger action that also amends the national audience reach cap.[69] For instance, several broadcast commenters argue that Congress was well aware of the UHF discount and intended to include the discount in establishing the precise 39 percent cap.[70] Fox and Sinclair argue that elimination

---

[65] *Id.* at 8. *See also* Fox June 9, 2016, *Ex Parte* Letter at 1.

[66] Sinclair Comments at 6; ION Comments at 11-12; Trinity Comments at 2.

[67] Sinclair Comments at 6-7. In addition, ION contends that the only reasonable construction of Section 202 of the 1996 Act is that Congress intended the quadrennial review process to be the only means for the Commission to review and update its media ownership rules. Specifically, ION claims that because Congress excluded examination of the national audience reach cap from the scope of the quadrennial review process, the Commission is presumably barred from reviewing or modifying the national audience reach cap under its general rulemaking authority. ION Comments at 12-13. ION argues further that the Third Circuit's decision in *Prometheus I* does not provide the support for the Commission's assumption of authority to modify the UHF discount. *See id.* at 13-14.

[68] Trinity Comments at 2-5; Letter from Colby M. May, Counsel to Trinity Broadcasting Network, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 2 (filed July 29, 2016) (Trinity July 29, 2016, *Ex Parte* Letter at 2).

[69] Sinclair also contends that the cap itself is unconstitutional and that the Commission should stop enforcing it for that reason, claiming that the cap restricts group owners' speech, cannot survive strict scrutiny and thus violates the First Amendment; violates the Equal Protection clause of the Constitution because broadcast television licensees are the only communications providers subject to a national cap; and violates broadcasters' due process rights because the cap is unsupported and therefore is arbitrary and capricious. Sinclair asserts that the cap could not survive strict scrutiny review of any of its constitutional claims. Sinclair Comments at 10-12. Sinclair fails to support its cursory assertions with any analysis. Regarding the First Amendment claim, the D.C. Circuit has rejected the argument that the national TV cap is subject to strict scrutiny for purposes of the First Amendment and held that the 35 percent statutory ownership cap was constitutional under rational basis analysis. *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1045-47 (D.C. Cir. 2002). Nor has Sinclair provided any justification for its statement that judicial review of the national cap would be subject to strict scrutiny for purposes of its other arguments. Sinclair does not even claim that the national cap could not survive rational basis review, which would apply in this case because the national cap is not based on suspect classifications and does not violate the First Amendment. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). *See also 2002 Biennial Review Order*, 18 FCC Rcd at 13828-34, paras. 538-52 (concluding that some national cap is necessary to preserve and promote localism).

[70] *See, e.g.*, Sinclair Comments at 5-7; Fox Comments at 4-12; Fox June 9, 2016, *Ex Parte* Letter at 1-2; Univision Comments at 13; ION Comments at 11-12; Trinity Comments at 1-5. Sinclair notes that when Congress raised the national audience reach cap from 25 percent to 35 percent in 1996, it expressly approved the use of the UHF discount. Sinclair Comments at 2 & n.7 (citing H.R. Rep. No. 104-204 at 118 ("This 'UHF discount' appropriately reflects the technical and economic handicaps applicable to UHF facilities and the Committee does not envision that the UHF discount calculation will be modified so as to impede the objectives of this section.")). *See also* Fox Comments at 11-12.

of the discount effectively results in a reduction of the cap and so the Commission cannot eliminate the discount unless it also amends the cap, presumably by increasing the permissible audience reach.[71] Similarly, Univision claims that the UHF discount is inextricably tied to the national audience reach cap and can be reconsidered only in conjunction with consideration of the cap.[72] Fox argues further that the CAA converted the national audience reach cap into a statutory standard. Thus, in Fox's view, altering the discount effectively modifies the cap, which violates the plain text of the statute.[73] These commenters point to the CAA's legislative history, which indicates that the cap was set at 39 percent to avoid divestiture of broadcast interests by certain parties that would be required without the discount.[74]

21. We conclude that the Commission has the authority to modify the national audience reach cap, including the authority to revise or eliminate the UHF discount.[75] We find that no statute bars the Commission from revisiting the cap or the UHF discount contained therein in a rulemaking proceeding so long as such a review is conducted separately from a quadrennial review of the broadcast ownership rules pursuant to Section 202(h) of the 1996 Act. The CAA simply directed the Commission to revise its rules to reflect a 39 percent national audience reach cap and removed the requirement to review the national ownership cap from the Commission's quadrennial review requirement.[76] It did not impose a statutory national audience reach cap or prohibit the Commission from evaluating the elements of this rule.[77] Thus, the Commission retains authority under the Communications Act to review any

---

[71] Specifically, these commenters note that the CAA uses the term "national audience reach," which, commenters reason, under the Commission's rules, includes the UHF discount. These commenters allege that the use of the term demonstrates Congress's belief that the national audience reach cap and the discount are inextricably related. *See* Fox Comments at 4-6; Fox June 9, 2016, *Ex Parte* Letter at 1; Sinclair Comments at 5; Trinity Comments at 5.

[72] Univision Comments at 13.

[73] Fox Comments 6-7; Fox June 9, 2016, *Ex Parte* Letter at 1.

[74] Sinclair Comments at 5 & n.25 (citing the legislative history of the CAA); Fox Comments at 12 & nn.33-34 (citing the legislative history of the CAA).

[75] 47 CFR § 73.3555(e).

[76] The CAA states in relevant part:

> The Telecommunications Act of 1996 is amended as follows--
>
> (1) in section 202(c)(1)(B) by striking "35 percent" and inserting "39 percent";
>
> (2) in section 202(c) by adding the following new paragraphs at the end:
>
> "(3) Divestiture.--A person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B) through grant, transfer, or assignment of an additional license for a commercial television broadcast station shall have not more than 2 years after exceeding such limitation to come into compliance with such limitation. This divestiture requirement shall not apply to persons or entities that exceed the 39 percent national audience reach limitation through population growth.
>
> (4) Forbearance.--Section 10 of the Communications Act of 1934 (47 U.S.C. 160) shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B);"; and
>
> (3) in section 202(h) by striking "biennially" and inserting "quadrennially" and by adding the following new flush sentence at the end:
>
> "This subsection does not apply to any rules relating to the 39 percent national audience reach limitation in subsection (c)(1)(B).".

CAA § 629(1) & (3).

[77] *Id.* The CAA also provides that the Commission may not apply its forbearance authority under Section 10 of the Communications Act, 47 U.S.C. § 160, to any person or entity exceeding the 39 percent national audience reach cap. *See id.* § 629(4). While the meaning of this provision is unclear given that forbearance authority does not apply to

(continued….)

aspect of the national audience reach cap; it simply is not required to do so as part of the quadrennial review. Specifically, the Communications Act gives the Commission the statutory authority to revisit its own rules and revise or eliminate them when it concludes such action is appropriate. The Act authorizes the agency to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions."[78] Similarly, Section 303(r) provides that the Commission may "[m]ake such rules and regulations . . . not inconsistent with this law, as may be necessary to carry out the provisions of this Act . . . ."[79] Indeed, courts have held that the Commission has an affirmative obligation to reexamine its rules over time.[80] In *Bechtel v. FCC*, the court observed that "changes in factual and legal circumstances may impose upon the agency an obligation to reconsider a settled policy or explain its failure to do so. In the rulemaking context, an agency also may be obligated to reexamine its approach 'if a significant factual predicate of a prior decision has been removed.'"[81] As we explain further below, this is precisely the case in this instance.

22. With respect to the UHF discount contained in the rule, even those advocating retention of the discount based on the CAA acknowledge that the CAA does not even mention the UHF discount.[82] Some commenters argue that the CAA should be interpreted as acknowledging the UHF discount because we should read it into Congress's intended definition of the term "national audience reach," which is included in that statute.[83] But the CAA does not include any language to indicate that Congress intended to preclude the Commission from reexamining the "national audience reach" at a later time.[84]

(Continued from previous page)

the regulation of broadcasters under Title III of the Communications Act, we do not interpret this provision as prohibiting the Commission from reexamining and revising the national audience reach cap or the UHF discount. We think this provision is most reasonably interpreted as a congressional directive that the Commission not decline to enforce against any person or entity the stricter national cap that Congress required the Commission to adopt. After all, the statute was a response to the Commission's relaxation of the cap, and Congress directed the Commission to instead adopt a more stringent cap. There is nothing in the CAA that suggests Congress intended to prevent the Commission from tightening the cap, repealing the UHF discount, or otherwise changing its rules at a later date.

[78] 47 U.S.C. § 154(i).

[79] *Id.* § 303(r). *See also Sports Blackout Rule*, Report and Order, 29 FCC Rcd 12053, 12058, para. 9 (2014) (*Sports Blackout Order*) (finding that, despite a statute stating that the Commission "shall" apply the sports blackout rule to direct broadcast satellite and online video service, the Commission could repeal the rule under its general rulemaking power to review its rules and modify or repeal them as it deems appropriate).

[80] *See, e.g.*, *Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 767 (6th Cir. 1995), citing *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992), *cert. denied*, 506 U.S. 816 (1992) (*Bechtel*) ("[W]here the factual assumptions which support an agency rule are no longer valid, agencies ordinarily must reexamine their approach."); *Geller v. F.C.C.*, 610 F.2d 973, 979 (D.C. Cir. 1979) ("[An] agency cannot sidestep a reexamination of particular regulations when . . . circumstances make that course imperative.").

[81] *Bechtel*, 957 F.2d at 881 (quoting *WWHT, Inc. v. FCC*, 656 F.2d 807, 819 (D.C. Cir 1981)). *See also Sports Blackout Order*, 29 FCC Rcd at 12061-12068, paras. 13-19 (describing shift of distribution rights from leagues to teams, change from gate receipts to television revenues as primary source of NFL revenue, and reduction in NFL blackouts as factual differences making sports blackout rules no longer relevant).

[82] Fox Comments at 5; Sinclair Comments at 5.

[83] *See, e.g.*, Sinclair Comments at 5; Fox Comments at 4-6; Univision Comments at 13; ION Comments at 11-12; Trinity Comments at 1-5. Several times, the CAA refers to "the 39 percent national audience reach limitation." *See supra* note 76.

[84] *See AFL-CIO v. Brock*, 835 F.2d 912, 916 (D.C. Cir. 1987) ("To freeze an agency interpretation, Congress must give a strong affirmative indication that it wishes the present interpretation to remain in place."). Further, Sinclair's appeal to the legislative history of the 1996 legislation raising the cap from 25 percent to 35 percent, *see supra* note 70, is inapt because it says nothing about congressional intent when Congress enacted legislation in 2004 to lower the Commission's 45 percent cap to 39 percent.

23. Moreover, we disagree with commenters' suggestion that the CAA's legislative history somehow supports a conclusion that Congress fully considered either the UHF discount or the effect of the – then future – DTV transition.[85] The history of this immense, omnibus bill does not reflect any consideration of the UHF discount or its potential elimination. There is no basis for the assumption that Congress, in overruling the Commission's decision to raise the national audience reach cap to 45 percent and mandating it be moved back down to 39 percent, did so with the expectation that the Commission would indefinitely maintain the UHF discount, especially given that post-DTV transition there is no technological basis for the UHF discount.[86] We note further that, when Congress chose to supersede the Commission's action and revise the national audience reach cap down to 39 percent, it was on notice of the Commission's intent to phase out the discount, which the Commission had expressed in 1998 and again in 2002. Congress was also aware, of course, of the Commission's broad authority – indeed, its obligation – to reevaluate its rules periodically and revise any that no longer serve the public interest. It could have foreclosed the Commission from ever revising the national audience reach cap or the UHF discount by making the national cap and the UHF discount a statutory restriction or by otherwise withdrawing Commission authority to modify the cap or the UHF discount. It did not do so, opting instead for the limited measure that reduced the cap from 45 percent to 39 percent and relieving the Commission of the obligation to reevaluate the national audience reach cap in the mandated quadrennial ownership review.[87] The Public Interest Commenters argue that these actions suggest Congress's intent was to prevent excessive consolidation in the broadcast market, and we agree.[88] In fact, as discussed below, operation of the analog-era discount after the DTV transition effectively allows some broadcasters with UHF stations to reach far more than the 45 percent of the national audience that Congress thought too high.

24. Our interpretation of the CAA is consistent with the conclusion of the Third Circuit. The court explained in *Prometheus I*, that, although Congress excluded the national audience reach cap from the quadrennial review requirement under Section 202(h), it did not foreclose Commission action to review or modify the UHF discount in a separate context.[89]

### B. Elimination of the UHF Discount

25. The *Notice* tentatively concluded that the historical justification for the UHF discount no longer exists and the rule is obsolete and should be eliminated. Many commenters support the Commission's tentative conclusions. Several commenters agree that television broadcasting in the UHF

---

[85] In 2004, when Congress lowered the national audience reach cap in the CAA, the digital transition was still several years away and was designed to progress on a gradual, market-by-market basis. Congress therefore could not have evaluated the impact of the DTV transition on the UHF discount. *See* 47 U.S.C. 309(j)(14)(A)-(B) (2004) (stating that only television broadcast stations meeting certain criteria could broadcast in an analog format beyond December 31, 2006). As noted above, later in 2006 the gradual transition approach was replaced with a hard deadline for transition by June 12, 2009. *See supra* note 33.

[86] The legislative history from the 1996 Act cited by Sinclair simply reinforces the notion that the UHF discount "appropriately reflect[ed] the technical and economic handicaps applicable to UHF facilities" at that time. *See supra* note 70.

[87] *See Chevron U.S.A. v. Nat'l Res. Def. Council*, 467 U.S. 837, 843 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

[88] Public Interest Commenters Reply at 2-3.

[89] *Prometheus I*, 373 F.3d at 397 ("Although we find that the UHF discount is insulated from this and future periodic review requirements, we do not intend our decision to foreclose the Commission's consideration of its regulation defining the UHF discount in a rulemaking outside the context of Section 202(h)."). *See also* Section 202(h) of the 1996 Act, 47 U.S.C. § 303 note.

band is no longer technically inferior to operations in the VHF band.[90] For example, Block asserts that the UHF discount is an "outdated relic of the old analog broadcasting system," because UHF stations are now more desirable than VHF stations for digital broadcasting.[91] Free Press also agrees that the DTV transition eliminated the technical disadvantages faced by UHF stations and notes that, when the UHF discount was adopted, diminished signal coverage greatly impacted broadcasters as they depended more on over-the-air signal coverage than they do today.[92] Given that UHF stations no longer suffer from weaker signals and smaller audience reach, and are less dependent today on over-the-air coverage, Free Press argues that UHF station owners no longer need the UHF discount to remain viable and competitive.[93]

26. Notably, commenters in this proceeding have not presented evidence of any existing technical limitations that render digital UHF stations inferior to digital VHF stations. As Public Interest Commenters state, "[n]ot a single commenter contended that the original justification for the UHF discount is still valid."[94] At best, ION asserts that several years of signal parity does not remedy the disparities between UHF and VHF stations, citing VHF commercial and economic advantages acquired during the analog era.[95] To the contrary, several commenters support our conclusion that the DTV transition eliminated the technical disparities between UHF and VHF services that existed in the analog world.[96]

27. Other commenters argue that, aside from any technological considerations that may originally have justified the UHF discount, the discount remains necessary today to promote competition, localism, and diversity.[97] For example, Sinclair asserts that the UHF discount helps non-network broadcast groups compete with stations owned and operated by the major broadcast networks, which typically have higher ratings and continue to benefit from historical viewing patterns.[98] Additionally, ION argues that eliminating the UHF discount will stifle the creation of new networks, like those built by ION, Univision, and Trinity, thus reducing competition and diversity.[99] In response, Free Press, WGAW,

---

[90] *See, e.g.*, Block Comments at 1-3; Free Press Comments at 3; CCA Comments at 1; WGAW Comments at 3-4; Public Interest Commenters Reply at 3; Letter from Ross Lieberman, Senior Vice President of Government Affairs, American Cable Association (ACA), to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 1-3 (filed August 2, 2016) (ACA August 2, 2016, *Ex Parte* Letter).

[91] Block Comments at 1-2; *see also* CCA Comments at 1; ACA August 2, 2016, *Ex Parte* Letter at 2. Block further argues that large station groups have already exploited the UHF discount by purchasing dozens of UHF stations, driving their true national audience reach well above the national audience reach cap. Therefore, Block argues, station owners no longer need incentives like the UHF discount to utilize the UHF band. Block Comments at 2-3.

[92] Free Press Comments at 3, 6. *See also* WGAW Comments at 3; ACA August 2, 2016, *Ex Parte* Letter at 2.

[93] Free Press Comments at 3.

[94] Public Interest Commenters Reply at 1. *See also* ACA August 2, 2016, *Ex Parte* Letter at 2-3.

[95] ION Comments at 9-10; Letter from John R. Feore, Counsel to ION Media Networks, Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 2 (filed July 15, 2016) (ION July 15, 2016, *Ex Parte* Letter).

[96] Free Press Comments at 3 (stating the digital transition eliminated the technical disparities of UHF stations); CCA Comments at 2 (asserting the UHF discount is a product of the analog era and no longer serves its purpose); WGAW Comments at 3 (noting the technical justification for the UHF discount is now obsolete); Block Comments at 2 (arguing UHF stations are more desirable than VHF stations for digital broadcasting); ACA August 2, 2016, *Ex Parte* Letter at 3 (claiming that the discount's factual justification is lost, and therefore it is no longer in the public interest and its retention by the Commission would be arbitrary and capricious).

[97] *See, e.g.*, Fox Comments at 13-18; ION Comments at 7-10; Univision Comments at 1; Sinclair Comments at 7-8.

[98] Sinclair Comments at 7-8.

[99] ION Comments at 9.

Block, and ACA assert that the UHF discount actually harms competition, localism, and diversity because it encourages media consolidation.[100]

28. The record is absolutely clear: UHF stations are no longer technically inferior in any way to VHF stations. Therefore, we find that the DTV transition has rendered the UHF discount technically obsolete, and we hereby eliminate it from the calculation of the national audience reach cap. The UHF discount was forged in an analog world to address an analog coverage deficiency.[101] Today, in a digital world, there is no remaining technical justification for the UHF discount. In fact, solely as a result of the DTV transition, the national cap is effectively 78 percent for a station group that includes only UHF stations, and for any station group that includes a UHF station, the effective national cap now exceeds the 39 percent level that Congress directed the Commission to establish. Rather than offsetting an actual service limitation or reflecting a disparity in signal coverage, the UHF discount serves only to confer a factually unwarranted benefit on owners of UHF television stations that undermines the purpose of the national audience reach cap. Furthermore, the Commission's ongoing experience reviewing media transactions after the DTV transition date indicates that failure to correct the distortion that the UHF discount causes in the calculation of the national audience reach as a result of the DTV transition creates an ongoing potential that additional transactions could undermine the national audience reach cap.

29. At the time the UHF discount was established, analog UHF television stations were demonstrably inferior to VHF stations, with weaker signals and a smaller audience reach.[102] The UHF discount ensured that UHF stations were not presumed to reach a larger audience than they actually reached.[103] Thirty years after its adoption, however, it is clear that the UHF discount cannot be justified in the digital world. As discussed above, the UHF discount was intended explicitly to recognize and compensate for the inferior coverage and smaller viewership that analog UHF stations suffered in comparison to analog VHF stations.[104] While that was necessary in the mid-1980s, the Commission soon found that the disparity was unlikely to exist in perpetuity. Further, three decades ago roughly 60 percent of U.S. television households received programming exclusively over-the air, while according to the most recent Nielsen data, approximately 11.5 percent, or about 13.3 million television households, were broadcast-only.[105]

30. As early as 1988 the Commission noted that the disparities between UHF and VHF services had begun to decrease.[106] And, as the disparity between the two services eroded during the 1980s and 1990s, the Commission repealed a number of rules and policies that had previously treated UHF

---

[100] Free Press Comments at 4-5; WGAW Comments at 4-7; Block Comments at 2; ACA August 2, 2016, *Ex Parte* Letter at 3.

[101] *1985 TV Ownership Reconsideration*, 100 FCC 2d at 93, para. 43 ("[W]e find that while there has been demonstrable progress in the viability of UHF television, the inherent physical limitations of this medium should be reflected in our national multiple ownership rules."). *See also 2002 Biennial Review Order*, 18 FCC Rcd at 13845, para. 585 ("[T]he discount was enacted because UHF stations were competitively disadvantaged by weaker signals and smaller household reach than VHF stations.").

[102] *1985 TV Ownership Reconsideration*, 100 FCC 2d at 92-94, paras. 42-44.

[103] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13845, para. 586 (discussing data showing that UHF stations reached between 56 percent and 61 percent and between 35.7 percent and 78.2 percent of the service area of VHF stations owned by the same licensees in the same markets).

[104] *See supra* para. 5.

[105] Broadcasting Cablecasting Yearbook 1985 at A-2; Nielsen, *2015-2016 Universe Estimates: National Media Related Universe Estimates* (excel spreadsheet), Feb. 1, 2016.

[106] *Policies Regarding Detrimental Effects of Proposed New Broadcast Stations on Existing Stations*, Report and Order, 3 FCC Rcd 638, 642, para. 27 (1988) (stating that "the former disparities between the UHF and VHF services have been largely eliminated") (*1988 UHF Impact Policy Order*).

stations differently, and occasionally more favorably, than their VHF counterparts.[107] By the mid-1990s, the Commission went so far as to note that the disparities between UHF and VHF stations had been largely ameliorated and the ability of UHF stations to compete against VHF stations had greatly improved.[108]

31. The most important change, however, occurred with the transition of television broadcasting to digital, which the Commission had long recognized would likely eliminate the inferiority of UHF channels. As explained above, in the *1998 Biennial Review Order*, the Commission made clear its skepticism that the UHF discount would continue to have any relevance following the DTV transition.[109] Even though the Commission ultimately decided to retain the UHF discount in the *1998 Biennial Review Order* because the digital transition was not yet complete, it indicated that the discount's days were numbered.[110] At that time, the Commission discussed at length its expectation that the transition to digital broadcasting would potentially "rectify the UHF/VHF disparity" and that "the eventual modification or elimination of the discount for DTV [would] be appropriate."[111]

32. In its subsequent *2002 Biennial Review Order*, the Commission determined that the issue was ripe and that the forthcoming DTV transition would substantially equalize UHF and VHF signals.[112] The DTV transition has borne out the Commission's expectation. As a result of the DTV transition, digital UHF television stations do not suffer from the same technical deficiencies that had characterized analog UHF stations in comparison to VHF facilities.

33. UHF spectrum is now highly desirable in light of its superior propagation characteristics for digital television.[113] ION notes that, since the 2009 DTV transition, 74 percent of the nation's television stations are now operating on UHF channels, and 80 percent of the aggregate television viewing population is served by UHF stations.[114] As a result of the DTV transition, the number of UHF

---

[107] *See id.* at 639, 642, paras. 6, 26 (eliminating the UHF Impact Policy, which limited approval of new, or modifications to existing, VHF stations if the proposal would harm existing or potential UHF stations); *Review of the Prime Time Access Rule, Section 73.658(k) of the Commission's Rules*, Report and Order, 11 FCC Rcd 546, 546, 596-97, 601-02, paras. 1, 99-102, 113-15 (1995) (repealing Prime Time Access Rule, which prohibited network-affiliated television stations in the top 50 markets from broadcasting more than three hours of network programs during prime time hours and was designed to increase programming available to independent stations, including UHF stations) (*1995 Prime Time Access Rule Order*); *Review of the Commission's Regulations Governing Television Broadcasting*, Report and Order, 10 FCC Rcd 4538, 4542, paras. 1, 26 (1995) (repealing secondary affiliation rule, which required a third network seeking an affiliate in the market to offer its programming first to the independent station, often a UHF station) (*1995 Review of Television Broadcast Rules Order*).

[108] *Broadcast Television National Ownership Rules*, Notice of Proposed Rulemaking, 11 FCC Rcd 19949, 19954, para. 12 (1996) (stating "the UHF disparity has been ameliorated over the years") (*Broadcast Television National Ownership Rules NPRM*); *1995 Prime Time Access Rule Order*, 11 FCC Rcd at 597, para. 101 (noting "that the UHF signal disparity has been reduced, albeit not entirely"); *1995 Review of Television Broadcast Rules Order*, 10 FCC Rcd at 4542, para. 20 (stating that "[f]rom a technical perspective, the ability of the UHF television service to compete against VHF service, however, has improved in the 24 years since the secondary affiliation rule was adopted").

[109] *1998 Biennial Review Order*, 15 FCC Rcd at 11080, para. 38.

[110] *Id.* at 11078-80, paras. 35-38. *See also* Free Press Comments at 3.

[111] *1998 Biennial Review Order*, 15 FCC Rcd at 11080, para. 38.

[112] *2002 Biennial Review Order*, 18 FCC Rcd at 13847, para. 591.

[113] *Broadcast Innovation NPRM*, 25 FCC Rcd at 16511-13, paras. 42-45.

[114] ION Comments at 5. In April 2010, Broadcasting & Cable noted that following the June 2009 DTV transition, "the majority of U.S. TV stations had moved to UHF channels, which are better suited to broadcasting digital television at lower power level." *Top 25 Station Groups: How They Were Ranked*, BROADCASTING & CABLE, Apr. 12, 2010, *at* http://www.broadcastingcable.com/file/10313-B_C_Top_25_Station_Groups.pdf?force=true (visited,
(continued….)

stations increased by 221 stations and the number of VHF stations decreased by 204 stations, indicating that over 200 stations, or approximately 15 percent of the total number of commercial television stations, switched spectrum bands in favor of UHF as a result of the DTV transition.[115] Notably, the DTV transition preserved station coverage, and in many cases, allowed stations to improve coverage by upgrading their facilities, maximizing power, and capitalizing on improved propagation of digital television signals.[116] Therefore, stations have enhanced their coverage and audience reach as a result of the DTV transition, both because of the technical superiority of digital broadcasts on UHF channels and as a result of the chance to "maximize" their signal coverage during the transition. The evidence clearly establishes that digital UHF operations do not suffer from the same technical limitations as analog UHF operations. Additionally, this finding is consistent with past Commission decisions scrutinizing the necessity of the UHF discount and recognizing the increased economic viability and success of the UHF band.[117]

34. Simply put, the UHF discount does not appropriately reflect the technical and economic reality of UHF facilities today. And, in fact, the discount impedes the objectives of the national audience reach cap by effectively expanding the 39 percent cap even beyond the level that Congress determined was too high when it enacted the CCA. Without any current technological justification, the continued application of the UHF discount distorts the calculation of a licensee's national audience reach and undermines the intent of the cap. Continued application of the UHF discount seven years after the DTV transition has the absurd result of stretching the national audience reach cap to allow a station group to actually reach up to 78 percent of television households, dramatically raising the number of viewers that a station group can reach and thwarting the intent of the cap.[118] The discount was intended to make the calculation of an owner's audience reach better reflect the reality of the audience the stations actually reached. In the current circumstances, however, applying the discount creates a loophole that allows

(Continued from previous page)
June 21, 2016) (*2010 Top 25 Station Groups Chart*). *See also* Paige Albiniak, *B&C's Top 25 Station Groups 2010*, BROADCASTING & CABLE, Apr. 12, 2010, *at* http://www.broadcastingcable.com/news/local-tv/bc%E2%80%99s-top-25-station-groups-2010/42271 (visited June 21, 2016) (*B&C's Top 25 Station Groups 2010*).

[115] *See Broadcast Station Totals as of December 31, 2008* (rel. Feb. 27, 2009) (listing 796 UHF commercial TV licenses and 582 VHF commercial TV licenses); *Broadcast Station Totals as of June 30, 2009* (rel. Sept. 4, 2009) (listing 1,017 UHF commercial TV licenses and 378 VHF commercial TV licenses).

[116] *See 1998 Biennial Review Order*, 15 FCC Rcd at 11080, para. 38 ("[…] pursuant to Section 5009(c) of Pub. Law 106-113, 113 Stat. 1501, Appendix I (1999), the Commission, on December 7, 1999, issued a Public Notice giving DTV licensees until December 31, 1999, in which to file notice that they intend to seek maximization of their DTV service area. One thousand three hundred and sixteen letters of notification manifesting the intent to file to maximize DTV stations' service areas were filed by that deadline. Accordingly, DTV licensees, including those operating on UHF channels, have been given the opportunity to maximize their DTV coverage areas, and not merely replicate their analog coverage.").

[117] *See, e.g.*, *Broadcast Innovation NPRM*, 25 FCC Rcd at 16511, para. 42 (recognizing that UHF spectrum is highly desirable for flexible use); *Broadcast Television National Ownership Rules NPRM*, 11 FCC Rcd at 19954, para. 12 ("the UHF disparity has been ameliorated over the years"); *1995 Review of Television Broadcast Rules Order*, 10 FCC Rcd at 4542, para. 20 ("From a technical perspective, the ability of the UHF television service to compete against VHF service, however, has improved in the 24 years since the secondary affiliation rule was adopted."). We note further that retention of the UHF discount would contradict past Commission actions to eliminate regulatory measures originally adopted to assist analog UHF stations. *See supra* para. 30.

[118] This assumes all stations in the group broadcast on UHF channels. *See, e.g.*, Public Interest Commenters Reply at 3. Further, the Public Interest Commenters argue that the continued existence of an obsolete discount incentivizes station group owners to switch their VHF stations to UHF stations for the very purpose of avoiding the effects of the national audience reach cap, in which case the existence of the discount proactively undermines the rule. *Id.* at 3-4. *See also* ACA August 2, 2016, *Ex Parte* Letter at 2, stating that the UHF discount, "now gives owners of UHF stations an unfair advantage in the number of households their signal may lawfully reach and skews the broadcast marketplace."

owners to fail to count audience that the stations actually do reach. For example, prior to the DTV transition, a station group owner might have a theoretical audience reach of 39 percent, but, because some stations in the group operated using inferior analog UHF signals, the group could not actually reach all of that audience. So the UHF discount reasonably allowed the station group owner to adjust the audience reach calculation to a lower percentage to reflect that reality better. Immediately after the DTV transition, however, the same UHF stations in the group would experience improved audience reach as a function of the technical superiority of digital broadcasts on UHF channels. The station group's actual national audience reach would now equal or even exceed 39 percent, as its stations would, in fact, reach the television households in their market areas, and a discount to offset a spectral coverage deficiency would no longer be warranted. Continued application of the antiquated UHF discount now has the unintended consequence of significantly discounting a station's actual audience reach for purposes of the rule when in reality the station's audience reach is not diminished at all by the use of UHF technology, but rather improved.[119]

35. Additionally, as a result of the DTV transition, many stations that were broadcasting on VHF channels at the time the 39 percent cap was instituted have shifted to UHF channels. Despite having signal coverage that is equal to, or even better than, its previous VHF channel, the former VHF station now receives – for the first time – the benefit of the UHF discount, *i.e.*, a 50 percent reduction in the audience reach attributed to the station, all based on a discount intended to offset the inferiority of *analog* UHF signals. For instance, a licensee that traded an analog VHF station for a digital UHF station will now appear to have room to acquire additional stations under the 39 percent cap simply by virtue of having changed spectrum, even though the number of stations owned by the licensee and the audience reached by those stations remain the same. Such a result serves as an unwarranted windfall for stations that migrated from VHF to UHF in the DTV transition, in light of the general technical superiority of the digital UHF channels.[120]

36. For example, in 2009, just prior to the DTV transition, Fox owned 27 stations with a total national audience reach of 37.22 percent before application of the UHF discount and 31.20 percent after application of the UHF discount.[121] In 2010, immediately after the DTV transition, Fox continued to own 27 stations with a total national audience reach of 37.10 percent before application of the UHF

---

[119] Furthermore, as demonstrated by the example above, the digital UHF station very likely would have greater signal coverage and reach a greater number of viewers because of the technological innovations of the DTV transition. Despite this fact, the continued application of the analog-era UHF discount would reduce the audience reach as calculated for purposes of the national audience reach cap for this station by 50 percent. *See supra* para. 33.

[120] Even after the DTV transition, a number of stations that initially elected to operate on a VHF channel sought to relocate to a UHF channel to resolve technical difficulties encountered in broadcasting digitally on a VHF channel. *See, e.g.*, *Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments, Television Broadcast Stations. (Panama City, Florida)*, Report and Order, 26 FCC Rcd 14415 (Chief, Video Division, MB 2011) (substituting channel 18 for channel 7 for Gray Television Licensee, LLC); *Amendment of Section 73.622(i), Post-Transition Table of DTV Allotments, Television Broadcast Stations. (Nashville, Tennessee)*, Report and Order, 26 FCC Rcd 7677 (Chief, Video Division, MB 2011) (substituting channel 25 for channel 5 for NewsChannel 5 Network, LLC); *Amendment of Section 73.622(i), Final DTV Table of Allotments, Television Broadcast Stations. (Oklahoma City, Oklahoma)*, Report and Order, 25 FCC Rcd 2276 (Associate Chief, Video Division, MB 2010) (substituting channel 39 for channel 9 for Griffin Licensing, L.L.C.). *See also* Block Comments at 2 (noting many broadcasters switched from VHF to UHF channels after the DTV transition); *Top Station Groups Stay the Course*, TVNEWSCHECK, Apr. 7, 2010, http://www.tvnewscheck.com/article/41240/top-station-groups-stay-the-course#top-group-5 (stating the UHF discount no longer makes sense given that following the DTV transition most stations are UHF stations) (visited June 20, 2016).

[121] Paige Albiniak, *NAB 2009: Top 25 Station Groups*, BROADCASTING & CABLE, Apr. 19, 2009, at http://www.broadcastingcable.com/news/programming/nab-2009-top-25-station-groups/34555 (visited June 21, 2016).

discount.[122] However, because five of Fox's stations switched from analog VHF channels to digital UHF channels in the transition, Fox's national audience reach calculation suddenly decreased with the benefit of the UHF discount, which allowed the station group to calculate its audience reach as only 24.75 percent – despite the fact that Fox still owned the same number of stations in the same markets reaching the same audiences.[123] Although only five of Fox's stations switched from analog VHF to digital UHF channels in the DTV transition, these stations were all located in the top 10 DMAs, which account for a significant percentage of the television households in the nation.[124] As a result, reducing the national audience reach by 50 percent for just a handful of stations in these larger markets had the effect of greatly reducing Fox's national audience reach calculation and potentially allowing significant additional consolidation, although it had no effect on its actual national audience reach. This example demonstrates the absurd results created by the continued existence of the discount.

37. Some commenters note that in 2003 the Commission retained the UHF discount for stations not owned by the Big Four networks and indicated the Commission would "examine the extent of the competitive disparity between UHF and VHF stations as well as the impact on the entry and viability of new broadcast networks."[125] These commenters thus claim that the Commission must consider not only the technological disparity between UHF and VHF, but the competitive disparity as well.[126] But any competitive disparity between UHF and VHF flowed from the technological disparity.[127] As we have detailed above, following the transition to DTV, UHF stations are no longer competitively disadvantaged as compared to VHF stations. The competitive disadvantages suffered by analog UHF stations – namely weaker signals, smaller household reach, greater electricity costs, and potentially reduced carriage by cable systems as compared to VHF stations[128] – have been resolved by the transition to digital broadcasting. Further, the record does not reflect evidence of any existing competitive disparity resulting from the continued deficiency of UHF signals. For example, no party has proffered evidence that advertisers routinely discount the prices paid for advertising on UHF stations versus VHF stations, as

[122] *2010 Top 25 Station Groups Chart*; *see also B&C's Top 25 Station Groups 2010*.

[123] *See 2010 Top 25 Station Groups Chart*; R.R. Bowker, *Broadcasting & Cable Yearbook 2010*, "Section B, Broadcast Television" (2009); R.R. Bowker, *Broadcasting & Cable Yearbook 2009*, "Section B, Broadcast Television" (2008) (providing group ownership and station listings).

[124] *Id.*

[125] *2002 Biennial Review Order*, 18 FCC Rcd at 13847, para. 591; *see also* ION Comments at 10-11, Letter from John R. Feore, Counsel to ION Media Networks, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 1 (filed August 15, 2016) (ION August 15, 2016, *Ex Parte* Letter); Tribune Reply at 3, Trinity July 29, 2016, *Ex Parte* Letter at 2; Sinclair Comments at 7-8.

[126] Despite the technical superiority of digital UHF stations, ION argues the UHF discount is still necessary because the DTV transition did not remedy the longstanding economic disadvantages of UHF stations. ION Comments at 9-11; ION July 15, 2016, *Ex Parte* Letter at 2. *See also* Sinclair Comments at 7-8 (noting continued competitive disadvantages of UHF stations). Contrary to ION's claims, the Commission in 2003 made no affirmative decision to preserve the UHF discount for stations not owned and operated by the Big Four networks, and certainly did not do so because "those stations are most likely to continue suffering from persistent economic handicap afflicting UHF stations," as ION argues. ION Comments at 10; *see also id.* at 6-9. The Commission clearly articulated that the UHF discount was predicated on the competitive disparity arising from the technical differences between the two types of channels, and merely deferred a decision on eliminating the discount, stating that it would "propos[e] a phased-in elimination of the discount when DTV transition is near completion." *2002 Biennial Review Order*, 18 FCC Rcd at 13847, para. 591. With the advent of a hard deadline for the transition and the universal switch of all full-power stations to DTV in 2009, however, the need and logic for a gradual elimination of the UHF discount evaporated, along with the basis for the discount. There is even less need for the discount seven years after the transition.

[127] *2002 Biennial Review Order*, 18 FCC Rcd at 13845-46, paras. 585-88.

[128] *Id.*

commenters alleged in 2003.[129] Thus, we find no evidence that UHF stations today face a competitive disparity vis-à-vis VHF stations. In fact, as we note above, a number of former analog VHF stations chose to operate on UHF channels, further belying the suggestion that a competitive disparity persists between the two types of channels. Further, the Commission has eliminated the historic steep discount in annual regulatory fees assessed for UHF stations, combining UHF and VHF stations into a single fee category beginning in Fiscal Year 2014, thereby eliminating a distinction based on the historical disadvantages of UHF.[130]

38. Of course, this is not to say that all *stations* are now competitive equals. Disparities continue to exist between stations in terms of viewership, advertising revenue, retransmission consent fees, and programming, to name a few. But these competitive disparities are not the result of any current technical differences between UHF and VHF stations. Because UHF stations are no longer technologically disadvantaged, they can now compete effectively in a market with VHF stations. Disparities between stations today are the result of market competition, programming choices, network affiliation, and capitalization. Moreover, we do not believe that retention of the UHF discount would resolve any of these competitive differences.[131] Finally, in response to Sinclair's claim that removing the discount would frustrate the original purpose of the national cap, *i.e.*, to "preserv[e] the balance of power between networks and affiliates,"[132] we note that removing the discount will prevent networks from expanding their reach, and our grandfathering regime, discussed below, will ensure that broadcasters that otherwise would exceed the cap after the discount is eliminated – none of which are the Big Four networks – will be grandfathered.

39. Some commenters also note that the *2002 Biennial Review Order* found that "the UHF discount continues to be necessary to promote entry and competition among broadcast networks."[133] First, when the Commission made that finding, the DTV transition was still a number of years in the future.[134] Second, contrary to the Commission's observations nearly a decade and a half ago, we do not see that the UHF discount is leading to the creation of new broadcast networks today. The record contains no evidence that new broadcast networks are being built today by assembling a national station group of UHF broadcast stations.[135] Similarly, our most recent annual report on the state of competition among video providers does not reflect a trend of emerging UHF broadcast networks. Instead, it appears that new programming networks are emerging as cable networks, online video programmers, and multi-cast digital networks – methods that do not rely on the UHF discount.[136] Therefore, we do not believe that

---

[129] *2002 Biennial Review Order*, 18 FCC Rcd at 13846, para. 588 n.1226.

[130] *See, e.g.*, *Assessment and Collection of Regulatory Fees for Fiscal Year 2013*, Report and Order, 28 FCC Rcd 12351, 12361-62, paras. 30 (2013) ("Historically, analog VHF channels (channels 1-13) were coveted for their greater prestige and larger audience, and thus the regulatory fees assessed on VHF stations were higher than regulatory fees assessed for UHF (channels 14 and above) stations in the same market area.").

[131] While ION argues that four years of signal parity is not enough to remedy the economic disparity between historically VHF stations and historically UHF stations, it fails to demonstrate how retention of the UHF discount would remedy the institutionalized economic disparity that it sees. *See* ION Comments at 9-10. Further, it has now been seven years since the DTV transition. *See supra* para. 34.

[132] Sinclair Comments at 7 & n.32 (quoting *2002 Biennial Review Order*, 18 FCC Rcd at 13842, para. 578).

[133] *2002 Biennial Review Order*, 18 FCC Rcd at 13845, para. 586; *see also* Tribune Reply at 3, ION Comments at 9, Sinclair Comments at 7; Trinity July 29, 2016, *Ex Parte* Letter at 2 & n.5.

[134] *See supra* notes 33 & 85.

[135] Free Press argues that the UHF discount does not promote new entrants because it "reduces the number of stations available to new entrants and reduces the number of competitors nationwide." Free Press Comments at 4. *See also* WGAW Comments at 4; Block Comments at 2.

the record in this proceeding warrants a conclusion that perpetuation of the UHF discount would foster the creation of new broadcast networks.[137]

40. While several commenters argue that we should reexamine the national audience reach cap in conjunction with our examination of the UHF discount,[138] reexamining the cap is not within the scope of the *Notice*, and we decline to initiate a further rulemaking proceeding at this time for that purpose.[139] As discussed above, we do not agree with commenters that eliminating the UHF discount also requires an examination of the national audience reach cap.[140] No party has presented persuasive reasons for revisiting the national cap at this time, and doing so would be far more complex than our decision today to eliminate the UHF discount, which we have concluded clearly lacks any remaining justification. Initiating a new rulemaking proceeding to undertake a complex review of the public interest basis for the national cap, which is the media ownership limit that Congress examined most recently, would only delay the correction of audience reach calculations necessitated by the DTV transition. Delay would unnecessarily complicate our efforts to bring the cap back into alignment with its stated level as broadcasters continue to increase their reach. Continued application of the discount absent its technical justification simply distorts the operation of the national audience reach cap by exempting the portions of the audience that are receiving a signal from being counted and allowing licensees that operate on UHF channels to reach more than 39 percent of viewers nationwide.[141] Removal of the analog-era discount

(Continued from previous page)

[136] *See, e.g.*, *Annual Assessment for the Status of Competition in the Market for the Delivery of Video Programming*, Seventeenth Report, MB Docket No. 15-158, 31 FCC Rcd 4472, 4494, 44495-99, 4499-4500, 4517, 4542-43, 4543-50, 4451-52, paras. 57, 59-67, 69-71, 103, 168-169, 171-182, 186-187 (2016). *See also* Univision Comments at 14 (noting that major networks are increasingly challenged by upstart networks, premium cable channels, and online video); Trinity July 29, 2016, *Ex Parte* Letter at 3 (describing new programming Trinity delivers by multi-casting).

[137] Indeed, ION, Tribune, and Trinity point to no such new emerging UHF broadcast networks. Rather, the commenters appear more concerned with the preservation of their own existing station combinations, which we address in the discussion on the grandfathering of existing broadcast station combinations below. *See infra* paras. 41-53.

[138] NAB Comments at 2-4; Letter from Rick Kaplan, General Counsel and Executive Vice President, National Association of Broadcasters to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 1 (filed June 14, 2016) (NAB June 14, 2016, *Ex Parte* Letter); Letter from Rick Kaplan, General Counsel and Executive Vice President, National Association of Broadcasters to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 1 (filed June 20, 2016) (NAB June 20, 2016, *Ex Parte* Letter); Letter from Rick Kaplan, General Counsel and Executive Vice President, and Jerianne Timmerman, Senior Vice President and Deputy General Counsel, National Association of Broadcasters to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 1 (filed June 23, 2016) (NAB June 23, 2016, *Ex Parte* Letter); Fox Comments at 13-21; Fox June 9, 2016, *Ex Parte* Letter at 1; Sinclair Comments at 8-12; Univision Comments at 13-15; ION Comments at 14-16.

[139] In this regard, our elimination of the UHF discount is unlike our adoption of the attribution rule for television joint sales agreements (TV JSAs), which the Third Circuit held was contrary to our periodic review obligation under section 202(h). *Prometheus Radio Project v. FCC*, 824 F.3d 33, 59 (3d Cir. 2016) ("[T]he Commission cannot expand its attribution policies for an ownership rule to which § 202(h) applies unless it has, within the previous four years, fulfilled its obligation to review that rule and determine whether it is in the public interest."). The Local TV ownership rule clearly is subject to periodic review under section 202(h), whereas the national television ownership cap is not subject to that obligation. In addition, unlike our action on TV JSAs, we are grandfathering station groups that will exceed the national cap after we eliminate the UHF discount, so elimination of the UHF discount will not require divestitures by station owners. Finally, as discussed above, retention of the UHF discount is indefensible, regardless of the level of the cap, because it is irrational in light of the digital transition. Therefore, we reject the recent contentions of NAB and Fox that *Prometheus III* supports a conclusion that we cannot eliminate the UHF discount separately from a review of the national audience reach cap. *See* NAB June 20, 2016, *Ex Parte* Letter at 2-3; NAB June 23, 2016, *Ex Parte* Letter at 2, 3; Fox June 9, 2016, *Ex Parte* Letter at 2.

[140] *See supra* paras. 20-21.

[141] As discussed above, following the DTV transition, many stations switched from VHF stations to UHF stations, and their calculated reach decreased as a result of the UHF discount. *See supra* paras. 33, 35.

thus maintains the efficacy of the national cap.[142] Although we do not foreclose the possibility of examining the national audience reach cap in the future, we find it is appropriate to take action now to address the effects of the DTV transition by eliminating the UHF discount.

**C. Grandfathering of Existing Broadcast Station Combinations**

41. In the *Notice*, the Commission recognized that elimination of the UHF discount would affect the calculation of the national audience reach for broadcast station groups with UHF stations. The Commission suggested, however, that only a small number of broadcast station ownership groups approach the 39 percent national audience reach cap and only a few might exceed the cap if the UHF discount were eliminated. Therefore, the Commission proposed to grandfather existing broadcast station groups to the extent that they exceeded the 39 percent national audience reach cap solely as a result of the termination of the UHF discount rule as of the date of the release of the *Notice* in this proceeding, which occurred on September 26, 2013.[143] The Commission proposed similarly to grandfather station combinations for which applications were pending with the Commission or which had received Commission approval but were not yet consummated at the time the *Notice* was released. The Commission proposed further that, if a grandfathered ownership group was subsequently assigned or transferred, then it would be required to comply with the national television ownership rule in existence at the time of the assignment or transfer.[144]

42. A majority of commenters agree that the Commission should offer some kind of grandfathering to existing station combinations, although parties differ as to the form that grandfathering should take. Block and ACA generally supported the form of grandfathering proposed in the *Notice*.[145]

43. Sinclair, ION, and Univision argue that the grandfathering date should be the adoption date of this *Order*, not the date the *Notice* was released.[146] Sinclair and ION argue that basing grandfathering on the date of the Order would provide broadcasters with the necessary time to complete contemplated deals without altering business plans.[147] Sinclair asserts that this is the only fair approach, and that an earlier grandfathering cutoff would disrupt settled expectations, because broadcasters who entered into transactions after the date of the *Notice* did so in reliance on existing rules.[148] Univision contends that the proposed grandfathering date is retroactive and penalizes broadcasters, especially those station groups like Univision who were UHF pioneers.[149]

44. Sinclair argues alternatively that all UHF stations acquired, or for which an application to acquire was pending, prior to the date the discount is eliminated from our rules should be grandfathered until the station is sold.[150] The result of this proposal would be that a UHF station owned prior to the elimination of the discount would be discounted for purposes of calculating a station group's compliance with the national audience reach cap until the owner sells the station, while newly acquired stations would

---

[142] *See supra* para. 34.

[143] *Notice*, 28 FCC Rcd at 14331, para. 20.

[144] *Id.* at 14331-32, para. 20.

[145] Block Comments at 3; ACA August 2, 2016, *Ex Parte* Letter at 4. Block emphasizes though that any grandfathering rule must prevent broadcasters from acquiring more desirable UHF stations at a discounted ownership level and argues that broadcasters who have acquired UHF stations since the DTV transition should not receive grandfathering. Block Comments at 3.

[146] Sinclair Comments at 12-13; ION Comments at 17-21; Univision Comments at 7-10.

[147] Sinclair Comments at 12-13; ION Comments at 21.

[148] Sinclair Comments at 12-13.

[149] Univision Comments at 9-10.

[150] Sinclair Comments at 14-15.

not be discounted.[151] In effect, Sinclair is proposing to grandfather all station groups at their current national audience reach with the UHF discount in effect, instead of grandfathering just those station groups that would exceed the 39 percent cap due to the elimination of the UHF discount.[152]

45. In addition, ION, Univision, Tribune, and Trinity – owners of the only station groups that will be over the current national ownership cap absent the UHF discount – contend that the Commission should adopt grandfathering rules to preserve the diversity and competition gains achieved by UHF broadcasters. They advocate permitting the assignment or transfer of UHF station combinations with the UHF discount intact to future purchasers.[153] In the event the Commission does not adopt a transferable grandfathering approach, Univision asks that a waiver mechanism be established that allows a broadcast group exceeding the national audience reach cap due to the elimination of the discount to demonstrate the importance of keeping the station portfolio intact. Univision also requests that a station group be presumptively entitled to a waiver if it enters into a corporate reorganization that does not result in an increase in the group's audience reach.[154]

46. On the other hand, some commenters do not support any grandfathering at all or believe a more limited grandfathering regimen should be offered than what the Commission proposed in the *Notice*.[155] Specifically, Free Press asks the Commission to forego grandfathering and instead require broadcast station groups that exceed the 39 percent audience reach cap as a result of the elimination of the UHF discount to divest stations in order to comply with the cap within 18 months.[156] Similarly, the Public Interest Commenters oppose any grandfathering of current station combinations that exceed the cap without the discount.[157] In the alternative, the Public Interest Commenters oppose the adoption of Sinclair's proposal to discount a station's audience reach until the station is sold.[158]

47. We adopt the proposal for grandfathering reflected in the *Notice*. We will grandfather broadcast station ownership groups that would exceed the 39 percent national audience reach cap as a result of the elimination of the UHF discount as of September 26, 2013, *i.e.*, the date of the *Notice*. As we further proposed,[159] we also grandfather proposed station combinations for which an assignment or transfer application was pending with the Commission or that were part of a transaction that had received Commission approval as of that date if such station groups would otherwise exceed the cap. We will require any grandfathered ownership combination subsequently assigned or transferred to comply with the national audience reach cap in existence at the time of the transfer of control or assignment of license. We find that these provisions provide an appropriate balance between the valid expectations of broadcast station ownership groups who exceed the cap solely as a result of the elimination of the UHF discount and the goals and purposes of the 39 percent national audience reach cap.

48. We note that there are no broadcasters that will exceed the national cap following the elimination of the UHF discount with a combination that will not be fully grandfathered by today's decision. We note further that no broadcast transactions since the release of the *Notice* have resulted in an

---

[151] *Id.* at 14.

[152] *Id.* at 14-15.

[153] ION Comments at 21-23; ION July 15, 2016, *Ex Parte* Letter at 3; Univision Comments at 3-7; Tribune Reply at 4-7; Trinity July 29, 2016, *Ex Parte* Letter at 4.

[154] Univision Comments at 10-12.

[155] Free Press Comments 6-7; Public Interest Commenters Reply at 9-10; WGAW Comments at 6.

[156] Free Press Comments at 6-7.

[157] Public Interest Commenters Reply at 9.

[158] *Id.* at 9-10.

[159] *Notice*, 28 FCC Rcd at 14331-32, para. 20.

entity exceeding the national ownership cap. Thus, as a practical matter, there is no actual difference in grandfathering as the date of the date of the *Notice* or the date of this *Report and Order*. Despite the claims of Fox, the Commission has continued to evaluate and approve broadcast transaction applications during the pendency of this proceeding.[160] The grandfathering proposal we adopt today protects the existing ownership structure as of the release of this *Report and Order* for all broadcast television station groups that will exceed the national audience reach cap upon the elimination of the UHF discount. Given the long history of notice that the UHF discount would be eliminated following the DTV transition and the potential for significant distortion of the national audience reach cap – indeed, the potential to double the national cap – we believe that the decision to use the date of the *Notice* as the grandfathering date is fully supported, as proposed in the *Notice*, and best serves the public interest.

49. We find that the date of the *Notice* is the proper cut-off for grandfathering, consistent with previous Commission decisions.[161] We do not believe, as Sinclair argues, that our decision not to grandfather transactions entered into after the date of the *Notice* disrupts settled expectations. The release date of the *Notice* was when the Commission gave clear notice that it intended to eliminate the UHF discount in calculating the national audience reach for broadcast television station groups. In addition, the grandfathering of interests in connection with the "equity/debt plus" rule and the attribution of Local Marketing Agreements (LMAs) each used the date of the notice in those proceedings as the cut-off date.[162] Therefore, we are not persuaded to designate the adoption date of this *Report and Order* as the grandfathering date for the UHF discount as some commenters request. Doing so would have given

---

[160] Fox Comments at 23-26. *See also Applications of Local TV Holdings, LLC, Tribune Broadcasting Co. II, LLC & Dreamcatcher Broadcasting , LLC for Consent to Transfer of Control of Certain Licensee Subsidiaries of Local TV Holdings, LLC*, Memorandum Opinion and Order, 28 FCC Rcd 16850 (MB 2013).

[161] In its comments, ION attempts to distinguish the Commission precedent we cite at note 162 *infra* from our grandfathering proposal in this proceeding, arguing that UHF broadcasters lacked sufficient notice of the possible elimination of the UHF discount. *See* ION Comments at 19-21; Univision, Trinity, and ION August 15, 2016, *Ex Parte* Letter at 1 (claiming that they acquired the "vast majority" of their UHF stations long before the Commission showed an interest in eliminating it). ION contends that eliminating the UHF discount reflects a reversal of a nearly 30-year-old rule that is central to several companies' business planning and was upheld by the Commission and endorsed by Congress less than a decade ago. ION Comments at 19. However, as set out above, in 1996 and 1998, the Commission stated that any entity that acquired stations after the 1996 Act and complied with the national audience reach cap only by virtue of the UHF discount would be subject to the outcome of the Commission's action on the UHF discount. *See supra* para. 7 & note 25. Additionally, as noted above, the Commission as early as 1992 anticipated the possibility that the transition to digital television would obviate the need for the UHF discount. *See supra* note 24. We note that from 1995 to 1999, Paxson Communications Corporation, ION's predecessor, continued to acquire UHF stations and grew significantly. *See* Television & Cable Factbook, Stations A-1384 (Vol. 63, 1995 ed.); Television & Cable Factbook, Stations A-1386 (Vol. 64, 1996 ed.); Television & Cable Factbook, Stations A-1429 (Vol. 65, 1997 ed.); Television & Cable Factbook, Stations A-1464 (Vol. 66, 1998 ed.); Television & Cable Factbook, Stations A-1450 (Vol. 67, 1999 ed.) (listing number of stations owned by TV station owners in each year). Accordingly, ION was effectively on notice as early as 1996 that it would be subject to Commission action concerning the UHF discount. ION also argues that, unlike previous grandfathering cases, our proposal excludes those broadcasters who had entered into transactions to acquire UHF stations as of the date of the *Notice*, but had not filed applications for approval of those transactions at the Commission. ION Comments at 20. As stated *supra* at para. 48 and *infra* at para. 501, our grandfathering decision addresses these concerns.

[162] *See Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, Report and Order, 14 FCC Rcd 12559, 12628-31, paras. 162-73 (1999) (determining interests acquired on or after the NPRM adoption date subject to the new equity/debt plus rules adopted in the order). *See also Review of the Commission's Regulations Governing Television Broadcasting*, Report and Order, 14 FCC Rcd 12903, 12963, para. 139 (1999) (*Local TV Ownership Order*), clarified in Memorandum Opinion and Second Order on Reconsideration, 16 FCC Rcd 1067, 1085-88, paras. 50-55 (2001) (grandfathering TV LMAs entered before the release date of the NPRM and not those entered after that date), *aff'd in part and remanded in part sub nom. Sinclair Broadcast Group, Inc. v. FCC*, 284 F.3d 148, 166 (D.C. Cir. 2002).

broadcasters an incentive to rush to engage in new transactions that could have diluted the effectiveness of our action to preserve the national audience reach cap by eliminating the outdated and technically unsupported UHF discount, perpetuating the distortive effect of this anachronistic regulation.

50. Further, the industry has clearly been on notice for at least 20 years that the UHF discount would likely be eliminated following the transition to DTV.[163] The Commission further stated in 2000, when the *1998 Biennial Review Order* was released, that it expected to eliminate the UHF discount after completion of the DTV transition.[164] In addition, the Commission, in fact, previously decided to phase out the UHF discount, although that phase-out was rendered moot by congressional action.[165] Also, as we discussed above, the technical basis for the discount is no longer valid, and its continued application has the potential to create market distortions. The grandfathering proposal we adopt today ensures that, going forward, the national audience reach of broadcast station groups is reflected accurately in the broadcast television market while not penalizing those station groups who exceed the national audience reach cap solely as a result of eliminating the UHF discount.

51. Contrary to Univision's contention, the grandfathering mechanism we adopt here does not make our decision to eliminate the UHF discount retroactive. Today's action does not alter the past lawfulness of station combinations, does not impose any liability for having assembled station groups that would be prohibited going forward, and does not introduce any retrospective obligations for past conduct.[166] And as noted above, by grandfathering existing station groups that would exceed the national audience reach cap without the continued benefit of the UHF discount as of the date of the *Notice*, we are specifically protecting all existing broadcast television station ownership combinations that would otherwise exceed the cap from the future effect of this change, even though application of the revised rule to them would not be considered retroactive.

52. ION and Trinity urge the Commission to adopt permanent grandfathering of station groups, such as its own, that resulted in the creation of a new broadcast network.[167] We conclude, however, that our decision not to grandfather the UHF discount for broadcast station ownership groups following a future assignment or transfer of control, as proposed in the *Notice*, is fully consistent with prior Commission practice regarding grandfathering.[168] This approach strikes the appropriate balance

---

[163] *See supra* para.7.

[164] *See supra* para. 8 & note 25. In fact, the Commission provided additional notice in 1998 with the release of the Notice of Inquiry in that proceeding.

[165] *See supra* para. 10 & note 33.

[166] *See Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006).

[167] ION Comments at 21-23; ION July 15, 2016, *Ex Parte* Letter at 3; Trinity July 29, 2016, *Ex Parte* Letter at 4.

[168] *See, e.g.*, *Local TV Ownership Order*, 14 FCC Rcd at 12909, para. 11 ("Any transfer of a grandfathered combination after the adoption date of this Report and Order (whether during the initial grandfathering period [or] after a permanent grandfathering decision has been made) must meet the [existing] radio/TV cross-ownership rule."); *Applications of Stauffer Communications, Inc.*, Memorandum Opinion and Order, 10 FCC Rcd 5165, 5165, para. 3 (1995) ("[G]randfathered status under our multiple ownership rules terminates upon Commission approval of a transfer of control."); *Amendment of Sections 73.34, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations*, Second Report and Order, 50 FCC 2d 1046, 1076, para. 103 (1975) (grandfathering existing combinations of newspapers and broadcast stations, but requiring future owners to comply with the new rule prohibiting cross-ownership of newspapers and broadcast stations); *2002 Biennial Review Order*, 18 FCC Rcd at 13809-10, para. 487 (grandfathering existing radio and television station combinations that would have been out of compliance under the new rules, but making clear that such grandfathering was not transferable); *Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, Report and Order, 29 FCC Rcd 6567, 6848-49, paras. 691-693 (2014) (grandfathering existing station combinations that otherwise would no longer comply with the media ownership rules as a result of the auction, but, upon transfer, requiring new owners to comply with the rules in place at the time of the transfer or obtain a waiver). *See also Notice*, 28 FCC Rcd at 14331-32, para. 20.

between avoiding imposition of the hardship of divestiture on owners of existing station combinations who have long owned the combination in reliance on the rules, and moving the industry toward compliance with current rules when owners voluntarily decide to sell their stations.[169] The grandfathering rule we adopt today preserves existing combinations, like ION's, that resulted in new broadcast networks. We note that despite ION's broad assertion, networks continue to exist with owned and operated station groups that comply with the national audience reach cap, or which are far below the nearly 65 percent nationwide coverage reached by ION's station group. In addition, we note that even if the Commission permitted a grandfathered station group to be transferred intact, there would be no obligation for the new buyer to maintain the stations' current network affiliation or the programming aired by the current licensee. Thus, we conclude that the public interest would not be served by allowing grandfathered combinations to be freely transferable in perpetuity where a combination does not comply with the national audience reach cap at the time of transfer or assignment simply because the combination once resulted in a new network.

53. Finally, we find that the record does not support Univision's request that we fashion a specific waiver standard for violations of the national audience reach cap that result from elimination of the UHF discount. We note that parties may always petition the Commission for a waiver under our existing rules if they believe unique circumstances warrant a waiver in a particular case.[170] However, we expect such circumstances to be rare and isolated given that only a few existing broadcast television station ownership groups will exceed the cap with the elimination of the discount. Ultimately, there are many different ways to structure an assignment or transfer of control that may present varying levels of concern regarding the potential impact of a proposed transaction. Given the fact-specific nature of our review of such transactions, a specific waiver standard is not appropriate. Instead, we believe that a case-by-case approach will best serve the public interest by allowing the Commission to consider the unique circumstances of any proposed transaction involving grandfathered combinations and its potential impact on competition.[171]

### D. VHF Discount

54. In the *Notice*, the Commission sought comment on whether it would be appropriate at this time to adopt a "VHF discount."[172] Several commenters contend that it would be inappropriate for the Commission to adopt a VHF discount at this time.[173] Public Interest Commenters assert that the justifications used to support the UHF discount at the time of its implementation are not applicable to digital VHF stations in the present situation.[174] For instance, they note that a limited percentage of television households rely exclusively on over-the-air service, which greatly reduces the impact of any VHF signal coverage limitations.[175] Instead of adopting a VHF discount, these commenters urge the

---

[169] Furthermore, as noted above, station owners were effectively on notice that entities that acquired television stations after implementation of the 1996 Act and that complied with the national audience reach cap only by virtue of the UHF discount would be subject to the outcome of the Commission's action on the UHF discount. *See supra* para. 7 & note 161; *see also supra* note 24 (noting that as early as 1992 the Commission anticipated the possibility that the transition to digital television would obviate the need for the UHF discount).

[170] *See* 47 CFR § 1.3. *See also WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C. Cir. 1969).

[171] Univision, Trinity, and ION assert generally that such a case-by-case approach is "often untimely and difficult to manage in a financial/commercial setting," but offer no specific facts or examples. Univision, Trinity, and ION August 15, 2016, *Ex Parte* letter at 2.

[172] *Notice*, 28 FCC Rcd at 14332-33, paras. 22-23.

[173] *See, e.g.*, Free Press Comments at 7-8; Public Interest Commenters Reply at 10; CCA Comments at 3.

[174] Free Press Comments at 7; Public Interest Commenters Reply at 10.

[175] Free Press Comments at 3, 7-8; Public Interest Commenters Reply at 10. *See also* ION Comments at 10. The Public Interest Commenters state that when the Commission adopted the UHF discount, half of U.S. households

(continued….)

Commission to address VHF propagation issues on a case-by-case basis, arguing that occasional deficiencies in some digital VHF stations do not justify a universal VHF discount applicable to the whole band.[176] As Free Press points out, the Commission has already taken steps to resolve signal propagation issues in the VHF band by permitting stations to operate at a higher power than originally authorized.[177] Additionally, other commenters note that VHF stations still possess greater commercial and economic advantages acquired during the analog era.[178] Thus, they argue that these stations are not inferior to other competing stations in the way that nascent UHF stations were at the time the UHF discount was adopted.[179]

55. Other commenters contend, however, that, if the Commission eliminates the UHF discount, it would be arbitrary and capricious not to adopt a VHF discount.[180] These commenters argue that VHF stations today suffer from the same diminished audience reach that once afflicted the UHF band.[181] They assert that VHF stations are less desirable for digital broadcasting because VHF signals face increased interference and require larger antennas for reception.[182] Therefore, they urge the Commission to adopt, at a minimum, a 50 percent VHF discount.[183]

56. We decline to adopt a VHF discount at this time. On balance, we disagree with commenters that eliminating the UHF discount also requires concurrent adoption of a VHF discount. As noted above, the DTV transition has made UHF spectrum generally more desirable than VHF spectrum for purposes of digital television broadcasting.[184] Yet, despite the challenges to the digital VHF band, the current record does not convince us that digital television operations in the VHF band are universally technically inferior to operations in the UHF band in a manner or to a degree that would warrant a

(Continued from previous page)
watched television over the air, but now only 10 percent of television households are exclusively over-the-air. Public Interest Commenters Reply at 10; *see also* Free Press Comments at 3, 7-8.

[176] Free Press Comments at 8-9; Public Interest Commenters Reply at 10.

[177] Free Press Comments at 8 (citing Video Division March 16, 2011, Letter). *See supra* para. 14 & note 52. The Commission is exploring engineering options to increase the utility of VHF spectrum and is considering new VHF maximum power limits to help improve signal strength and compensate for higher noise levels, especially for consumers that use indoor antennas. *See Broadcast Innovation NPRM*, 25 FCC Rcd at 16513-17, paras. 46-57. The Commission has also granted special temporary authority to a number of digital VHF stations for such power increases beyond the maximum limits to improve DTV reception. *Id.* at 16513, para. 48 (citing as examples WHAS-TV, Louisville, KY, Ch. 11, BDSTA-20091014AAM; WABC-TV, New York, NY, Ch. 7, BDSTA-20100108ACK; WUSA, Washington, DC, Ch. 9, BDSTA-20091218ACS; KRCR-TV, Redding, CA, Ch. 7, BDSTA-20090717ABBADD).

[178] For example, ION states that analog VHF stations used their market positions to build audiences and relationships with advertisers and networks, and today, these stations continue to benefit from established reputations. ION Comments at 10; ION July 15, 2016, *Ex Parte* Letter at 2. *See also* Public Interest Commenters Reply at 10.

[179] Public Interest Commenters Reply at 10. Although not opposed to a VHF discount, ION and Sinclair also recognize the many historical economic advantages that VHF stations continue to enjoy. *See* ION Comments at 9-10 and n.18; ION July 15, 2016, *Ex Parte* Letter at 2; Sinclair Comments at 7-8.

[180] Fox Comments at 2-3, 22; Sinclair Comments at 15. *See also* Block Comments at 3 (supporting adoption of a VHF discount to promote efficient use of both UHF and VHF television bands).

[181] Fox Comments at 22-23; Sinclair Comments at 15.

[182] Fox Comments at 22; Sinclair Comments at 15.

[183] *See* Fox Comments at 22. *But cf.* Free Press Comments at 8 (stating that if adopted, a VHF discount should be calculated based on available data, because it is misguided to assume that every VHF station covers merely 50 percent of the households in a DMA).

[184] *See supra* para. 14.

discount.[185] The record does not provide clear evidence that digital VHF stations consistently suffer from significant technical disadvantages in audience coverage sufficient to justify adoption of a discount.[186] Further, the record lacks evidence that the economic viability of VHF stations would be threatened without a discount.[187] Moreover, as discussed above, the Commission has already taken steps to assist individual VHF stations in addressing technical concerns.[188] Accordingly, we decline to adopt a VHF discount.

## IV. PROCEDURAL MATTERS

### A. Final Regulatory Flexibility Analysis

57. As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[189] the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) relating to this Report and Order in MB Docket No. 13-236. The FRFA is set forth in Appendix B.

### B. Paperwork Reduction Act Analysis

58. This document does not contain proposed information collection(s) subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13, *see* 44 U.S.C. §§ 3501-3520. In addition, therefore, it does not contain any new or modified information collection burden for small business concerns with fewer than 25 employees, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4).

### C. Congressional Review Act

59. The Commission will send a copy of this Report and Order to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

## V. ORDERING CLAUSES

60. Accordingly, **IT IS ORDERED** that, pursuant to the authority contained in Sections 1, 2(a), 4(i), 303(r), 307, 309, and 310 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 303(r), 307, 309, and 310, this Report and Order **IS ADOPTED**. The rule modification attached hereto as Appendix A shall be effective thirty (30) days after publication of the text or summary thereof in the *Federal Register*.

61. **IT IS FURTHER ORDERED** that the Commission **SHALL SEND** a copy of this Report and Order to Congress and to the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

---

[185] As discussed above, several commenters argue that the justifications used to support the UHF discount are not applicable to digital VHF stations. *See supra* para. 54.

[186] To the extent VHF stations have experienced signal propagation issues as a result of the digital transition, those effects are limited not only by steps the Commission has already taken, as discussed above, but also by increased MVPD penetration, which was not the case for UHF stations when the Commission adopted the UHF discount.

[187] *See* Public Interest Commenters Reply at 10 (stating that no commenters have argued that VHF station owners now face economic hardship).

[188] *See supra* para. 14 & note 52.

[189] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. § 601 *et seq.*, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996). The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996 (CWAAA).

62. **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

## APPENDIX A

## Final Rule

**PART 73 – RADIO BROADCAST SERVICES**

1. The authority citation for Part 73 continues to read as follows:

AUTHORITY: 47 U.S.C. 154, 303, 334, 336 and 339.

2. Amend § 73.3555 by revising paragraph (e) to read as follows:

**§ 73.3555 Multiple ownership.**

* * * * *

(e) National television multiple ownership rule.

(1) No license for a commercial television broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners, members, officers or directors having a cognizable interest in television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent.

(2) For purposes of this paragraph (e):

(i) National audience reach means the total number of television households in the Nielsen Designated Market Areas (DMAs) in which the relevant stations are located divided by the total national television households as measured by DMA data at the time of a grant, transfer, or assignment of a license. ~~For purposes of making this calculation, UHF television stations shall be attributed with 50 percent of the television households in their DMA market.~~

* * * * *

## APPENDIX B

### Final Regulatory Flexibility Act Analysis for the *Report and Order*

1. As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *Notice of Proposed Rulemaking* (*Notice*) in this proceeding.[2] The Federal Communications Commission (Commission) sought written public comment on the proposals in the *Notice*, including comment on the IRFA. The Commission received no comments on the IRFA. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

### A. Need for, and Objectives of, the Report and Order

2. This *Report and Order* eliminates the so-called "UHF discount" in the Commission's national television multiple ownership rule. The national television ownership rule currently prohibits a single entity from owning television stations that, in the aggregate, reach more than 39 percent of the total television households in the nation.[4] Prior to this *Report and Order*, the rule provided television stations broadcasting in the UHF spectrum with a discount by attributing those stations with only 50 percent of the television households in their Designated Market Areas (DMAs); this is termed the UHF discount.[5] The UHF discount was adopted in recognition of the technical inferiority of UHF signals in analog television broadcasting and was intended to mitigate the competitive disadvantages that UHF stations experienced in comparison to VHF stations because of their weaker signals and smaller audience reach.[6]

3. Yet the Commission concludes in the *Report and Order* that the technical justification for the UHF discount no longer exists. The evidence establishes that the digital UHF band does not suffer from the same technical limitations as the analog UHF band. Therefore, the Commission eliminates the UHF discount from the national television multiple ownership rule with this *Report and Order*. The Commission also adopts the grandfathering proposals presented in the *Notice*.[7] The Commission finds that these proposals do not harm existing broadcast station ownership groups exceeding the national audience reach cap due to the elimination of the UHF discount and are consistent with the protections it has provided in previous decisions.

4. Legal Basis. The authority for the action taken in this rulemaking is contained in Sections 1, 2(a), 4(i), 303(r), 307, 309, and 310 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 303(r), 307, 309, and 310.

### B. Summary of Significant Issues Raised in Response to the IRFA

5. No public comments were filed in response to the IRFA.

---

[1] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996). The SBREFA was enacted as Title II of the Contract With America Advancement Act of 1996 (CWAAA).

[2] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 28 FCC Rcd 14324, 14337-40, App. B (2013) (*Notice*).

[3] 5 U.S.C. § 604.

[4] 47 CFR § 73.3555(e)(1).

[5] *Id.* § 73.3555(e)(2)(i).

[6] *See Amendment of Section 73.3555 [formerly Sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations*, Memorandum Opinion and Order, 100 FCC 2d 74, 92-94, paras. 42-44 (1985).

[7] *Notice*, 28 FCC Rcd at 14331-32, para. 20.

### C. Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

6. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[8] The Chief Counsel did not file any comments in response to the proposed rules.

### D. Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

7. The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted in the *Report and Order*.[9] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[10] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[11] A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[12]

8. *Television Broadcasting*. The SBA designates television broadcasting stations with $38.5 million or less in annual receipts as small businesses.[13] Television broadcasting includes establishments primarily engaged in broadcasting images together with sound. These establishments operate television broadcasting studios and facilities for the programming and transmission of programs to the public. These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule. Programming may originate in their own studio, from an affiliated network, or from external sources.[14] The Commission estimates that there are 1,387 licensed commercial television stations in the United States.[15] In addition, according to Commission staff review of the BIA/Kelsey Media Access Pro Television Database as of March 25, 2016, 1,264 (or about 91 percent) of the estimated 1,387 commercial television stations have revenues of $38.5 million or less and, thus, qualify as small entities under the SBA definition. We therefore estimate that the majority of commercial television broadcasters are small entities. The Commission has also estimated the number of licensed noncommercial educational ("NCE")

---

[8] 5 U.S.C. § 604(a)(3).

[9] 5 U.S.C. § 603(b)(3).

[10] *Id.* § 601(6).

[11] *Id.* § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632). Pursuant to the RFA, the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register." 5 U.S.C. § 601(3).

[12] 15 U.S.C. § 632.

[13] The SBA raised its standards for television broadcasting stations in 2012. Previously, television broadcasting stations with no more than $14 million in annual receipts were considered a small business pursuant to the SBA's standards. Those standards have since increased to $38.5 million in annual receipts. *See* U.S. Small Business Administration, Small Business Size Standards: Information, 77 Fed. Reg. 72702, 72705 (Dec. 6, 2012). *See also* 13 CFR § 121.201, NAICS code 515120.

[14] U.S. Census Bureau, *2012 NAICS Definition, 515120 Television Broadcasting*, http://www.census.gov./eos/www/naics/index.html (visited June 23, 2016).

[15] *See* Press Release, FCC, Broadcast Station Totals as of December 31, 2015, (Jan. 8, 2016), https://apps.fcc.gov/edocs_public/attachmatch/DOC-337189A1.pdf (visited June 23, 2016).

television stations to be 390.[16] These stations are non-profit, and therefore considered to be small entities.[17]

9. We note, however, that in assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[18] must be included. Our estimate, therefore, likely overstates the number of small entities that might be affected by our action because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. In addition, an element of the definition of "small business" is that the entity not be dominant in its field of operation. We are unable at this time to define or quantify the criteria that would establish whether a specific television station is dominant in its field of operation. Accordingly, the estimate of small businesses to which rules may apply does not exclude any television station from the definition of a small business on this basis and is therefore possibly over-inclusive to that extent.

### E. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

10. The *Report and Order* modifies the calculations underlying the national television multiple ownership rule as set forth in paragraph 3 above, which would affect reporting, recordkeeping, or other compliance requirements. The conclusion modifies several FCC forms and their instructions: (1) FCC Form 301, Application for Construction Permit for Commercial Broadcast Station; (2) FCC Form 314, Application for Consent to Assignment of Broadcast Station Construction Permit or License; and (3) FCC Form 315, Application for Consent to Transfer Control of Corporation Holding Broadcast Station Construction Permit or License. The Commission may have to modify other forms that include in their instructions the media ownership rules or citations to media ownership proceedings, including Form 303-S and Form 323. The impact of these changes will be the same on all entities, and we do not anticipate that compliance will require the expenditure of any additional resources as the proposed modification to the calculations underlying the national television multiple ownership rule will not place any additional obligations on small businesses.

### F. Steps Taken to Minimize Significant Impact on Small Entities and Significant Alternatives Considered

11. The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[19] The *Notice* invited comment on issues that had the potential to have significant impact on some small entities.[20]

12. The rule change adopted in this *Report and Order*, as set forth in paragraph 3 above, is intended to achieve our public interest goal of competition. By recognizing the technical advancements of the UHF band after the DTV transition, this *Report and Order* seeks to create a regulatory landscape that reflects the current value of UHF spectrum in order to better assess national television ownership figures. Further, this *Report and Order* complies with the President's directive for independent agencies

---

[16] *See id*.

[17] 5 U.S.C. §§ 601(4), (6).

[18] "[Business concerns] are affiliates of each other when one [concern] controls or has the power to control the other, or a third party or parties controls or has to power to control both." 13 CFR § 121.103(a)(1).

[19] 5 U.S.C. § 603(c).

[20] *See Notice*, 28 FCC Rcd at 14337, App. B, para. 1.

to review their existing regulations "to determine whether such regulations should be modified, streamlined, expanded, or repealed so as to make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives."[21] By eliminating an outdated rule, we seek to reduce the costs and burdens of compliance on firms generally, including small business entities. And we find that the benefits of our decision to eliminate the UHF discount outweigh any costs or other burdens that may result from our action. In addition, the grandfathering proposal the Commission adopts in the *Report and Order* aims to create a more effective regulatory landscape by addressing current market realities. Overall, this *Report and Order* seeks to expand broadcast ownership opportunities for station owners, which includes small entities, by accurately reflecting broadcast television ownership in the digital age. Given that the technical justification for the UHF discount no longer exists, continued application of the discount stifles competition by encouraging consolidation instead of promoting new entrants in local broadcast television markets. Therefore, the Commission believes the rule change adopted in this *Report and Order* will benefit small entities, not burden them.

### G. Reports to Congress and Government Accountability Office

13. The Commission will send a copy of the *Report and Order*, including this FRFA, to Congress and the Government Accountability Office pursuant to the Congressional Review Act.[22] The *Report and Order* and FRFA (or summaries thereof) will also be published in the Federal Register.[23]

---

[21] Exec. Order No. 13579, 76 Fed. Reg. 41587 (July 14, 2011).

[22] *See* 5 U.S.C. § 801(a)(1)(A).

[23] *See id*. § 604(b).

## APPENDIX C

### List of Commenters

**Comments filed in MB Docket No. 13-236**

1. Block Communications, Inc. (Block)
2. Competitive Carriers Association (CCA)
3. 21st Century Fox, Inc. and Fox Television Holdings, Inc. (Fox)
4. Free Press (Free Press)
5. ION Media Networks, Inc. (ION)
6. National Association of Broadcasters (NAB)
7. Sinclair Broadcast Group, Inc. (Sinclair)
8. Trinity Christian Center of Santa Ana, Inc. (Trinity)
9. Univision Communications, Inc. (Univision)
10. Writers Guild of America, West, Inc. (WGAW)

**Reply Comments filed in MB Docket No. 13-236**

1. Free Press, Common Cause, Media Alliance, and the Office of Communication, Inc. of the United Church of Christ (Public Interest Commenters)
2. National Association of Broadcasters (NAB)
3. Tribune Company (Tribune)

**DISSENTING STATEMENT OF COMMISSIONER AJIT PAI**

*Re:* *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236.

In this *Order*, the Commission votes to substantially tighten the national audience reach cap ("national cap"), which restricts the percentage of households in the United States that a single company can serve through commercial television broadcast stations. Currently, the rule states that no entity can own commercial television stations in markets containing more than 39% of U.S. television households.[1] But there's a catch. For purposes of calculating compliance with the national cap, a UHF television station is "attributed with 50 percent of the television households" in its market.[2]

This is called the UHF discount, and today the Commission decides to eliminate it. That will substantially change the impact of the national cap. Consider the example of Univision. Right now, Univision's national audience reach for purposes of the national cap is only 22.8%, which is well below 39%. This means that under our current regulations, Univision has room to purchase television stations in many new markets. With the termination of the UHF discount, however, Univision's national audience reach will rise to 44.8%, a figure above the national 39% cap. Accordingly, Univision will not have the ability to purchase television stations in *any* new market.

To be sure, the technical basis for the UHF discount no longer exists. In the analog era, UHF stations were technically inferior to VHF stations. But with the digital transition, that is no longer true. Indeed, UHF stations are now technically superior to VHF stations. Therefore, I would have supported eliminating the UHF discount in the context of a general review and adjustment of our 39% national cap. But the Commission should not eliminate the UHF discount without also considering an adjustment to the national cap to reflect today's marketplace. Indeed, I believe that the Commission is acting unlawfully by taking that step.

Why is this *Order* arbitrary and capricious? Recall the Commission's failed attempt to restrict joint sales agreements (JSA) between television stations. Back in 2014, the Commission tried to attribute these JSAs. This meant that a station selling more than 15% of another television station's advertising time would be counted as owning that station for purposes of the Commission's ownership rules.[3]

As the Third Circuit observed when reviewing the Commission's decision, "attribution of television JSAs modifie[d] the Commission's ownership rules by making them more stringent."[4] In particular, the decision to attribute JSAs had the effect of tightening the local television ownership rule, which limits the number of television stations that a single company can own in a given television market. At the time that the Commission decided to attribute television JSAs, however, it expressly declined to decide whether the local television ownership rule was still in the public interest. And it certainly did not set forth any case for why the local television ownership rule should be made more stringent.

Therefore, the Third Circuit vacated the television JSA attribution rule. The court reasoned that "unless the Commission determines that the preexisting ownership rules are sound, it cannot logically

---

[1] *See* 47 C.F.R. § 73.3555(e)(1).

[2] *Id*. § 73.3555(e)(2)(i).

[3] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, MB Docket No. 14-50, Further Notice of Proposed Rulemaking and Report and Order, 29 FCC Rcd 4371, 4527–42, paras. 340–67 (2014).

[4] *Prometheus Radio Project v. FCC*, 824 F.3d 33, 58 (3d Cir. 2016).

demonstrate that expansion is in the public interest."[5] The same is true here. It is undeniable that eliminating the UHF discount has the effect of expanding the scope of the national cap rule. Companies, such as Univision, that are currently in compliance with the national cap ownership rule will be above the cap once the UHF discount is terminated. Yet, the Commission has refused to review whether the current national cap ownership rule is sound or whether there is a need to make it more stringent, which is precisely what this *Order* does.

The Commission attempts to distinguish this *Order* from the JSA precedent by noting that the local television ownership rule is subject to the quadrennial review obligation set forth in section 202(h) of the Telecommunications Act of 1996, while the national cap rule is not.[6] But this, in my view, is not a decisive distinction. The Commission may not have a legal obligation to review the national cap every four years, but once it chooses to review it, it cannot take piecemeal action that would substantially tighten it without examining whether tightening the rule as a whole is justified.[7]

Here, for example, it has been over seven years since the completion of the digital television transition. And during those seven years when the UHF discount has been on the books, is there any evidence that the national cap has been insufficiently stringent? Is there any indication that any of the core objectives of the Commission's media ownership policies—competition, diversity, and localism—have been harmed? Tellingly, the Commission is unable to point to any such evidence.

Moreover, even absent the specific legal requirement to review particular media ownership regulations every four years pursuant to section 202(h) of the Telecommunications Act of 1996, "courts have held that the Commission has an affirmative obligation to reexamine its rules over time."[8] And the agency's obligation surely applies to the national cap rule given both the rule's unique history and the Commission's elimination of the UHF discount, thus substantially tightening the cap.

In 1998, the Commission chose to retain the 35% national cap that it had adopted two years earlier.[9] But the D.C. Circuit found the FCC's decision arbitrary and capricious. Specifically, it stated that "the Commission ha[d] adduced not a single valid reason to believe the [35% national cap rule] [was] necessary in the public interest, either to safeguard competition or to enhance diversity."[10] On remand, the Commission in 2003 found that a 35% national cap could not be justified and raised the cap to 45%.[11]

---

[5] *Id.*

[6] *See Order* at note 139.

[7] The Commission also claims that this *Order* differs from the television JSA attribution rule because it grandfathers station groups that will exceed the national cap after the elimination of the UHF discount while the Commission allowed for no such grandfathering in the JSA context. *See id.* But this distinction is also irrelevant. What matters is that the Commission is making the national cap rule more stringent. Companies that currently have the ability to purchase television stations in new markets won't be able to do so once this *Order* takes effect. And as the Third Circuit indicated, the Commission cannot "logically demonstrate that an expansion [of the rule] is in the public interest" "unless[it] demonstrates that the preexisting ownership rule[] is sound." *Prometheus*, 824 F.3d at 58.

[8] *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 28 FCC Rcd 14324, 14329–30, para. 14 (2013) (*Notice*).

[9] *See 1998 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Biennial Review Report, 15 FCC Rcd 11058, 11072–75, paras. 25–30 (2000).

[10] *Fox Television Stations Inc. v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002).

[11] *See 2002 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13814–45, paras. 499–584 (2003).

The next year, Congress instructed the Commission to adjust the cap down to 39%,[12] and it has remained there ever since.

So we are now facing a 39% national cap that has not been adjusted or reviewed for a dozen years. During that time, the video industry has undergone revolutionary change. In particular, the rise of over-the-top video has transformed the video marketplace. For instance, Netflix, YouTube, Amazon, and Hulu all did not offer Internet video when the national cap was set at 39%. We are confronting a 39% national cap that the Commission itself has never justified. Indeed, the last time that the Commission reviewed the merits of the national cap it concluded that a 45% cap was justified. And we are dealing with a 39% cap that approximates the cap that the D.C. Circuit rejected over a decade ago.

Of course, one might object that all of this is irrelevant because Congress told the Commission to set the national cap at 39% in 2004, and that's reason enough to leave it unchanged in 2016. That argument might have some force had the Commission been content to leave the national cap rule alone. But having fiddled with one critical component of the rule—the UHF discount—the FCC can't obstinately refuse to review another, especially when the Commission affirms that doing so is within its power.[13]

Given this history and the vast changes in the media marketplace since the 39% cap was set, the Commission's assertion that "[n]o party has presented persuasive reasons for revisiting the national cap at this time"[14] rings hollow. And indeed, that claim is undermined to the extent that eliminating the UHF discount effectively tightens the national cap dramatically.

Turning to the other reasons provided by the Commission for refusing to reexamine the national cap, the *Order* notes that such reexamination "is not within the scope of the *Notice*,"[15] and that "[i]nitiating a new rulemaking proceeding to undertake a complex review of the public interest basis for the national cap . . . would only delay the correction of audience reach calculations necessitated by the digital transition."[16] This is the administrative equivalent of the teenager who murders his parents and then pleads for judicial mercy as an orphan.

When the Commission took up the *Notice* in this proceeding, I asked my colleagues to simultaneously seek comment on eliminating the UHF discount and adjusting the national cap.[17] Back then, I specifically argued that we could not "modify the UHF discount without simultaneously reviewing the national audience cap."[18] Unfortunately, my plea fell on deaf ears.

Now, almost three years later, we are told that reviewing the national cap would delay elimination of the UHF discount. But had we sought comment on adjusting the national cap in the *Notice* as I requested, we would have had more than enough time to complete that review over the course of the last 35 months.

Moreover, it is worth noting that when it comes to eliminating the UHF discount, the FCC has not exactly embraced what President Obama has referred to as the fierce urgency of now. If time is of the

[12] *See* Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99–100 (2004).

[13] *See Order* at para. 21.

[14] *Order* at para. 40.

[15] *Id.*

[16] *Id.*

[17] *Notice*, 28 FCC Rcd at 14343–44 (Dissenting Statement of Commissioner Ajit Pai).

[18] *Id.* at 14343.

essence and delay can't be tolerated, then why did it take almost three years to complete this rulemaking? The Commission offers no explanation.

Finally, I disagree with the *Order*'s approach to grandfathering. While I appreciate the fact that companies no longer in compliance with the national cap due to elimination of the UHF discount will not be required to sell stations immediately, the Commission should also allow such station groups to be transferred to new ownership without requiring divestitures. Station groups such as ION and Univision have been good for competition in the video market by facilitating the creation of new broadcast networks to challenge established networks. And I do not see what harm would be alleviated or purpose would be served by requiring these station groups to be broken up in the event of a sale.

I also believe that the grandfathering of station groups should be pegged to the date this *Order* becomes effective rather than the date that the *Notice* was adopted—almost three years ago. As I said when the Commission proposed its approach in the *Notice*:

> [*The Notice*] only proposes to eliminate the UHF discount. It does not actually end the UHF discount. The UHF discount will be the law of the land tomorrow and every day after that unless the Commission votes to repeal it. Through its grandfathering proposal, however, today's NPRM effectively tells the private marketplace to behave as if the UHF discount has already been eliminated, treating the rest of the rulemaking process like an empty formality.[19]

And sure enough, I was right. Following the adoption of the *Notice*, the private sector behaved as if the UHF discount had already been eliminated. No company sought to purchase any television station that would have put it above the 39% cap as calculated without the UHF discount. The UHF discount, as a practical manner, was eliminated without the Commission actually repealing it. The rest of the rulemaking process, which ended up taking almost three years, was in fact an empty formality. This "sentence first, verdict afterwards" process makes a mockery of the notice-and-comment rulemaking process and sets a disturbing precedent for future proceedings.

For all of these reasons, I dissent.

[19] *Id*. at 14344.

## DISSENTING STATEMENT OF COMMISSIONER MICHAEL O'RIELLY

*Re:* *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule, MB Docket No. 13-236*

In a perfect world, the Commission ought to be able to thoughtfully update its media ownership rules to reflect current marketplace realities. Such a universe doesn't exist at this Commission on these issues, as politics has become more important than substance. With this item, the majority continues that practice.

It is clear that UHF television stations are no longer less desirable or less technology-capable than VHF stations. The conversion of television stations from analog to digital, the excessive prevalence of multichannel video programming distributors, changing personal media consumption habits, and other factors have essentially eliminated the original differences between the two frequencies. The stations are rather interchangeable and shouldn't be treated differently for purposes for our market audience reach calculations. While making this rule change may have little practical impact, I would support it as a policy matter, as I would be open to considering an increase in the national ownership limit, if the Commission had the authority to do so.

However, I reject the assertion that the Commission has authority to modify the National Television Ownership Rule in any way, including eliminating the UHF discount, and therefore I dissent. The pertinent language ultimately included in the 2004 Consolidated Appropriations Act ("CAA") was heavily negotiated and painstakingly crafted in order to settle a recurring and particularly contentious media ownership issue. I know since I was there at the time and helped reach the agreement on behalf of a former employer with the staff of many Members of Congress, including former Senator Ted Stevens, who was lead negotiator, a detail that helps explain why the provision ended up in an appropriations bill. The result was a national ownership cap that remains one of the few media ownership rules specifically set by statute and the only one exempted from the Quadrennial Review process governing the other ownership rules, in order to protect a tenuous compromise from the whims of the Commission. Since enactment, many parties have advocated changes in different elements of this compromise for a wide variety of reasons, including those cited here. But the only acceptable venue for these arguments is Congress. The need, yet again, for the Commission to resort to generic provisions like 4(i) or 303(r) for authority belies its disingenuous interpretation of the CAA.

Even if the Commission had authority to change the National Television Ownership Rule, this Order would be the wrong way to go about it. Having apparently learned nothing from past efforts to prematurely change attribution rules for JSAs before the Quadrennial Review of media ownership rules was complete, the Commission is replicating the same flawed approach. This item stubbornly plows ahead in a similar cart-before-the-horse scheme to tinker with a calculation methodology without any consideration of the current validity the overall rule it modifies. Just consider the simple fact that the Commission seems to have no hesitation altering the market realities of UHF stations despite that these are some of same stations participating in the broadcast incentive auction. As one of the commenters observed, the Commission's move "reflects an agency staring so hard at a single tree that it has lost sight entirely of the forest."[1]

[1] Fox Comments 1.

Meanwhile, the "forest" of the current media marketplace is thriving, proliferating and changing at a breathtaking rate. But the Commission seems to be affected by some sort of tunnel vision that blinds it to the many radical changes in the way media is produced and consumed. Thus, impervious to any intrusion of reality, the media ownership rules now operate as a one-way ratchet that can only be tightened, never relaxed, despite the overwhelming evidence that broadcasters are operating in a much more competitive environment than ever before.

# Attachment F

# Declaration of Carmen Scurato

In the
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| FREE PRESS, *et al.*, Petitioners, | ) | |
| v. | ) | No. 17-1129 |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, Respondents. | ) | |

## DECLARATION OF CARMEN SCURATO

I, Carmen Scurato, am Director of Policy & Legal Affairs at the National Hispanic Media Coalition ("NHMC").

I frequently monitor news outlet, trade press, and investment analyst reports concerning broadcast media ownership transactions. This declaration describes what was widely discussed in such reports leading up to and following the FCC's decision to reinstate the UHF Discount. A sampling of these reports are attached to this declaration.

After the FCC announced that it was considering reinstating the UHF Discount, many reports detailed how doing so would generate a number of transactions that would otherwise be prohibited without the reinstatement. The Wall Street Journal's March 29, 2017 article, "FCC Tees Up Rule Change That

Could Spur Wave of TV Industry Mergers,"[1] is representative of such reporting. At around the same time, investment analyst groups released reports making similar predictions. Cowan Insight observed that "[a]fter months of speculation, this first concrete step toward relaxed ownership rules could encourage M&A discussions."[2] Another analyst predicted that reinstatement of the UHF Discount would lead to a "robust M&A environment."[3]

Immediately following the reinstatement of the UHF Discount it became clear that such transactions would quickly be underway. News outlets ran stories with such headlines as "FCC Takes Lid Off National Station Ownership,"[4] and the New York Times reported on May 1, 2017, "TV Station Owners Rush to Seize on Relaxed F.C.C. Rules."[5] Investment analysts reacted similarly, including Fitch Solutions', which reported on April 24, 2017: "Fitch: TV Broadcast Consolidation to Begin (Again)."[6]

---

[1] FCC Tees Up Rule Change That Could Spur Wave of TV Industry Mergers, Wall Street Journal, Mar. 29, 2017, https://www.wsj.com/articles/fcc-to-vote-on-relaxing-obama-era-rule-on-tv-ownership-1490825750.
[2] Pai Recommendations Good for Telcos and Broadcasters, Cowan Insight, Apr. 3, 2017 (Attached).
[3] Analyst Expects Wave of TV Station Merger Activity, Broadcasting & Cable, Mar. 13, 2017 (Attached).
[4] TVNewsCheck, Apr. 20, 2017 (Attached).
[5] TV Station Owners Rush to Seize on Relaxed FCC Rules, New York Times, May 1, 2017 (Attached).
[6] Fitch: TV Broadcast Consolidation to Begin (Again), Fitch Solutions, Apr. 24, 2017 (Attached).

Even before the Commission's reinstatement of the UHF Discount was published in the Federal Register, Sinclair Broadcast Group moved to take advantage of the reinstatement by announcing its intention to purchase Bonten Media's TV stations.[7] The Baltimore Sun reported that "Sinclair announced the deal a day after the FCC relaxed broadcast ownership rules, a move expected to pave the way for television industry consolidation."[8]

Not long after, on May 8, 2017, Sinclair announced that it would purchase Tribune Media to create what would be, by far, the nation's most powerful TV group. Bloomberg reported that the "deal to acquire Tribune Media Co. marks the first in what's expected to be a frenzy of media and telecom dealmaking under the looser regulatory climate of the Trump administration."[9]

---

[7] *See, e.g.*, Sinclair Agrees To Buy Bonten Media After FCC Eases TV Station Mergers, Deadline.com, Apr. 21, 2017 (Attached).
[8] Sinclair Broadcast announces plans to buy Bonten Media Group for $240 million, Baltimore Sun, Apr. 21, 2017 (Attached).
[9] Sinclair Gobbles Up Tribune in First Big Media Deal of Trump Era, May 8, 2017, Bloomberg, https://www.bloombergquint.com/business/2017/05/08/sinclair-gobbles-up-tribune-in-first-big-media-deal-of-trump-era.

Indeed, Sinclair is not the only one expected to be active in this frenzy. One article cites Wells Fargo Analyst Marci Ryvicker as expecting Tegna and Nexstar to also engage in buying. [10] Fox and CBS may also seek to acquire more stations.[11]

In the aftermath of these announcements, a New York Times report summed up the current attitude in the market: "'These were mergers that could never have been contemplated a year ago,' [Richard] Greenfield, [a media analyst at] BTIG, said of the deals that might blossom under the new F.C.C. 'You're enabling the impossible in many ways, so people are saying, 'Let's take a shot at this.'"[12]

I declare under penalty of perjury that the foregoing is true and correct.

May 26, 2017

Carmen Scurato

---

[10] Analyst Expects Wave of TV Station Merger Activity, Broadcasting & Cable, Mar. 13, 2017 (Attached).

[11] TV Station Owners Rush to Seize on Relaxed FCC Rules, New York Times, May 1, 2017 (Attached); Fitch: TV Broadcast Consolidation to Begin (Again), Fitch Solutions, Apr. 24, 2017 (Attached).

[12] TV Station Owners Rush to Seize on Relaxed FCC Rules, New York Times, May 1, 2017 (Attached).

# Will TV Station Groups Gain Greater Coverage With A Deregulatory-Minded Trump Administration?

mediapost.com/publications/article/290257/will-tv-station-groups-gain-greater-coverage-with.html

- by Wayne Friedman , Staff Writer, December 2, 2016

Under President-elect Donald Trump, executives are hoping for a bigger promise of a large national footprint with additional TV station acquisitions.

Marci Ryvicker, media analyst of Wells Fargo, believes the recent rise in stock prices among TV station groups is pinned to the hope of deregulation -- where one individual TV station group can grow beyond the federal rules placing a 39% limit on its overall U.S. household coverage.

Where might that go? Ryvicker says the U.S. TV station coverage limit could expand to 45% or possibly even 50% of the marketplace.

In that regard, analysts might wonder what opportunities might arise from perhaps an ever smaller -- but more powerful -- number of TV station groups.

Does local cable advertising stand to make better deal for marketers -- especially when it comes to addressable TV advertising through set-top boxes?

Local retail data -- first-party data from marketers -- continues to gain in value among those major national TV advertisers. But right now, local cable has somewhat of a leg up in this area versus that of local TV stations.

TV stations counter this by saying their local TV viewership, amassed together, is bigger than cable -- and far more lucrative and powerful for local-minded marketers.

New programmatic efforts will help out here for local TV stations. But that's long-term. Going forward, TV groups will look to more immediate results coming from buying more TV stations.

# Tribune Media Rising on Deal Speculation Despite Obstacles to Sale

thestreet.com/story/14028735/1/tribune-media-rising-on-deal-speculation-despite-obstacles-to-sale.html

Leon Lazaroff

3/6/2017

**Tribune Media** (TRCO) is on a tear.

The stock has jumped nearly 30% over the past month amid speculation that the owner of WGN America is either for sale or poised to sell various assets, i.e. some of its television stations as well as parts of its real estate portfolio.

Tribune Media's biggest one-day gain ever came last week on the heels of a Reuters story that **Sinclair Broadcasting** (SGBI) , the country's largest TV station group, had approached Tribune Media about a possible takeover. Shares of Chicago's Tribune were up 1.7% to $37.99 on Monday afternoon.

A sale of Tribune Media, owner of 42 local TV stations as well as WGN America, to Sinclair or any other major TV station owner is likely to run into regulatory obstacles. The FCC prohibits any TV station group from owning networks that cover more than 39% of the country. The commission last year changed the way TV station coverage is counted, resulting in a higher audience reach for some station groups despite no change in the number of stations they own.

Even if FCC Chairman Ajit Pai reverses that policy, it's unclear whether the 39% gap will be lifted.

Nonetheless, a sale is still possible, Wells Fargo media analyst Marci Ryvicker said in an investor note published on Sunday. "We think a purchase of the entire company is not just possible, but most likely -- albeit a bit complicated," she said.

Sinclair, which has been leading a charge to raise or even eliminate the TV station audience cap, covets Tribune Media because it owns major stations in most of the country's largest cities. Sinclair, on the other hand, has built a portfolio of mostly medium-to-small-city TV stations with national affiliations.

To win regulatory approval for such a transaction, a number of things would have to happen, Ryvicker said. First, the FCC would have to reinstate the so-called UHF discount, which the agency removed in 2016 after more than 30 years. The FCC argued that a 1985 rule that counted just 50% of stations that historically had limited range had ceased to apply ever since cable TV became the dominant means of receiving a broadcaster's signal.

Second, Tribune Media would have to sell some holdings such as its 20% stake in Food Network, which it co-owns with **Scripps Networks Interactive** (SNI) , and some TV stations in markets where Sinclair, for instance, is a dominant operator.

But regulatory obstacles could force Tribune Media to sell assets rather than the whole company, Jefferies media analyst John Janedis said in a March 1 investor note.

One scenario calls for Tribune Media to sell WGN America, its flagship network that has struggled to gain the kind of traction enjoyed by other general-interest networks such as **Time Warner**'s (TWX) TNT and TBS. Tribune Media sold its Gracenote music service in December to Nielsen to both raise cash, $560 million, and focus on its core TV station holdings.

Tribune revenue in the fourth quarter gained 11% year over year to $529.6 million as political advertising bolstered results. Net income of $19 million for the quarter contrasted with a $380.9 million loss in the same period a year earlier.

CEO Peter Liguori, who was hired four years ago in large part to expand WGN America's programming, left the

company on March 1 after reporting its fourth-quarter earnings. Liguori's exit was announced in January. Tribune board member Peter Kern is serving as interim CEO while the company works with Korn Ferry, a national executive search firm, to fill the position.

# Analyst Expects Wave of TV Station Merger Activity

broadcastingcable.com/blog/currency/analyst-expects-wave-tv-station-merger-activity/164008

Currency

Mar 13, 2017 07:45 AM ET

Sinclair, Tegna, Nexstar seen as strongest buyers by Ryvicker

**By Jon Lafayette**

Analyst Marci Ryvicker of Wells Fargo sees consolidation in the station business in the future and expects Sinclair Broadcast Group, Tegna and Nexstar doing the buying.

In a note Sunday, Ryvicker said the government was expected to reinstate the UHF discount, relax some local ownership rules and raise the ownership caps. Those changes should lead to what she called “a pretty robust M&A environment."

The environment, at this point, has more buyers than sellers. The only big seller at this point looks like Tribune Media, which has announced it is pursuing strategic options.

The price tag for broadcast assets seems to be between 6-7 times earnings. And the sell sign seems to be 8.5 to 9 times earnings.

Ryvicker says that Sinclair has the most capacity for M&A, followed by Tegna. And she figures as broadcasters buy to get up to the 39% cap, acquisitions will to a large degree be accretive and help generate additional cash flow.

Macro Commentary

Quick Hit

April 3, 2017

- **WRG Technology, Media & Telecommunications**

# *Pai Recommendations Good for Telcos and Broadcasters*

**Paul Gallant**
202.868.5303
paul.gallant@cowen.com

**The Cowen Insight**

On Thursday evening, Chairman Pai circulated two draft rulings to be voted on April 20. Assuming they pass, they would: 1) Eliminate current price regulation for most BDS lines -- positive for **CenturyLink**, **Frontier** and **AT&T**; and 2) Reinstate the UHF Discount -- good first step for potential M&A involving **Sinclair**, **Tribune**, **Nexstar**, **CBS**, **Tegna**, **Gray**, etc.

Chairman Pai has posted complete drafts of his BDS and UHF recommended decisions on the FCC website in advance of the April 20 Open Meeting. (Mr. Pai started doing this because key members of Congress had requested it over the past couple of years. It clearly improves agency transparency and seems to have won support from companies and other groups. It will be interesting to see whether posting the full text has any effect on policy by telegraphing agency plans in greater detail and perhaps helping opponents mobilize.)

In any event, here is our take on Mr. Pai's proposed outcomes on BDS and UHF:

**1. BDS would be solid win for incumbent telcos.** Consistent with our prediction last week, Mr. Pai is recommending significant deregulation of telco BDS service. The most important part of the ruling would declare roughly 90% of incumbent telcos TDM-based BDS lines to be free of price regulation due to competition. It would also formally declare that packet-based BDS (Ethernet) to be competitive and wall off future price regulation. We expect the ruling to win majority support (although unlikely 3-0 given Commissioner Clyburn's strong support for BDS competition from CLECs). If adopted, the ruling would likely take effect later in 2017. It will probably be challenged in court, but in our view, the FCC is likely to prevail because: A) The complex economic subject matter is classic "agency deference" material; and B) The court likely will appreciate the FCC's candid acknowledgement of modest imprecision in the scope of deregulation for the sake of being administerable (i.e. avoiding the delay and expense of revamping telco billing and reporting systems). If the proposal is adopted, it would be positive for CenturyLink, Frontier and AT&T, and a setback for BDS buyers like **Windstream** and **Sprint**.

**2. Return of UHF Discount -- first step toward M&A flexibility.** The Chairman also recommends reinstatement of the UHF Discount. The reason is the same one he gave when he dissented last year to elimination of the discount: Getting rid of the discount effectively tightens the national TV cap and should only be done if the agency simultaneously considers raising the 39% cap. After months of speculation, this first concrete step toward relaxed ownership rules could encourage M&A discussions. But there are two key remaining steps before the scope of potential consolidation is clear: A) Possible increase in national cap: This could unfold in at least a couple of ways, but bottom line, we think the end result will be "real reach" cap of at least 50%; and B) Local TV cap relaxation: We continue to believe the FCC will vote -- possibly by late 2017 -- to allow ownership of two top-four stations in a market. This top-four rule is now the key remaining obstacle to broadcast TV M&A that could change the economics of station ownership. *Third Circuit court review: We end with an important reminder -- the FCC's new ownership rules will be challenged in the 3rd Circuit Court in Philadelphia, which has been skeptical of prior FCC deregulation efforts on ownership. We suspect this FCC's desire to end almost 20 years of futility on ownership revisions ultimately will produce an evidence-based decision that withstands judicial scrutiny. But investors should remember that the FCC's TV ownership rulings won't be final until the court has its say.*

www.cowen.com

USCA Case #17-1129 Document #1677084 Filed: 05/26/2017 Page 114 of 133

TVNewsCheck
THE BUSINESS OF BROADCASTING

updated

# FCC Takes Lid Off National Station Ownership

By Harry A. Jessell
TVNewsCheck, April 20, 2017 12:20 PM EDT

In a move that is expected to trigger another wave of station consolidation, the FCC today voted to allow station groups to exceed the nominal ownership cap that limits groups to coverage of no more than 39% of U.S. TV homes.

It did so by restoring the 50% discount on the coverage of UHF stations in calculating groups' coverage.

"This will have the effect of increasing the cap well beyond the 39% level established by Congress in 2004," said Democratic Commissioner Mignon Clyburn, who dissented in the 2-1 vote. In fact, she said, it will allow groups "to actually reach 78% of television households."

In one of its last actions last year, the FCC under Obama-appointed Tom Wheeler had eliminated the discount. Ajit Pai, appointed to succeed Wheeler in January, announced his intention to reverse the action last month. Ion Media and Trinity Broadcasting had asked the commission to reconsider the Wheeler FCC vote.

The FCC also said it will launch a rulemaking later this year to look at the national ownership cap in its entirely and consider raising the cap with or without the discount.

Groups opposed to media consolidation might take the FCC to court to block the action.It's under discussion, said Andy Schwartzman, of the Institute for Public Representation at the Georgetown University Law Center.

"Today's disgraceful vote is a cynical political ploy to help large broadcast companies become larger, notwithstanding the lack of any sustainable legal rationale for doing so," he said.

The FCC action opens the door for mergers involving groups that are bumping up against the cap without the discount. Sinclair, Nexstar, CBS and NBC all lobbied the FCC to restore the discount.

The immediate beneficiary may be Sinclair Broadcast Group. It is rumored to be in talks to acquire all or most of Tribune Media. With the discount, it will be able to move ahead with any such plans.

Sinclair's coverage now stands at 38.6%. With the discount, it could grow to between 53.3% and 68% depending on the mix of UHF and VHF stations. The fewer VHFs, whose coverage is fully counted, the closer it can get to 68%.

The following chart shows the top 20 TV station groups ranked by their current coverage and show how big they could get if they buy only fully counted VHF stations (minimum actual cap) going forward or only discounted UHF stations (Maximum actual cap). Current actual and FCC coverage percentages come courtesy of BIA/Kelsey.

The numbers on the chart are all percentage except the last two columns.

| Owner | Actual coverage | FCC coverage | Headroom under 39% with discount | Minimum actual cap | Maximum actual cap | No. of markets | No. of stations |
|---|---|---|---|---|---|---|---|
| Ion Media | 64.8% | 32.4% | 6.6% | 71.4% | 78.0% | 56 | 62 |
| Univision | 44.1 | 23.2 | 15.8 | 59.9 | 75.8 | 25 | 59 |
| Tribune Media | 43.7 | 26.7 | 12.3 | 56.0 | 68.3 | 34 | 54 |
| Nexstar Media | 39.2 | 26.1 | 12.9 | 52.1 | 65.0 | 100 | 171 |
| Sinclair Broadcast | 38.6 | 24.3 | 14.7 | 53.3 | 68.0 | 83 | 169 |
| CBS | 37.7 | 24.6 | 14.4 | 52.1 | 66.5 | 18 | 30 |
| Fox | 36.8 | 24.3 | 14.7 | 51.4 | 66.1 | 17 | 29 |
| NBC/Telemundo | 36.1 | 19.4 | 19.6 | 55.8 | 75.4 | 20 | 28 |
| Tegna | 31.3 | 26.3 | 12.7 | 44.0 | 56.7 | 39 | 55 |
| ABC | 22.4 | 20.7 | 18.3 | 40.8 | 59.1 | 8 | 8 |
| Hearst Television | 18.7 | 13.2 | 25.8 | 44.5 | 70.3 | 27 | 34 |
| EW Scripps | 18.1 | 11.4 | 27.6 | 45.7 | 73.4 | 24 | 36 |
| Raycom Media | 15.5 | 10.7 | 28.3 | 43.8 | 72.1 | 43 | 73 |

USCA Case #17-1129 Document #1677084 Filed: 05/26/2017 Page 115 of 133

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Entravision | 13.9 | 7.1 | 31.9 | 45.8 | 77.7 | 24 | 58 |
| Liberman | 11.2 | 5.6 | 33.4 | 44.6 | 78.0 | 10 | 10 |
| Cox Media | 11.1 | 5.9 | 33.1 | 44.3 | 77.4 | 11 | 15 |
| Meredith | 10.7 | 6.9 | 32.1 | 42.9 | 75.0 | 12 | 28 |
| Gray Television | 10.3 | 7.6 | 31.4 | 41.8 | 73.2 | 56 | 131 |
| Graham Holdings | 6.6 | 3.7 | 35.3 | 41.9 | 77.2 | 6 | 7 |

Clyburn blasted the FCC's action in a statement prior to her no vote and in a Q&A with reporters after the meeting.

She accused Pai of hypocrisy. While he professes the desire to eliminate outdated regulations, she said, he chose to snatch the UHF discount from "a regulatory crypt" to immediately allow the big to get bigger.

With its vote, she said, the FCC is "inviting all broadcast stations to actually distort the calculation of their national audience reach and take advantage of a loophole that allows owners to fail to count audience that the stations actually do reach."

Pai defended his action by saying that the UHF discount and the leveling of the cap must be considered in tandem and that they will in the rulemaking later this year. Pai pointed out that he made the same argument when the Wheeler FCC first proposed eliminating the discount in 2013 and when it actually went ahead and did it last year.

The FCC, however, may have a problem in adjusting the 39% cap. Fellow Republican FCC Commissioner Michael O'Rielly, who gave Pai the second vote he needed to restore the discount, reiterated his belief that the FCC lacks the authority to change the cap. Congress set the cap and only it can change it, he said.

---

*Copyright 2017 NewsCheckMedia LLC. All rights reserved. This article can be found online at: http://www.tvnewscheck.com/article/103424/fcc-takes-lid-off-national-station-ownership.*

# Sinclair Broadcast announces plans to buy Bonten Media Group for $240 million

baltimoresun.com/business/bs-bz-sinclair-acquires-bonten-media-20170421-story.html

4/21/2017

Lorraine MirabellaContact ReporterBaltimore Sun

Sinclair Broadcast Group Inc. has agreed to buy the stock of New York-based Bonten Media Group Holdings for $240 million, the Hunt Valley-based broadcaster announced Friday.

Bonten owns 14 television stations in eight markets, which reach about 1 percent of the TV households in the United States. The broadcaster also operates four stations through "joint sales agreements" with Esteem Broadcasting, and those stations will be acquired by Sinclair-owned Cunningham Broadcasting.

The Bonten and Esteem stations being acquired include NBC, ABC, Fox, CW, UNI and MNT affiliates in eight television markets in California, Montana, North Carolina, Tennessee, Texas and Virginia.

The acquisition will help Sinclair expand its regional presence in several states where it already owns stations, Chris Ripley, Sinclair president and CEO, said in Friday's announcement. Sinclair owns, operates or offers service to 173 television stations in 81 markets.

"We believe our economies of scale help us bring improvements to small-market stations, including investments in news, other quality local programming and multicast opportunities with our emerging networks of Comet, Charge! And TBD," Ripley said.

Sinclair expects to close the sale, using cash on hand, in the third quarter of this year. The deal is subject Federal Communications Commission approval and antitrust clearance.

Sinclair announced the deal a day after the FCC relaxed broadcast ownership rules, a move expected to pave the way for television industry consolidation. Bloomberg News has reported that Sinclair is preparing to buy Tribune Media, which would bring together two of the nation's largest television station owners. (Tribune is the former owner of The Baltimore Sun and owns the newspaper's Mount Vernon office building.)

The FCC voted Thursday to reinstate the so-called UHF discount. The discount allows stations broadcasting on those higher-frequency airwaves to count only half their audience against a cap allowing a single company to own stations reaching no more than 39 percent of the nation's television households.

Without the UHF discount, Sinclair had an audience reach of about 38 percent. With it reinstated, and including the Bonten stations, it would have an estimated 25 percent reach, said Marci Ryvicker, a senior analyst with Wells Fargo Securities.

"We do not believe this precludes other deals large or small," Ryvicker said in a report Friday. "We view this transaction as a "drop in the bucket" for [Sinclair.] It by no means precludes other deals from happening large or small as [Sinclair] clearly still has plenty of ... financial room."

Ryvicker said she expects future acquisitions to help boost Sinclair's free cash flow and stock price.

Sinclair shares fell 45 cents Friday to close at $39.90 each.

*lorraine.mirabella@baltsun.com*

lorraine.mirabella@baltsun.com

# Sinclair Agrees To Buy Bonten Media After FCC Eases TV Station Mergers

deadline.com/2017/04/sinclair-agrees-buy-bonten-media-fcc-ease-tv-station-merger-1202073744/

By David Lieberman 4/21/2017

Sinclair Broadcast Group was poised to act yesterday after the FCC cleared the way for some TV station mergers by restoring the so-called UHF discount.

The broadcaster announced this morning a two-part deal valued at $240.0 million. Sinclair picked up Bonten Media Group Holdings, which owns 14 television stations in 8 markets.

In addition, Cunningham Broadcasting — controlled by trusts for the children of Sinclair founder Julian Smith — will pick up the membership interest of Esteem Broadcasting. It has four stations that Bonten already runs via joint sales agreements.

Sinclair expects the deal to close by the end of September, following FCC approval.

The stations it's acquiring only reach about 1% of U.S. households. But before yesterday, the deal would have put Sinclair close to the federal ceiling that bars a broadcaster from reaching more than 39% of households; Sinclair already reaches 38%.

The FCC wiped that complication away yesterday by restoring a rule that the agency eliminated in August: It only counts half of the homes reached by UHF stations against the ceiling. By that calculation, Sinclair would only reach about 25% of the country even after its new deal.

"We view this transaction as a 'drop in the bucket' for [Sinclair]," Wells Fargo Securities' Marci Ryvicker says. "It by no means precludes other deals from happening – large or small." The company is believed to be eyeing a mega deal with Tribune Media if ownership rules are further relaxed.

Sinclair shares are down nearly 1% today.

Boten has five ABC affiliates, four NBC, two Fox ones, and three not tied to a Big 4 network.

Sinclair CEO Chris Ripley says his company's "economies of scale help us bring improvements to small market stations, including investments in news, other quality local programming, and multicast opportunities with our emerging networks of Comet, Charge! And TBD."

But Free Press CEO Craig Aaron calls the deal a "scandal."

"Sinclair has gone out of its way to boost Trump, praise his appointees and even hire his former spokespeople," he adds. "Now they are cashing in… The last thing local communities need is fewer perspectives and cookie-cutter content pushing an ideological agenda. But that's what Trump's FCC is set on doing: delivering favors that line the pockets of conservative outlets offering the administration favorable coverage."

# Fitch: TV Broadcast Consolidation to Begin (Again)

fitchsolutions.com/site/pr/1022617

24 Apr 2017 11:30 AM EST

Fitch Ratings-New York-24 April 2017: The Federal Communications Commission's (FCC) reinstatement of the Ultra High Frequency (UHF) 50% discount paves the way for a renewed round of consolidation in the television broadcast sector, according to Fitch Ratings.

Consolidation is positive for the TV broadcast sector as credit profiles stand to benefit from increased scale and diversification, and enhanced negotiating positions versus multichannel video programming distributors (MVPDs) and the networks. Debt financing required by potential transactions, as well as the benefits of increased scale including improved free cash flow generation, would need to be considered from a ratings perspective, although it is possible that mergers and acquisitions activity could temporarily lift leverage levels.

Sinclair Broadcast Group directly followed the FCC's UHF reinstatement with an announced acquisition of 14 TV stations from Bonten Media Group for $240 million. The Bonten acquisition will increase Sinclair's US TV Household (HH) coverage by just 1% leaving it ample room for incremental acquisitions. This was a more modest acquisition than market participants were anticipating as press reports suggested Tribune Media Company as a likely acquisition target.

The increased ability to consolidate, as a function of the rule reinstatement is particularly relevant for stations that were close to the 39% national ownership restriction without the UHF discount. CBS Corp. at 38% US HH coverage, now at 22% with a UHF discount reinstatement; Sinclair Broadcast Group at 38% US TV HH coverage, now at 25% with a UHF discount; and Nexstar Media Group at 39% US TV HH coverage, now at 27% with a UHF discount, are likely consolidators of TV broadcast assets.

There are a number of industry dynamics favoring renewed horizontal consolidation in the TV broadcast sector. First, secular headwinds, along with the proliferation of programming options, increasing pressures from over-the-top (OTT) internet-based television services and viewer fragmentation, continue to result in declining broadcast television audiences. Independent broadcast station groups' efforts to provide OTT offerings have been constrained by networks and existing affiliation agreements.

Additionally, the negotiating power of the independent station group has eroded somewhat given the rapid consolidation among the MVPDs (AT&T-DirecTV, Charter-Time Warner Cable-Bright House) over the past couple of years. Illustrative of how negotiations are becoming more contentious, Charter has recently challenged Univision Communications, Twenty-First Century Fox and CBS Corp. with attempts to use content-licensing agreements acquired during the company's purchase of Time Warner Cable.

The negotiating position between MVPDs and the broadcast networks are becoming increasingly important for TV broadcast station groups as core TV advertising revenue growth will remain lackluster and operators are reliant on increasing retransmission fees received from MVPDs to support revenue and operating cash flow growth.

Per Magna Global, local broadcast TV advertising revenue declined 3.1% in 2016, excluding political and Olympics advertising revenue, and is expected to decline at roughly the same rate in 2017. Magna estimates national broadcast TV, excluding political and Olympics, will be flat in 2017 and flat to negative in the future. Additionally, for the independent station groups Fitch expects affiliates to share an increasing amount of these retransmission fees with the associated broadcast networks.

Contact:

Patrice Cucinello
Director
Corporate Finance
+1 212 908-0866

Kellie Geressy-Nilsen
Fitch Wire
+1 212 908-9123
Fitch Ratings, Inc.
33 Whitehall Street
New York, NY

Media Relations: Alyssa Castelli, New York, Tel: +1 (212) 908 0540, Email: alyssa.castelli@fitchratings.com.

Additional information is available on www.fitchratings.com. The above article originally appeared as a post on the Fitch Wire credit market commentary page. The original article can be accessed at www.fitchratings.com. All opinions expressed are those of Fitch Ratings.

# TV Station Owners Rush to Seize on Relaxed F.C.C. Rules

nytimes.com/2017/05/01/business/dealbook/tv-station-owners-rush-to-seize-on-relaxed-fcc-rules.html

5/1/2017

Ajit Pai, the F.C.C. chairman, in Barcelona in February. Broadcasters hope that he will let through the kinds of deals that were held up during the Obama administration. Lluis Gene/Agence France-Presse — Getty Images

The media industry has been rife with consolidation in recent years: Cable companies, film studios and telecommunications firms have all been bought and sold at a rapid clip.

Now, local television stations are at the center of the deal-making frenzy.

Last week, a day after the Federal Communications Commission eased regulations over how many stations an owner may have, Sinclair Broadcasting, the largest local broadcast group in the country, said it would buy 14 New York-based stations for $240 million.

The timing of Sinclair's deal may not have hinged directly on the change, but it demonstrated a demand for broadcast station mergers. Sinclair did not reply to requests for comment.

And now, a bidding war has begun over Tribune Media, the owner of WGN America and, in New York, PIX 11.

The Blackstone Group appears to be working with 21st Century Fox on a bid for Tribune. And Sinclair is also circling that company.

"The F.C.C. has basically said: 'Game on. We're going to let you consolidate further than anyone had imagined,'" said Richard Greenfield, a media analyst at BTIG.

Consolidation of local broadcast stations could lead to more expensive fees for consumers as providers pass on ever-higher fees from broadcasters and content creators to subscribers. But to media companies, the mantra of late has been that bigger is better.

For broadcast station companies in particular — including Sinclair, Fox and the Nexstar Media Group — owning more stations increases their power over cable companies, which pay to retransmit the stations.

Fox's motive for pursuing Tribune, which has more Fox affiliates than any other station owner, largely appears to be blocking a deal with Sinclair. It plans to form a joint venture with the Blackstone Group, an investment giant, in which Blackstone would provide the cash for a deal while Fox would provide its own television stations, according to people briefed on the plans who were not authorized to speak publicly about the matter.

If successful, Fox would then reduce its direct exposure to local television stations, Mr. Greenfield said, while still holding on to a piece — and while stymieing a rival.

Details of the potential joint venture were unclear, as were the precise reasons that Fox was turning to Blackstone. Tribune is a relatively small company, with a market value of about $3.4 billion.

But for companies like Fox and Sinclair, consolidation is also a defensive move, shoring them up at a time when online rivals like Netflix and Hulu are commanding more viewers. Content providers like CBS and the Walt Disney Company are also pushing for bigger fees from broadcasters.

And local television advertising sales, excluding political ads and the Olympics, were roughly flat last year, according to the research from Magna Global, with expectations that 2017 will be even tougher.

Getting bigger through station acquisitions, then, is meant to help these companies drive harder bargains. And smaller operators have emerged as potential takeover targets: The stock prices of two other broadcast companies, E. W. Scripps and Gray Television, are both up sharply this year.

Underpinning broadcasters' dreams of expansion is the hope that Ajit Pai, the F.C.C.'s new chairman and a Republican, will let through the kinds of deal making that had been held up during the Obama administration.

"Companies are talking about deals now because they have reason to believe the F.C.C. will relax all the ownership rules," said Paul Gallant, an analyst at Cowen and Company.

The first tangible step came with a 2-to-1 vote by the F.C.C. last week to reintroduce the so-called UHF discount.

Longstanding rules prohibit companies from covering more than 39 percent of American households, but the UHF discount allows station owners to exclude certain stations that operate in ultrahigh frequencies. With the reinstated discount, according to calculations by Fitch Ratings, Sinclair's household coverage percentage has fallen to about 25 percent, from 38 percent, while Nexstar's has dropped to 27 percent, from 39 percent, opening the door to new mergers and acquisitions.

"This represents a rational first step in media ownership reform policy allowing free and local broadcasters to remain competitive with multinational pay TV giants and broadband providers," Gordon Smith, the president of the National Association of Broadcasters, said in a statement.

The F.C.C.'s rule change followed pressure from industry groups. One week before the vote, Mitch Rose, NBC Universal's senior vice president for government relations, visited the office of the other Republican commissioner on the F.C.C., Michael O'Reilly, urging him to reinstate the UHF discount.

And in February, Tribune Media's general counsel, Edward Lazarus, met with Mr. Pai's chief of staff, Matthew Berry, and lobbied for the change in rules.

Mr. Pai has long been critical of strict broadcast ownership rules. He has said that online media companies such as Google, Facebook and Netflix are competing for audiences that were once served only by television. He has also been skeptical of rules against broadcast ownership limits, given that the agency has approved mergers in competing industries, including Charter's purchase of Time Warner Cable and AT&T's purchase of DirecTV.

At the annual National Association of Broadcasters convention in Las Vegas last week, Mr. Pai announced his intention to re-examine other media ownership rules. Broadcasters hope that one limit that may be removed is a prohibition on owning more than two stations in a local market.

Consumer groups and Democrats in Congress and at the F.C.C. warn that the changes will lead to great industry consolidation, giving a few companies great influence over news and public opinion.

The action "will actually harm the public interest, by reducing diversity, competition and localism," Mignon Clyburn, the sole Democrat at the F.C.C., said after the UHF discount vote.

In a letter to Mr. Pai last month, Democratic House members argued against both the UHF discount and a union of Sinclair and Tribune. Such a merger, they contended, could lead to higher cable fees because Sinclair charges cable companies more than Tribune does to retransmit its broadcasts.

"These were mergers that could never have been contemplated a year ago," Mr. Greenfield, of BTIG, said of the deals that might blossom under the new F.C.C. "You're enabling the impossible in many ways, so people are saying, 'Let's take a shot at this.'"

TVNewsCheck
THE BUSINESS OF BROADCASTING

Jessell At Large

# Fox Enthralled By Stations Again. But Why?

By Harry A. Jessell
TVNewsCheck, May 5, 2017 4:04 PM EDT

21st Century Fox CEO James Murdoch told securities analysts in February that Fox was not much interested in growing its station portfolio. "We really like the shape of our station business right now."

As Sean Spicer progenitor Ron Zeigler would say, that statement is "inoperative."

We learned this week that Fox believes the shape of its station business is too small and so is forging a joint venture with the Blackstone private equity outfit to make a bid for Tribune Media and its 42 stations. Tribune hung out the for-sale sign a year ago.

The news upset the widespread expectation, much in vogue at NAB last week, that the ever-acquisitive Sinclair Broadcast Group would sweep in and scoop up Tribune so that it would have the major market outlets it needs to fulfill its national ambitions.

So, why is Fox suddenly hot for Tribune?

Wrong question. Fox is not hot for Tribune; it's hot for Tribune's 14 Fox affiliates stretching from Seattle (DMA 14) to Greensboro, N.C. (DMA 46). Collectively, they reach 13.5% of TV homes.

If Fox can pull off this deal, its lineup of O&Os would swell to 31 stations covering about half of all TV homes, well within the bounds of the FCC's newly expanded national ownership limits.

Buying Tribune would give Fox and Blackstone the chore of spinning off the 28 non-Fox stations it doesn't want. They can be roughly divided into two groups: The traditional Tribune stations, a string of major-market, news-producing stations affiliated mostly with the CW topped by WPIX New York, KTLA Los Angeles and WGN Chicago, and a bunch of Big Four network affiliates in 50-plus markets.

So, let's reframe the question. Why is Fox hot for 14 more O&Os?

After news of Fox's play for Tribune broke, the research firm of MoffettNathanson put out a note that says that Fox has good offensive and defensive reasons for scarfing up the Fox affiliates.

On the offensive side of the ledger, it says, Fox would create "incremental value" for itself from the cost synergies of owning more stations and from exposure to more football markets. The Tribune Fox affiliates would give the network entree into six additional NFL markets, including two (Seattle and Milwaukee) for which it holds the Sunday NFC home-team rights.

In addition, MoffettNathanson says, the joint venture with Blackstone, which would absorb Fox's current stations, would shield parent 21st Century Fox from the volatile ad market and put the slow-growing station assets "below the line."

I would add another even bigger factor: retrans. According to the back of my envelope, Tribune's 14 Fox affiliates reach 15.5 million homes. Let's say 80% or around 12 million are MVPDs subs.

If Fox buys the affiliates, it could get $2 per month from each of the 12 million subs. That works out to $24 million a month or $288 million a year.

But if Sinclair gets the affiliates, it will collect the $2 and Fox will get only half the money through reverse comp.

USCA Case #17-1129 Document #1677084 Filed: 05/26/2017 Page 123 of 133

Here's where we get into the defensive rationale. If Sinclair wins Tribune, it becomes a massive Fox affiliate group with 52 affiliates covering around 28% of TV homes. That will give Sinclair tremendous leverage to push back on reverse comp and other matters. Maybe Fox ends up on the short end of the retrans split.

Rupert and the boys will suddenly have to consult with David Smith every time they want to make a move. Better to deal with the Blackstone bean counters.

MoffettNathanson says Fox has other reasons to keep Sinclair from getting too big. Because of those major market CW stations, a Sinclair-Tribune merger essentially creates a new national broadcaster outlet with big ideas for programming and new ATSC 3.0-enabled services like datacasting and targeted advertising.

Smith has been talking for years about creating a national news service that would compete with Fox News Channel and, with Tribune, he'll have all the pieces he needs to do it. MoffettNathanson also suggests that Sinclair-Tribune may have enough weight to compete for NFL rights when they come up in a few years.

So, if Fox buys Tribune, it will prevent Sinclair from becoming the affiliate group from hell and another national TV rival.

There would still be the question of Tribune's 28 non-Fox stations. Fox would be able to find plenty of buyers to spin off the 50-plus Big Four affiliates. But what of the CWs, particularly in the major markets? Who other than Sinclair wants them?

Nexstar? Perhaps. Like Sinclair, it likes to buy stations, but, unlike Sinclair, it has no visible strategy for putting major market stations to work.

As half owner (with Time Warner) in the CW, CBS certainly has an interest in what becomes of Tribune's CW affiliates.

I'd be curious to know whether the CW has the right, in the event of a sale, to shift its affiliation in New York, Los Angeles, Dallas and Miami from the new owner of Tribune to the CBS duopolies in those markets. I'd also be curious to know whether CBS is interested in buying Tribune's CW affiliates in Denver; St. Louis; Portland, Ore. Hartford, Conn.; Norfolk, Va.; and New Orleans.

There is some delicious irony in all this.

Just prior to the Great Recession, it became fashionable among the Big Four networks to shed smaller-market stations, In 2008, Fox sold eight of its O&Os to Local TV LLC for $1.1 billion -- WJW Cleveland; KDVR Denver; KTVI St. Louis; WDAF Kansas City; WITI Milwaukee; KSTU in Salt Lake City; WBRC Birmingham, Ala.; and WGHP Greensboro, N.C.

Oak Hill Capital Partners had formed Local TV a year earlier by purchasing the New York Times stations for $575 million, but it turned over the management to Tribune. Tribune liked Local TV so much that it bought it for $2.7 billion in 2013.

So, in a round-about way, Fox is now seeking to buy seven stations that it cast off a decade ago. (In 2009, Local TV swapped WBRC to Raycom for CBS affiliate WTVR Richmond.)

Of course, I must point out that the networks' station dumps followed by only a few years the nasty network-affiliate feud that tore apart the NAB and hobbled the association for several years.

The feud was triggered by the networks' insistence that the NAB push to loosen the FCC national ownership cap so they could -- wait for it -- acquire more stations.

In these turbulent TV days, M&A strategies seem as ephemeral as a Fox primetime offering.

# Trump's new rules will let Sinclair gobble up Tribune

recode.net/2017/5/8/15579014/sinclair-acquire-tribune-media-company-fcc-merger-regulation

5/8/2017

*Chip Somodevilla / Getty*

Sinclair Broadcast Group announced Monday it will acquire Tribune Media Company for $3.9 billion, the latest sign that media and telecom giants plan to take advantage of a relaxed regulatory environment under U.S. President Donald Trump.

If the deal is consummated, it would combine two of the country's largest owners of local TV stations: Sinclair could add 42 stations in 33 markets to its media empire, as well as the cable network WGN America and other assets.

For the moment, the fate of the deal rests in the hands of the Federal Communications Commission as well as the nation's antitrust regulators. As with any merger of this size, the government has the ability to review and block the merger, permit it to proceed as proposed, or require Sinclair and Tribune to make certain changes in order for them to proceed.

Already, though, Sinclair has benefited greatly from the FCC: Under its Republican chairman, Ajit Pai, the agency has relaxed media ownership rules, beginning with a change in the way some stations are counted toward a company's national footprint. That deregulatory move made Sinclair's bid for Tribune fathomable, analysts have said.

Once merged, Sinclair could still exceed the FCC's limit that broadcasters cannot have a market share greater than 39 percent. By some measures, it could reach 50 percent. In that case, it could divest some TV stations it's purchased in order to stay below the cap — but Pai has also explored raising the limit, which could grant the company another big break.

Instead, Sinclair's biggest challenge might be politics — and reports about its ties to Trump.

During the 2016 election, Sinclair stations appeared to have great access to the presidential candidate . While the company claimed it was not playing favorites, Trump's closest aide, Jared Kushner, said in December that Sinclair had actually struck a deal with Trump's campaign with respect to its coverage. (Sinclair said the deal never happened.)

Months later, Sinclair snapped up Boris Epsteyn, one of Trump's spokespeople in the White House, as a chief political analyst.

Still, the criticism about the company's close ties to conservatives predate the current presidency: Days before the 2004 election, it aired a documentary criticizing Democratic contender John Kerry's military record.

For now, the FCC's changes under new Republican leadership have drawn considerable criticism from Democrats, which feared it would only further consolidation in the media and telecom industries.

"The Commission just wrapped up and put a bow on a huge gift for those large broadcasters with ambitious dreams of more consolidation," said Mignon Clyburn, the FCC's sole Democratic commissioner, during an agency meeting last month. "Now, I am not a betting woman, but mark my word: This Order will have an immediate impact on the purchase and sale of television stations."

Pai, however, has stressed he plans to evaluate every transaction on its merits. Asked about his work to relax ownership rules, he told **Recode** last week: "Transactions are always going to come and go, depending on what the regulatory framework is.

"We're simply convinced that we have to have a set of rules that reflect the marketplace of 2017," he said, "not the marketplace of yesteryear."

---

### Subscribe to the Recode newsletter

Sign up for our Recode Daily newsletter to get the top tech and business news stories delivered to your inbox.

By signing up you agree to our terms of use.

# *S&PGR Rpt: US Local TV Broadcasters Could See M&A Rise In 2017

Dow Jones Institutional News
May 11, 2017 Thursday 7:23 PM GMT

Copyright 2017 Factiva ®, from Dow Jones
All Rights Reserved

Copyright © 2017, Dow Jones & Company, Inc.

**Length:** 1375 words

## Body

11 May 2017 15:23 ET Press Release: S&PGR Rpt: US Local TV Broadcasters Could See M&A Rise In 2017

The following is a press release from Standard & Poor's:

CHICAGO (S&P Global Ratings) May 11, 2017--S&P Global Ratings expects an uptick in mergers and acquisitions (M&A) among U.S. local television broadcasters in 2017 after the Federal Communications Commission (FCC) effectively relaxed U.S. TV broadcasters' 39% "national audience reach" cap by reinstating the 50% UHF discount in April, said a report published today, titled "U.S. Local TV Broadcasters Outlook: The FCC's Reinstated UHF Discount Could Spur Mergers And Acquisitions In 2017."

"The FCC's planned comprehensive review of media ownership rules that showed up on its docket in April could further ease restrictions on both the size and type of mergers that could pass muster, making possible deals that wouldn't overcome current regulatory hurdles," said S&P Global Ratings' credit analyst Jeanne Shoesmith. These include rules that currently limit the creation of major broadcast network (NBC, ABC, CBS, and FOX) duopoly markets (where a TV broadcaster owns more than one station in a single market

affiliated with one of those broadcast networks) and could be eliminated as part of the comprehensive review.

If local TV broadcasters are allowed to own several stations in a single market, particularly stations affiliated with the four major commercial broadcast television networks, there could be a flurry of M&A activity fueled by significant acquisition synergies and margin expansion opportunities from shared functions and facilities. Still, this M&A activity could lead to a more contentious relationship between networks and affiliates because the increased concentration of affiliates in certain TV groups could lead to an uptick in publicly fought affiliation battles, which could bring back regulatory scrutiny.

In 2017, we expect acquisition multiples of up to 2x most rated broadcasters' leverage. "We also believe that any impact on leverage and ratings would depend on how the acquisitions are funded and the amount of synergies the companies expect," said Ms. Shoesmith. "For most of the local TV broadcasters we rate, M&A deals that don't incorporate an equity funding component could result in negative outlook revisions or downgrades."

The report is available to subscribers of RatingsDirect at www.globalcreditportal.com and at www.spcapitaliq.com . If you are not a RatingsDirect subscriber, you may purchase a copy of the report by calling (1) 212-438-7280 or sending an e-mail to research_request@spglobal.com Ratings information can also be found on the S&P Global Ratings' public website by using the Ratings search box located in the left column at www.standardandpoors.com . Members of the media may request a copy of this report by contacting the media representative provided.

Primary Credit Analyst: Jeanne L Shoesmith, CFA, Chicago (1) 312-233-7026; jeanne.shoesmith@spglobal.com
Secondary Contact: Thomas J Hartman, CFA, Chicago (1) 312-233-7057; thomas.hartman@spglobal.com
Media Contact: Olayinka Fadahunsi, New York 212-438-5095; olayinka.fadahunsi@spglobal.com

# Attachment G

# Declaration of Matthew Wood

In the
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| FREE PRESS, *et al.*, Petitioners, | ) | |
| v. | ) | No. 17-1129 |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, Respondents. | ) | |

**DECLARATION OF MATTHEW F. WOOD**

I am Policy Director at Free Press.

This declaration describes the Federal Communications Commission's procedures for processing broadcast license assignment and transfer applications. It explains why, absent a stay of the FCC's Order reinstating the UHF Discount, applications for assignment or transfer of control of broadcast licenses that seek to take advantage of that decision can be granted within a few months after the decision otherwise would be effective on June 5, 2017.

Applicants for assignment of a license to another party, or for transfer of control of a company which possesses a license, file their applications using slightly different FCC forms (Form 314 for assignments and Form 315 for transfers), but they are functionally identical for purposes of processing by the FCC.

Applications are filed electronically. The initial processing is also done electronically. Facially complete applications are automatically scheduled for publication within a few days after filing. Each working day, the FCC Media Bureau issues a public notice listing newly accepted applications. Interested parties may file petitions to deny an application within 30 days after publication of the notice of acceptance.

The vast majority of applications are unopposed. After the expiration of the 30-day period for filing petitions to deny, unopposed applications are examined by staff paralegals and/or attorneys. Unless they detect any technical shortcoming, those applications are granted, typically within two weeks after the filing deadline. The Commission does not undertake any further inquiry into whether a facially complete, unopposed application is in the public interest. Rather, it will grant all such applications because it views the Commission's application forms as providing all information necessary to determine that grant of an application is in the public interest, convenience and necessity within the meaning of Section 309(a) of the Communications Act. This policy was considered and upheld in *Committee To Save WEAM v. FCC*, 808 F.2d 113, 118 (D.C. Cir. 1986), where the Court held that

> By requiring a proposed assignee to address the relevant facets of the public interest, convenience, and necessity on FCC Form 314, the Commission has incorporated the consideration of these issues into its application process. Therefore, the FCC's approval of WEAM's

application implies a finding on ample information that the public interest will be served by the assignment.

In the event that any interested party files a petition to deny an assignment or transfer application, the Commission's Media Bureau has been delegated authority to review the pleadings and prepare an order which addresses the issues raised. Uncomplicated cases can be resolved within a few weeks; on rare occasions, complicated cases can take several months for resolution. In even fewer cases, the staff may issue an inquiry letter to obtain additional information it considers necessary to reach a decision.

Under Section 309(d)(2) of the Communications Act, if the staff finds that "there are no substantial and material questions of fact" which preclude a grant of the application, the application is to be granted. If the staff finds what it considers to be a minor problem which it believes does not meet the "substantial and material" test, it typically resolves the matter by issuing a forfeiture or admonition and granting the application. This is very unusual, and happens perhaps a few times each year.

In theory, if the staff determines that there is a substantial and material issue of fact as to whether grant of an application is in the public interest, it must designate the application for hearing in front of an Administrative Law Judge pursuant to Section 309(e). However, this almost never happens. To the best of

my knowledge it has been at least several years since the staff designated a broadcast assignment or transfer application for hearing.

Because of the policies described here, unless a transferee or assignee has engaged in egregious misconduct, the Commission is unlikely to take remedial action in response to a petition to deny challenging a facially complete application. Nor is it likely that it will designate a hearing.

Based on the foregoing information, in the absence of a stay, parties seeking to take advantage of the reinstated UHF Discount to acquire television stations that would otherwise be precluded by the statutory 39% audience reach cap can file applications for approval on or after June 5, 2017. If unopposed, those applications would be placed on public notice within two weeks and would likely be granted within about six weeks thereafter. Opposed applications which do not raise significant issues would likely be acted upon, and granted, within 12 or 14 weeks after filing.

I declare under penalty of perjury that the foregoing is true and correct.

May 26, 2017

Matthew F. Wood

## CERTIFICATE OF SERVICE

I, Andrew Jay Schwartzman, hereby certify that on May 26, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Andrew Jay Schwartzman
Andrew Jay Schwartzman
Institute for Public Representation