**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

FREE PRESS, *et al.*,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

*Respondents*.

No. 17-1129

# OPPOSITION OF MOVANT-INTERVENORS TRIBUNE MEDIA COMPANY, TWENTY-FIRST CENTURY FOX, INC., UNIVISION COMMUNICATIONS INC., ION MEDIA NETWORKS, INC., AND TRINITY CHRISTIAN CENTER OF SANTA ANA, INC., TO PETITIONERS' EMERGENCY MOTION FOR STAY

David E. Mills
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 776-2865
dmills@cooley.com

*Counsel for ION Media Networks, Inc.*

Colby M. May
COLBY M. MAY, ESQ., P.C.
P.O. Box 15473
Washington, DC 20004
(202) 544-5171
cmmay@maylawoffices.com

*Counsel for Trinity Christian Center of Santa Ana, Inc.*

Robert A. Long, Jr.
Mace Rosenstein
Dustin Cho
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
rlong@cov.com
mrosenstein@cov.com
dcho@cov.com

*Counsel for Tribune Media Company, Twenty-First Century Fox, Inc., and Univision Communications Inc.*

June 1, 2017

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

GLOSSARY ........ vi

BACKGROUND ........ 1

ARGUMENT ........ 6

I. PETITIONERS ARE UNLIKELY TO SUCCEED ON THE MERITS. ........ 6

II. PETITIONERS HAVE NOT SHOWN THAT THEY WILL BE IRREPARABLY INJURED ABSENT A STAY. ........ 14

III. A STAY WILL HARM OTHER PARTIES AND IS NOT IN THE PUBLIC INTEREST. ........ 19

CONCLUSION ........ 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACS of Anchorage, Inc. v. FCC*,
290 F.3d 403 (D.C. Cir. 2002)....................13

*AT&T Corp. v. FCC*,
113 F.3d 225 (D.C. Cir. 1997)....................11

*AT&T Corp. v. FCC*,
86 F.3d 242 (D.C. Cir. 1996)....................12

*Common Cause v. FEC*,
108 F.3d 413 (D.C. Cir. 1997) (per curiam)....................17

*Dayton Bd. of Educ. v. Brinkman*,
439 U.S. 1358 (1978)....................15

*FCC v. Nat'l Citizens Comm. for Broadcasting*,
436 U.S. 775 (1978)....................18

*Fox Television Stations Inc. v. FCC*,
280 F.3d 1027 (D.C. Cir. 2002)....................18

*Geller v. FCC*,
610 F.2d 973, 980 (D.C. Cir. 1979)....................9

*Golden Gate Restaurant Ass'n v. City & Cty. of San Francisco*,
No. C 06-06997, 2007 WL 4591729 (N.D. Cal. Dec. 28, 2007)....................15

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015)....................14

*Nat'l Hispanic Media Coalition v. FCC*,
No. 96-1236, 1997 WL 811776 (D.C. Cir. Nov. 12, 1997) (per curiam unpublished order)....................17

*Prometheus Radio Project v. FCC*,
373 F.3d 372 (3d Cir. 2004) ....................7, 8

*Prometheus Radio Project v. FCC*,
824 F.3d 33 (3d Cir. 2016) ....................................................................11

*Prometheus Radio Project v. FCC*,
No. 03-3388, 2003 WL 22052896 (3d Cir. Sept. 3, 2003) (per curiam) ....................................................................16

*Sioux Valley Rural Television, Inc. v. FCC*,
349 F.3d 667 (D.C. Cir. 2003)....................................................................13

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)....................................................................17

*Twenty-First Century Fox, Inc. v. FCC*,
No. 16-1375 (D.C. Cir. Apr. 20, 2017)....................................................................4

*U.S. Sugar Corp. v. EPA*,
830 F.3d 579 (D.C. Cir. 2016)....................................................................7

*United States v. Michigan*,
505 F. Supp. 467 (W.D. Mich. 1980) ....................................................................15

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977)....................................................................6

**Statutes**

47 U.S.C. § 303(r)....................................................................9

47 U.S.C. § 309(b) ....................................................................17

47 U.S.C. § 310(d) ....................................................................17

47 U.S.C. § 405(a) ....................................................................12

Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629,
118 Stat. 3, 99-100....................................................................1, 7

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56,
111-12, § 202(h)....................................................................9

**Other Authorities**

47 C.F.R. § 1.429 ....................................................................5

47 C.F.R. § 73.3555(e) .......... 1, 2, 7

*Amendment of Section 73.3555 [Formerly Sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations*, FCC 84-638, 100 F.C.C. 2d 74 (1985) .......... 1, 2, 7

*Applications for Consent to Transfer of Control from License Subsidiaries of Allbritton Commc'ns Co. to Sinclair Television Grp., Inc.*, 29 FCC Rcd. 9156 (2014) .......... 18

*Applications for Consent to Transfer of Control of License Subsidiaries of Media Gen., Inc. from Shareholders of Media Gen., Inc. to Nexstar Media Grp., Inc.*, MB Docket No. 16-57, DA 17-23, 2017 WL 117616 (FCC Jan. 11, 2017) .......... 18

*K. Rupert Murdoch (Transferor) and Fox Entertainment Group (Transferee)*, 24 FCC Rcd. 5824 (FCC 2009) .......... 20

Notice of Proposed Rulemaking, *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, FCC 13-123, 28 F.C.C. Rcd. 14,324 (2013) .......... 2, 3, 4

Notice of Proposed Rule Making, *Second Periodic Review of the Commission's Rules and Policies Affecting the Conversion to Digital Television*, MB Docket 03-15, FCC 03-8(2003) .......... 10

Order on Reconsideration, *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, FCC 17-40 (Apr. 20, 2017) .......... *passim*

Report and Order, *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, FCC 16-116 (rel. Sept. 6, 2016) .......... *passim*

Sixth Report and Order, *Advanced Television Systems and Their Impact Upon the Existing Television Broadcast Service*, FCC 97-115, MM Docket No. 87-268, ¶ 29 (1997) .......................................................10

## GLOSSARY

| | | |
|---|---|---|
| DMA | – | Nielsen Designated Market Area |
| FCC | – | Federal Communications Commission |
| UHF | – | Ultra High Frequency |
| VHF | – | Very High Frequency |

Movant-Intervenors Tribune Media Company ("Tribune"), Twenty-First Century Fox, Inc. ("Fox"), Univision Communications Inc. ("Univision"), ION Media Networks, Inc. ("ION"), and Trinity Christian Center of Santa Ana, Inc. ("Trinity"), respectfully oppose the Emergency Motion for Stay Pending Judicial Review filed by Petitioners Free Press et al. Petitioners have not satisfied the stringent requirements for a stay pending judicial review.

## BACKGROUND

Since 1985, an FCC regulation has imposed a "national ownership cap" that limits the number of television stations that may be owned by a single station group based on the aggregate "national audience reach" of the group's stations. *See* 47 C.F.R. § 73.3555(e)(1); *Amendment of Section 73.3555 [Formerly Sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations*, FCC 84-638, 100 F.C.C. 2d 74, 100 (1985) ("*1985 Order*"). The level of the national ownership cap was adjusted from time to time until, in 2004, Congress directed the FCC to amend its regulations to set the cap at 39 percent of "national audience reach." *See* Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100.

Congress used the term "national audience reach" in implementing the 39 percent cap. The term, which is defined in the FCC rule promulgated in 1985, was

unchanged for 32 years, and always distinguished between stations operating on Very High Frequency ("VHF") spectrum and those operating on Ultra High Frequency ("UHF") spectrum. Specifically, the FCC defined the "reach" of a VHF station as *all* of the households in the VHF station's Nielsen Designated Market Area ("DMA"), whereas the FCC has defined the "reach" of a UHF station as *half* of the households in the UHF station's DMA. 47 C.F.R. § 73.3555(e)(2)(i); *see 1985 Order*, 100 F.C.C. 2d at 100. This distinction is known as the "UHF discount."[1]

In 2013, the FCC issued a notice of proposed rulemaking seeking comment on whether to change the national audience reach definition by eliminating the UHF discount on the basis of the improved technical performance of UHF channels following the transition to digital broadcasting. *See* Notice of Proposed Rulemaking, *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, FCC 13-123, 28 F.C.C. Rcd. 14,324 (2013) ("*NPRM*"). Then-Commissioner (now Chairman) Pai dissented, noting that although the *NPRM* effectively "proposes to tighten the national cap, it does not

---

[1] The UHF discount was adopted to account for the fact that "the laws of physics dictate that UHF signal strength will decrease more rapidly with distance than does VHF signal strength," which affected "its ability physically to reach viewers." *1985 Order*, 100 F.C.C. 2d at 93.

seek comment on whether doing so would be a good idea," and "therefore misses the forest (the overall national cap) for the trees." *Id.* at 14,344.

Several broadcasters likewise commented that lowering the national ownership cap by eliminating the UHF discount—thereby doubling the audience reach attributable to many stations—would require the FCC to analyze whether such a reduction is in the public interest. *See, e.g.*, Comments of 21st Century Fox, Inc. and Fox Television Holdings, Inc., MB Docket No. 13-236, at 13, 17-19 (FCC Dec. 16, 2013). They submitted evidence that, in the face of the rapid proliferation of national video programming networks, horizontal and vertical consolidation of the national cable distribution marketplace, and the emergence of online video distributors with ubiquitous national reach, tightening a national ownership cap that applies only to broadcasters would harm the public interest by limiting broadcasters' ability to remain viable in a diverse and competitive media marketplace. *See, e.g.*, *id.* at 19-21; Comments of Sinclair Broadcast Group, Inc., MB Docket No. 13-236, at 9-10 (FCC Dec. 16, 2013).

On September 6, 2016, the FCC released an order that redefined "national audience reach" by eliminating the UHF discount while leaving the 39 percent national audience reach limitation in place. *See* Report and Order, *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, FCC 16-116 (rel. Sept. 6, 2016) ("*UHF*

*Discount Elimination Order*”). The *UHF Discount Elimination Order* did not consider whether reducing the national ownership cap by eliminating the UHF discount was in the public interest. Rather, the FCC concluded that it would, for the first time, delink the national cap from the UHF discount. Further, the FCC decided to forgo a public interest analysis on the ground that it could not assess the overall national ownership cap without "[i]nitiating a new rulemaking proceeding to undertake a complex review of the public interest basis for the national cap." *Id.* ¶ 40. The effect of the *UHF Discount Elimination Order* was to tighten significantly the national limit on station ownership, and as a result (among others) four station groups that had relied on the UHF discount to assemble their station portfolios suddenly were deemed to exceed the 39 percent cap. *See id.* ¶ 45.

Movant-Intervenors ION and Trinity petitioned the FCC to reconsider its decision on the ground that the FCC had failed to offer any analysis of the impact of its order on the national ownership cap and the public interest. *See* Petition for Reconsideration of ION Media Networks, Inc., and Trinity Christian Center of Santa Ana, Inc., MB Docket No. 13-236, at 4 (FCC Nov. 23, 2016). Movant-Intervenor Fox petitioned this Court for judicial review of the *UHF Discount Elimination Order*. That case is being held in abeyance pending the outcome of the petition for reconsideration. *See* Status Report, *Twenty-First Century Fox, Inc. v. FCC*, No. 16-1375 (D.C. Cir. Apr. 20, 2017).

On April 20, 2017, the FCC granted reconsideration of the *UHF Discount Elimination Order*. The agency concluded that its original decision was arbitrary, capricious, and unwise as a matter of policy because it "never explained why tightening the cap was in the public interest or justified by current marketplace conditions." Order on Reconsideration, *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, FCC 17-40 ¶ 13 (Apr. 20, 2017) ("*Reconsideration Order*"). The FCC held that its earlier "fail[ure] to fully consider important arguments and [its] lack[] of a reasoned basis for its conclusion that action on the discount should not be combined with a broader review of the national cap" were sufficient grounds under 47 C.F.R. § 1.429 for the agency to grant reconsideration. *Id.* ¶ 17. The FCC stated that it would consider the UHF discount "as part of a broader reassessment of the national audience reach cap" that the agency "will begin later this year." *Id.* ¶ 15.

On May 10, 2017, Petitioners requested that the FCC stay the *Reconsideration Order* pending judicial review. *See* Petition for Stay Pending Judicial Review, MB Docket No. 13-236 (FCC May 10, 2017).

On May 12, 2017, Petitioners filed a petition for review in this Court, and on May 26, 2017, Petitioners filed the pending Emergency Motion for Stay.

## ARGUMENT

The Court will grant the "extraordinary relief" of a stay only if a petitioner establishes that: (1) it is likely to succeed on the merits on review; (2) it would suffer irreparable injury absent a stay; (3) a stay would not substantially harm other interested parties; and (4) a stay would serve the public interest. *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842-43 (D.C. Cir. 1977). Petitioners are unable to satisfy these demanding requirements.

### I. PETITIONERS ARE UNLIKELY TO SUCCEED ON THE MERITS.

In the *UHF Discount Elimination Order*, the FCC decided to eliminate the UHF discount based solely on a conclusion that the technological justification for the discount no longer exists. The FCC expressly declined to "reexamine the national audience reach cap in conjunction with our examination of the UHF discount," based on the majority's view such a reexamination would cause "delay" and "unnecessarily complicate" the proceedings. *Id.* ¶ 40. The FCC did not "foreclose the possibility of examining the national audience reach cap" at a later date, but deemed it "appropriate" to eliminate the UHF discount without undertaking a comprehensive examination of whether this action is in the public interest. *Id.* In the *Reconsideration Order*, the FCC determined that its decision to eliminate the UHF discount based on a narrow analysis of a single technological factor was arbitrary and capricious, as well as unwise, and that the long-established

UHF discount should remain in effect while the FCC considers whether its elimination would serve the public interest. The FCC's decision to undertake this broader public interest inquiry is reasonable and unlikely to be reversed by this Court. *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 663 (D.C. Cir. 2016) (arbitrary and capricious standard "is highly deferential" and "presumes the validity of agency action") (internal quotation marks and citation omitted).

1. There can be no serious dispute that the UHF discount is inextricably linked to the national ownership cap. The sole purpose of the UHF discount is to determine how national audience reach should be calculated for purposes of the ownership cap. *See* 47 C.F.R. § 73.3555(e); *1985 Order*, 100 F.C.C. 2d at 92-93. When Congress set the national television ownership cap at 39 percent, it used the FCC-defined term "national audience reach." Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100. Because the UHF discount is integral to determining "national audience reach" under the FCC rule adopted in 1985, Congress undoubtedly understood that audience reach would be calculated by applying the UHF discount when it set the cap at 39 percent. *See Prometheus Radio Project v. FCC*, 373 F.3d 372, 395-97 (3d Cir. 2004). Prior to the *UHF Discount Elimination Order*, moreover, the FCC consistently considered the UHF discount and the national cap in tandem. *See Reconsideration Order* ¶ 12. Indeed, given the integral relationship between the UHF discount and the national cap, the

Third Circuit has held that the UHF discount, like the national cap, is not subject to the statutory quadrennial review requirement applicable to the FCC's other media ownership rules. *See Prometheus Radio Project*, 373 F.3d at 395-97.

2. The FCC has identified a reasonable basis for concluding that elimination of the discount is not in the public interest. *See Reconsideration Order* ¶ 15 (noting that there are now "greatly increased options for consumers in the selection and viewing of video programming"). Since the national cap was last reevaluated in 2004, the media marketplace has undergone seismic changes. Viewership of national network programming has declined as "over-the-top" distributors such as Netflix, Hulu and Sony Vue have proliferated. In addition, there has been an explosion of online video consumption by users of YouTube and Facebook, which provide local news, sports and entertainment programming that competes with broadcasters. Meanwhile, the cable sector has experienced both horizontal and vertical consolidation. Yet broadcasters remain subject to ownership rules that limit their ability to compete on an equal footing with their largely unregulated counterparts. The cap, even with the UHF discount in place, limits broadcasters' ability to achieve the scope and scale they need to launch new national distribution platforms and to continue investing in high-quality programming to serve their local communities—programming their unregulated competitors are under no obligation to provide. Eliminating the UHF discount thus restricts the ability of

broadcasters to compete with non-broadcast video programmers, many of which enjoy full national distribution.[2]

Petitioners do not argue that these public interest considerations are irrelevant, or that the only issue the FCC is permitted to consider is whether the original technical justification for the UHF discount remains valid. Petitioners are right not to contest this issue, because Congress did not specify the reasons that would justify a decision by the FCC to retain or discard the discount. Moreover, the FCC generally is required to act in the public interest. *See, e.g.*, Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 111-12, § 202(h); *Geller v. FCC*, 610 F.2d 973, 980 (D.C. Cir. 1979) (FCC's "rulemaking power is expressly confined to promulgation of regulations that serve the public interest") (citing 47 U.S.C. § 303(r)).

Instead, Petitioners make a wholly unconvincing one-paragraph argument that tightening the national ownership cap serves the public interest (Stay Mot. 13-14). The FCC itself has made no such determination, and Petitioners acknowledge

---

[2] *See, e.g.*, Comments of ION Media Networks, Inc., MB Docket No. 13-236, at 6-9, 15 (FCC Dec. 16, 2013); Letter from Christopher G. Wood, Univision Communications Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236 (July 6, 2016); Letter from Colby M. May, counsel for Trinity Broadcasting Network, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236 (July 29, 2016); Comments of Univision Communications Inc., MB Docket No. 13-236, at 4 (FCC Dec. 16, 2013).

that "there is currently no factual record on whether national limits serve the public interest." Stay Mot. 15. Moreover, the FCC has identified arguments that could well lead it to conclude that eliminating the UHF discount harms the public interest.[3]

3. Contrary to Petitioners' assertion (Stay Mot. 14-15), the FCC's decision to undertake a broader reexamination of the public interest before eliminating the UHF discount does not rest on speculation about the outcome of that reexamination. The FCC determined that its original decision was arbitrary and capricious, as well as unwise, because the agency changed the definition of "national audience reach" without examining the ramifications of that change or whether the change serves the public interest. *See Reconsideration Order* ¶ 14.

---

[3] Moreover, many digital stations that operated in the UHF band in the analog era remain handicapped vis-à-vis their former VHF competitors even after the digital transition. The FCC's digital transition rules provided for the replication of analog stations' existing coverage areas by their new digital facilities, thereby perpetuating the UHF disadvantage. *See* Sixth Report and Order, *Advanced Television Systems and Their Impact Upon the Existing Television Broadcast Service*, FCC 97-115, MM Docket No. 87-268, ¶ 29 (1997). The FCC has acknowledged the disparate effects of this approach. *See* Notice of Proposed Rule Making, *Second Periodic Review of the Commission's Rules and Policies Affecting the Conversion to Digital Television*, MB Docket 03-15, FCC 03-8, ¶ 31 (2003) (explaining that, while "most analog VHF stations were allocated UHF digital facilities with power levels generally sufficient to permit replication of the station's analog VHF coverage," analog UHF stations were "allocated significantly less power," sufficient only to "permit replication of the analog coverage area of the UHF facilities, which is significantly smaller in most cases than the analog coverage area of VHF facilities").

That is hardly an irrational (let alone an "utterly irrational," Stay Mot. 15) conclusion. The FCC also looked to an earlier case in which the FCC determined that a television station selling more than 15 percent of another local station's advertising time would be deemed to have an ownership interest in the second station for purposes of the FCC's local television ownership rule. This technical change had the effect of tightening the ownership rule, but the FCC did not evaluate whether the underlying rule itself remained appropriate. The Third Circuit held that the FCC had erred, explaining that "unless the Commission determines that the preexisting ownership rules are sound, it cannot logically demonstrate that expansion is in the public interest." *Prometheus Radio Project v. FCC*, 824 F.3d 33, 58 (3d Cir. 2016). The Third Circuit's conclusion supports the FCC's decision to grant reconsideration here. At a minimum, the FCC gave a reasoned explanation for its decision, which is all that is required. *See AT&T Corp. v. FCC*, 113 F.3d 225, 229 (D.C. Cir. 1997) ("[T]he FCC was free to modify its rule on a petition for reconsideration so long as the modification was a 'logical outgrowth' of the earlier version of the rule, and provided the agency gave a reasoned explanation for its decision that is supported by the record.") (citations omitted).

Petitioners appear to argue that, when an agency concludes that it has erred by failing to consider one or more important factors, the agency cannot reconsider

its own decision unless it can predict that consideration of the additional factors will lead to a different outcome. That makes no sense. The FCC has broad authority to grant a petition for reconsideration that is filed within thirty days of public notice of the order. *See* 47 U.S.C. § 405(a). Moreover, as petitioners note (Stay Mot. 15), agencies are not supposed to prejudge the outcome of administrative proceedings. Thus, if Petitioners were correct, agencies would be largely powerless to correct their own mistakes. Instead, when an agency failed to consider an important aspect of the problem, the case would have to proceed to court. If the court concluded that the agency had erred, it would remand to the agency for further consideration without inquiring into whether consideration of the additional factors will lead to a different result. *See, e.g.*, *AT&T Corp. v. FCC*, 86 F.3d 242, 243 (D.C. Cir. 1996) ("Because the Commission failed to consider AT&T's argument . . . we vacate the Commission's Order and remand for reconsideration."). There is no sound reason why an agency should be prevented from taking this step on its own when it reasonably believes it has failed to consider an important aspect of the problem before it.

4. Even if Petitioners could somehow overcome these obstacles, they are unlikely to prevail on two additional questions that are vital to their success on the merits.

*First*, Petitioners contend (Stay Mot. 16-17) that the FCC has no authority to modify the 39 percent national ownership cap. Petitioners must show that they are likely to prevail on this issue, because if the FCC has authority to modify the 39 percent cap as well as the UHF discount, it clearly is reasonable for the agency to consider these inextricably intertwined issues together. *See ACS of Anchorage, Inc. v. FCC*, 290 F.3d 403, 410 (D.C. Cir. 2002) ("Clearly, . . . the Commission is entitled to substantial deference 'when it acts to maintain the status quo so that the objectives of a pending rulemaking proceeding will not be frustrated,' including the objective of implementing large-scale revisions 'in a manner that would cause the least upheaval in the industry.'") (citations omitted). But Petitioners were late to raise this argument before the FCC. *See Reconsideration Order* ¶ 17 n.60; *see also Sioux Valley Rural Television, Inc. v. FCC*, 349 F.3d 667, 678 (D.C. Cir. 2003). Moreover, the FCC has explained why it has authority to reconsider the national cap. *See UHF Discount Elimination Order* ¶¶ 17-24. And even if Petitioners could prevail on this issue, they are unlikely to prevail on the merits of this case. As explained above, the FCC may decide that the public interest is served by leaving the UHF discount in place without modifying the 39 percent cap.

*Second*, Petitioners must establish that, if the FCC has no authority to modify the 39 percent cap, it *does* have authority to modify the UHF discount. The FCC itself has concluded that "if the Commission was wrong about its authority to

modify the cap, then it follows that the Commission does not have authority to eliminate the discount, which was part of the cap." *Reconsideration Order* ¶ 17 n.60; *see also UHF Discount Elimination Order* at 39 (dissenting statement of Commissioner O'Rielly).

In sum, neither the FCC nor any court has ever subscribed to the series of propositions that Petitioners must establish to prevail in this case. It was reasonable for the FCC to conclude that the long-established UHF discount should remain in effect until the agency determines whether eliminating it is in the public interest. Accordingly, Petitioners are unlikely to succeed on the merits.

## II. PETITIONERS HAVE NOT SHOWN THAT THEY WILL BE IRREPARABLY INJURED ABSENT A STAY.

To qualify for a stay, petitioners must show that they will suffer harm that is "certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks and emphasis omitted). Petitioners fall well short of this demanding showing.

Although the *Reconsideration Order* restores the *status quo ante* by retaining a rule that has been in effect for 32 years, Petitioners nevertheless assert that it is "a major policy change." Stay Mot. 15, 19. Petitioners have it backwards. It is the *elimination* of the long-established UHF discount that represents a "major

policy change." Indeed, Petitioners acknowledged before the FCC that the stated purpose of the *Reconsideration Order* was to "maintain the *status quo ante* pending the initiation of a future notice and comment proceeding." Petition for Stay Pending Judicial Review, MB Docket No. 13-236, at 2 (FCC May 10, 2017). In contrast to the UHF discount's long history, the *UHF Discount Elimination Order* was effective for only a few months, during which time the FCC did not consider a single television station transaction that would implicate the national ownership cap. The Court should not enter a stay that erects a barrier to television station ownership combinations that have been permissible under the FCC's rules for decades.[4]

Petitioners assert that a stay is necessary to prevent "numerous otherwise prohibited transactions." Stay Mot. 17. For the most part, Petitioners rely on media and analyst reports that such transactions "could" occur, "may" occur, or are "expected" to occur. Stay Mot. Attachment F at 2-4. Such vague speculation is insufficient to show irreparable harm to anyone, let alone to Petitioners. The fact

---

[4] *See, e.g.*, *Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358, 1358 (1978) (denying an application for stay because "the *status quo* . . . here [] can be preserved only by denying" the stay); *Golden Gate Restaurant Ass'n v. City & Cty. of San Francisco*, No. C 06-06997, 2007 WL 4591729, at *2 (N.D. Cal. Dec. 28, 2007); *United States v. Michigan*, 505 F. Supp. 467, 471-72 (W.D. Mich. 1980) ("Here, unlike the typical situation in which a stay might be appropriate, the State urges this court change radically the *status quo* . . . .").

that the UHF discount has been in effect for decades, including for nearly eight years since the completion of the digital transition, casts grave doubt on petitioners' assertion that, absent a stay, the *Reconsideration Order* will immediately result in a tidal wave of new transactions.[5] It is also far from obvious that permitting transactions that would exceed an un-discounted 39 percent cap creates any harm at all. Today, four major broadcast groups, all of which serve important and diverse communities, operate on this basis without any public harm.

Apart from speculative news reports, Petitioners cite only two potential transactions. *See* Stay Mot. 17-18. For several reasons, Petitioners' assertions concerning these proposed transactions are not sufficient to demonstrate that they will suffer irreparable harm absent a stay.

*First*, Petitioners have not demonstrated that they, or their members, would be harmed by Sinclair's acquisition of Bonten's or Tribune's stations, or even that they view any of those stations. Absent such evidence, Petitioners not only cannot

---

[5] Petitioners incorrectly argue that this case is similar to a case in which the Third Circuit stayed an FCC order altering certain media ownership rules pending judicial review. *See Prometheus Radio Project v. FCC*, No. 03-3388, 2003 WL 22052896 (3d Cir. Sept. 3, 2003) (per curiam). The situation in that case was significantly different because (among other reasons) the new ownership rules had not been in effect for decades, and therefore the court was persuaded that staying their effectiveness would maintain the status quo. *See id.* at *1. Here, in contrast, the FCC's *Reconsideration Order* leaves in place a rule that has been in effect for 32 years.

demonstrate irreparable harm but cannot show the "personal stake in the outcome of the controversy" needed to "warrant [their] invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (emphasis omitted). Petitioners' inability to demonstrate concrete and imminent harm (as discussed below) raises a serious question about whether Petitioners have established Article III standing.[6]

*Second*, any harm to Petitioners is not "certain." Parties seeking to acquire television stations must apply for the FCC's consent, which initiates an administrative process that includes public notice and the opportunity to file oppositions (and, as appropriate, to seek judicial review). *See* 47 U.S.C. §§ 310(d), 309(b); Wood Decl. at 1-2. As Petitioners acknowledge, the FCC cannot grant such an application unless it determines that approval is in the public interest. *See* 47 U.S.C. § 310(d); Wood Decl. at 2. At least one Petitioner previously has successfully availed itself of this procedure to raise objections with respect to a

[6] This Court has had occasion to question certain Petitioners' standing. *See* *Common Cause v. FEC*, 108 F.3d 413, 419 (D.C. Cir. 1997) (per curiam); *Nat'l Hispanic Media Coalition v. FCC*, No. 96-1236, 1997 WL 811776, at *1 (D.C. Cir. Nov. 12, 1997) (per curiam unpublished order).

specific proposed transaction that did "not violate any Commission rule or policy" (Stay Mot. 19) and was subsequently withdrawn.[7] *See* Exhibit A.

*Third*, Petitioners have not shown that any harm to them is imminent. Petitioners' own declaration states that applications seeking to take advantage of the *Reconsideration Order* would not be granted for approximately two months if unopposed, and three months or longer if opposed. *See* Wood Decl. at 4. In fact, approval may take much longer. *E.g.*, *Applications for Consent to Transfer of Control of License Subsidiaries of Media Gen., Inc. from Shareholders of Media Gen., Inc. to Nexstar Media Grp., Inc.*, MB Docket No. 16-57, DA 17-23, 2017 WL 117616 (FCC Jan. 11, 2017) (approving transaction more than 11 months after filing); *Applications for Consent to Transfer of Control from License Subsidiaries of Allbritton Commc'ns Co. to Sinclair Television Grp., Inc.*, 29 FCC Rcd. 9156 (2014) (same).

*Fourth*, Petitioners have not shown that any harm to them is irreparable. They assert that if a transaction is approved, the FCC will not require divestiture even if the UHF discount is later eliminated. But there is no dispute that the FCC

---

[7] In that case, Free Press prevailed in challenging a transaction that was permitted under FCC rules on the ground that it nonetheless was contrary to the public interest. As that example demonstrates, although *unopposed* applications may typically be granted by FCC staff (*see* Stay Mot. 18-19), the FCC treats *opposed* applications quite differently.

has authority to order such a divestiture, and has exercised that authority in the past. *See, e.g.*, *FCC v. Nat'l Citizens Comm. for Broadcasting*, 436 U.S. 775, 814 (1978); *Fox Television Stations Inc. v. FCC*, 280 F.3d 1027, 1053 (D.C. Cir. 2002).

For all of these reasons, Petitioners have not come close to showing that they will suffer irreparable harm in the absence of a stay.

## III. A STAY WILL HARM OTHER PARTIES AND IS NOT IN THE PUBLIC INTEREST.

In a single short paragraph, Petitioners assert that a stay will not harm broadcasters because it will simply "maintain the status quo" and allow broadcasters to "continue to operate their businesses as before pending judicial review." Stay Mot. 20. As explained above, however, a stay would actually alter a status quo that has been in effect for 32 years. A stay thus would harm broadcasters that have operated in good faith reliance on the integrated 39 percent cap, including the long-standing definition of "national audience reach."

A stay would effectively halve the cap for some station groups. As a result, station group owners that historically have been in compliance with the 39 percent cap suddenly would be deemed to exceed it. ION has reported that elimination of the UHF discount will have an immediate adverse effect on its market value and

ability to raise capital.[8] And ION, Univision, and Trinity have stated that repeal of the UHF discount will lead to diminished business opportunities and a reduction in service to their viewers.[9]

A stay would require these owners to break up their station groups upon a "change in control," an event that includes certain recapitalization or refinancing transactions. *See Reconsideration Order* ¶ 52; *see, e.g.*, *K. Rupert Murdoch (Transferor) and Fox Entertainment Group (Transferee)*, 24 FCC Rcd. 5824, 5824-25 (FCC 2009). Thus, a stay would restrict some group owners' ability to engage in refinancings and recapitalizations. If forced divestitures occurred as a result of a stay, they could have a wide range of adverse consequences including disruption of distribution networks that serve viewers and advertisers and loss of broadcast television service to historically underserved communities.

Petitioners assert (Stay Mot. 21-22) that a stay would advance the public interest by promoting competition, localism, and diversity. But the Commission has made no such determination. In the *UHF Elimination Order*, it simply concluded that the technological basis for the UHF discount no longer applied and

---

[8] *See* Letter from Robert M. McDowell, counsel for ION Media Networks, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 13-236, at 2 (Jan. 11, 2017).

[9] *See* Opposition to Petition for State of ION Media Networks, Inc., Trinity Christian Center of Santa Ana, Inc., and Univision Communications Inc., MB Docket No. 13-236, at 13-14 (FCC May 17, 2017).

declined even to consider whether eliminating the UHF discount was in the public interest. In the *Reconsideration Order*, moreover, the FCC identified reasonable arguments, supported by the record, that eliminating the UHF discount would harm the public interest by making it more difficult for broadcasters to compete with non-broadcast platforms that provide video programming and to form new networks. *See Reconsideration Order* ¶ 15. Petitioners appear to argue that a stay serves the public interest simply because it would impose additional restrictions on ownership of television stations. If that were a valid argument, *any* restriction on media ownership would be in the public interest. Neither Congress nor the FCC has adopted that extreme view.

The public interest is also served by minimizing unnecessary regulatory instability. The UHF discount has been in effect for 32 years. The FCC has acted in the public interest by avoiding an abrupt regulatory shift that may be quickly reversed.

## CONCLUSION

The Emergency Motion for Stay should be denied.

Respectfully submitted,

/s/ Robert A. Long, Jr.
Robert A. Long, Jr.
Mace Rosenstein
Dustin Cho
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
rlong@cov.com
mrosenstein@cov.com
dcho@cov.com

*Counsel for Tribune Media Company, Twenty-First Century Fox, Inc., and Univision Communications Inc.*

David E. Mills
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 776-2865
dmills@cooley.com

*Counsel for ION Media Networks, Inc.*

Colby M. May
COLBY M. MAY, ESQ., P.C.
P.O. Box 15473
Washington, DC 20004
(202) 544-5171
cmmay@maylawoffices.com

*Counsel for Trinity Christian Center of Santa Ana, Inc.*

June 1, 2017

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,028 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman and 14 point font.

/s/ Dustin Cho
Dustin Cho

# EXHIBIT A

*Before the*
**FEDERAL COMMUNICATIONS COMMISSION**
WASHINGTON, DC 20554

| | | |
|---|---|---|
| Application for Assignment of License of WMYS-LP from Weigel Broadcasting Co. to WSBT, Inc. | ) ) ) | BALTTL-20080818ABS |
| Application for Assignment of License of WCWW-LP from WCCW-TV Limited Partnership to WSBT, Inc. | ) ) ) | BALTTL-20080818ABQ |
| Application for Assignment of License of WBND-LP from WBND-TV Limited Partnership to WSBT, Inc. | ) ) ) | BALTTL-20080818ABN |

**PETITION TO DENY**

Free Press respectfully submits this Petition to Deny the assignment of the licenses of WMYS-LP, WCWW-LP and WBND-LP, South Bend, IN to WSBT, Inc., an entity wholly owned and controlled by Schurz Communications, Inc. ("Schurz").

Free Press is a national, nonpartisan organization working to promote diverse and independent media ownership, strong public media, and universal access to communications. Free Press has nearly 500,000 members and activists throughout the country, including the South Bend, IN area. The Declarations of C. Lincoln Johnson, Joshua Leuthold and John Sitter, members of Free Press, provided as Attachment A hereto, are submitted in support of this petition.

WSBT, Inc. is the licensee of WSBT-TV, the CBS affiliate in South Bend. Thus, if the proposed transaction were approved, Schurz would own four of the six TV network affiliates in South Bend. In addition to WSBT-TV, Schurz owns the *South Bend Tribune*, the only daily newspaper in South Bend, and WSBT-AM and WNSN(FM), both located in South Bend. There is probably no market in the country in which one entity currently has that much control over the adver-

tising market and over the marketplace of ideas. The fact that Schurz is well-established in South Bend, and that it may even claim that it has a record of superior service with its existing properties is irrelevant to whether it, or any applicant, should be afforded so much power in any community.

Unlike full-power TV stations, as to which the Commission has adopted specific ownership rules, the Commission makes case-by-case determinations with respect to whether grant of low power TV applications is in the public interest. *Low Power Television Service*, 51 RR2d 476, ¶94 (1981) (declining "to impose inviolable rules"). This does not change the basic requirements of Section 309(a) of the Communications Act; the burden is always on any applicant to make an affirmative demonstration that grant is in the public interest.

The record here raises very substantial questions of fact which cannot be answered without an evidentiary hearing. *Citizens TV Protest Committee v. FCC*, 348 F.2d 56, 60 (D.C. Cir. 1965); *Clarksburg Publishing Company v. FCC*, 225 F.2d 511, 520-21 (D.C. Cir. 1955). *See also Citizens for Jazz on WRVR v. FCC*, 775 F.2d 392 (D.C. Cir. 1985). Approval would clearly be contrary to the public interest. Accordingly, the Commission should designate the three applications for hearing.

The Commission has long recognized that maintaining diversity in the local marketplace of ideas is central to the Communications Act. *See, e.g, Frontier Broadcasting Co.*, 27 FCC 486 (1971). "In setting its licensing policies, the Commission has long acted on the theory that diversification of mass media ownership serves the public interest by promoting diversity of program and service viewpoints, as well as by preventing undue concentration of economic power." *FCC v. NCCB*, 436 U.S. 775, 780 (1978); *see also United States v. Midwest Video Corp.*, 406 U.S. 649, 665-670 (1972); *Metropolitan Television Co. v. FCC*, 289 F.2d 874 (D.C. Cir. 1961); *Carter Mountain Transmission Corp. v. FCC,* 321 F.2d 359 (D.C. Cir. 1963); *Carroll Broadcasting Co. v.*

*FCC*, 258 F.2d 440 (D.C. Cir. 1958).

The citizens of South Bend have a huge stake in the outcome of this proceeding. Their right to a vibrant marketplace of ideas is guaranteed by the First Amendment, which "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press v. United States*, 326 U.S. 1, 20 (1944) Moreover, "[t]he 'public interest' standard necessarily invites reference to First Amendment principles." *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 122 (1972). In addition, even though the Commission does not enforce the antitrust laws, it may call on antitrust policies to promote diversity in giving content to the "public interest, convenience and necessity." *United States v. Radio Corporation of America,* 358 U.S. 334, 351 (1958).

As is more fully set forth in the Report of S. Derek Turner, Attachment B hereto, if the proposed transaction is approved, Schurz would own the number 1, number 3, number 5 and number 7 ranked TV stations, the only daily newspaper and the number 2 and number 4 radio stations, including the only news formatted radio station, in South Bend. He shows that the TV market (HHI approximately equal to 3000), the radio market (taking LMA's into account) (approximately equal to 2700), and the DMA-wide print market (approximately equal to 3300) in South Bend are all "highly concentrated markets." Not surprisingly, the market for news producing outlets (print, radio and TV) is already stratospheric. If the Schurz transaction is approved, the HHI will ascend from 6451 to 6778. Schurz alone will control 81 per cent of the revenue in the South Bend news market.

The burden faced by Schurz is substantial, indeed. It is beyond peradventure that concentration of this magnitude is contrary to the public interest, especially in light of the absence of any countervailing benefits. And, although it bears the burden of establishing that grant of the

applications is in the public interest, Schurz has submitted no public interest statement or other evidentiary submission relating to this matter. It does not claim, much less establish, that any of the involved stations are failing , that they are experiencing financial distress, that it will be adding significant amounts of new local news, or that the Schurz properties will exercise independent news judgments. Thus, it meets none of the criteria which a majority of the Commission has recently said would be necessary to rebut a presumption against cross-ownership in medium-sized or smaller markets. *See 2006 Quadrennial Review*, 23 FCCRcd 2310, 2050-55 (2008), *appeal pending*.

**CONCLUSION**

WHEREFORE, Free Press asks that the Commission dismiss the assignment applications or designate them for hearing pursuant to 47 U.S.C. §309(d), and grant all such other relief as may be just and proper.

Respectfully submitted,

Andrew Jay Schwartzman

Parul Desai

Harold Feld

Media Access Project
Suite 1000
1625 K Street, NW
Washington, DC 20006
(202) 232-4300

September 22, 2008