IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Free Press, *et al.*,<br>Petitioners,<br><br>v.<br><br>Federal Communications Commission<br>and United States of America,<br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 17-1129 |

**OPPOSITION OF FEDERAL COMMUNICATIONS COMMISSION TO EMERGENCY MOTION FOR STAY PENDING REVIEW**

Petitioners fall far short of demonstrating that the extraordinary remedy of a stay pending review is warranted. In the *Reconsideration Order* challenged here,[1] the Commission made one principal determination: It concluded that the agency erred when, in a previous order,[2] the FCC repealed a discount applicable to ultra-high frequency (UHF) television stations used in calculating compliance with the FCC's national cap on the percentage of U.S. households that a licensee's television stations may reach. Since the UHF discount dictates how the agency calculates compliance with the national cap, the two components of the FCC's rule

---

[1] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, FCC 17-40 (released April 21, 2017) (*Reconsideration Order*).

[2] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, 31 FCC Rcd 10213 (2016) (*Repeal Order*).

work hand in glove. Indeed, they operated together for more than three decades, and they are, as the Commission reasonably determined, "inextricably linked." *Reconsideration Order* ¶ 1. Before the 2016 *Repeal Order*, the national cap never operated in the absence of the UHF discount, and repealing the UHF discount had the practical effect of substantially tightening the national cap. The *Reconsideration Order* provided a detailed and reasoned explanation for the Commission's conclusion that the agency erred in the *Repeal Order* as a matter of law and policy by failing even to consider the impact of repealing the UHF discount on the national cap. Petitioners have not come close to making the extraordinary showing necessary to warrant staying the *Reconsideration Order* pending review.

*First*, petitioners have not shown that they are likely to succeed on the merits. This case involves two components of a single FCC rule that limits the percentage of U.S. households a single company can reach through commercial television stations. In the *Reconsideration Order*, the FCC recognized that the technological justification for creating the UHF discount had been eliminated by the transition to digital broadcasting, but reasonably found that it was arbitrary and capricious as well as unwise for the agency in the *Repeal Order* to modify one component—the UHF discount—without even *considering* whether to change the other—the 39 percent level for the national ownership cap. *Reconsideration Order*

¶ 1. The approach adopted in the *Repeal Order* was the regulatory equivalent of decreasing the number of questions on a high school math test from 100 to 50 without reexamining whether students who get 50 correct answers nonetheless get an F. The agency corrected this error in the *Reconsideration Order*. It reinstated the status quo, which had prevailed for more than 30 years, while at the same time announcing that it would revisit *both* the UHF discount *and* the national cap later this year. *Id.* ¶ 10. The agency's action was fully consistent with precedents from this and other appellate courts making clear that the FCC should not restructure an entire industry on a piecemeal basis. Petitioners offer no basis for concluding that the FCC erred in determining that the *Repeal Order* was arbitrary and capricious as a matter of law and unwise as a matter of policy.

*Second*, petitioners fall far short of showing that they will suffer irreparable harm without a stay. Simply put, there is no exigency in this case. The *Reconsideration Order* cannot itself cause any harm—let alone irreparable harm—to petitioners, as their motion readily acknowledges. To be sure, the *Reconsideration Order* will become effective on June 5, 2017, absent a stay. But petitioners do not tie their claimed injury to that date. Rather, they look to entirely different, future, and speculative agency action. In particular, they contend that if, at some indefinite point in the future, the FCC commences a separate adjudicatory proceeding to consider a license transfer application that would have violated the

national cap but for the UHF discount, and if the FCC approves the application, they will suffer cognizable harm at that point. This chain of future events, which depends on the Commission's approval of transactions it has yet to consider, is much too speculative to warrant a stay. Beyond that, the purported harm from allowing the *Reconsideration Order* to take effect in the ordinary course is not *irreparable*. Even in petitioners' scenario, the full range of ordinary remedies would remain available if the FCC issues any such future order in a separate proceeding, including taking an appeal or seeking a stay of that decision. Finally, the purported "harm" here is merely in returning to the regulatory landscape that had existed for the last 30 years, until the *Repeal Order* went into effect in November 2016.

*Finally*, as further explained below, the public interest and balance of equities weigh against a stay, which would put back in place an FCC decision that the Commission has now reconsidered and determined to be both unlawful and unwise. The public interest would not be served by such a result.

For all of these reasons, the motion for stay should be denied.

## BACKGROUND

In 1985, the FCC adopted a rule limiting the percentage of U.S. households that a licensee's commercial television stations may reach. *See Amendment of Section 73.3555 [formerly Sections 73.35, 73.240 and 73.636] of the Commission's*

*Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations*, 100 FCC 2d 74, 88-94 ¶¶ 33-44 (1985) (*1985 Order*). At the same time and as part of that rule, the Commission adopted a methodology for calculating a particular station's "reach." When the national audience reach cap was first adopted, "delivery of television signals [was] inherently more difficult at UHF" spectrum bands than at VHF (very high frequency) bands "because the laws of physics dictate that UHF signal strength will decrease more rapidly with distance than does VHF signal strength." *Id.* at 93 ¶ 43.[3] To account for this discrepancy between UHF and VHF stations, the Commission employed a "UHF discount" to assess compliance with the audience reach cap—*i.e.*, it attributed to the owners of UHF stations only 50 percent of the households that those stations could theoretically reach. *Id.* at 93 ¶ 44.

Originally, the rule prohibited a single entity from owning stations that, in the aggregate, reached more than 25 percent of television households nationwide. *Id.* at 90-91 ¶¶ 39-40. At the direction of Congress, the FCC increased the national

[3] "UHF" and "VHF" denote the radio frequency range on which a television station transmits its signal. "UHF" includes frequencies "ranging from about 300 MHz to about 3 GHz." NEWTON'S TELECOM DICTIONARY 1263 (28th ed. 2014). "VHF" includes "frequencies between about 30 MHz and 300 MHz." *Id.* at 1297.

cap to 35 percent in 1996.[4] The Commission then adopted an order that would have raised the cap to 45 percent in 2003.[5] In both instances, the FCC retained the UHF discount. In 2004, Congress directed the FCC to amend its rules to reduce the cap to 39 percent. *See* Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (CAA) (Mot., Attachment D). The Commission continued to apply the discount to calculate the 39 percent cap. The cap has remained unchanged since 2004. *See* 47 C.F.R. § 73.3555(e)(1).

In August 2016, the Commission voted to abolish the UHF discount. *Repeal Order*, 31 FCC Rcd at 10213-14 ¶¶ 1-3. It determined that after the transition to digital television (DTV) in 2009, the UHF discount had become "technically obsolete" because "UHF stations [were] no longer technically inferior in any way to VHF stations." *Id.* at 10226 ¶ 28.

The Commission rejected arguments that it "should reexamine the national audience reach cap in conjunction with" its review of the UHF discount. *Repeal Order*, 31 FCC Rcd at 10232 ¶ 40. While it determined that it had "the authority to

---

[4] *See Implementation of Sections 202(c)(1) and 202(e) of the Telecommunications Act of 1996 (National Broadcast Television Ownership and Dual Network Operations*), 11 FCC Rcd 12374 (1996).

[5] *See 2002 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, 18 FCC Rcd 13620, 13842-44 ¶¶ 578-583 (2003).

modify the national audience reach cap," *id.* at 10222 ¶ 21, and while it did "not foreclose the possibility" of examining the cap "in the future," the Commission nonetheless decided to eliminate the UHF discount without first considering whether the cap itself should be adjusted—indeed, without considering how removing the discount would impact the cap or how a tightened cap would impact the media marketplace. *Id.* at 10233 ¶ 40.

Commissioners Pai and O'Rielly dissented from the *Repeal Order*. Commissioner Pai said that "the Commission should not eliminate the UHF discount without also considering an adjustment to the national cap to reflect today's marketplace." *Repeal Order*, 31 FCC Rcd at 10247 (dissenting statement of Commissioner Pai). He maintained that "eliminating the UHF discount effectively tightens the national cap dramatically," *id.* at 10249, and that it was unreasonable to take such "piecemeal action" without examining "whether the current national cap ownership rule is sound or whether there is a need to make it more stringent." *Id.* at 10248. Commissioner O'Rielly stated that he believed the agency did not have authority to eliminate the UHF discount. He went on to say that even if the Commission had authority to do so, it should not "tinker with" the UHF discount "calculation methodology without any consideration of the current validity" of the "rule it modifies." *Id.* at 10251 (dissenting statement of Commissioner O'Rielly).

The elimination of the UHF discount took effect on November 23, 2016. *See* 81 Fed. Reg. 73075 (Oct. 24, 2016).[6] On the same day, ION Media Networks and Trinity Christian Center of Santa Ana, Inc. (collectively, "ION") jointly petitioned for reconsideration of the *Repeal Order*. ION argued that the FCC could not reasonably eliminate the UHF discount "without analyzing the impact that ruling would have on the national audience reach cap and determining that the result would be in the public interest." Petition for Reconsideration at 4. ION observed that the Commission's ruling had resulted in "an unprecedented … tightening of the national audience reach cap—doubling overnight the calculated audience reach of every UHF station in the country and substantially increasing the calculated audience reach of every station owner that holds one or more UHF stations." *Id.* at 3. ION contended that "the FCC had no basis" for eliminating the UHF discount "[w]ithout evidence that the public interest demanded a tightening of the national cap." *Id.* at 4.

In April 2017, the Commission granted ION's petition for reconsideration by a vote of 2-1 and reinstated the UHF discount. *Reconsideration Order* ¶ 1.

On reconsideration, the Commission concluded that "eliminating the UHF discount on a piecemeal basis, without considering the national cap as a whole,

---

[6] In the six months since the discount was abolished, the FCC has not blocked any transaction for failure to comply with the national audience reach cap.

was arbitrary and capricious" as well as "unwise from a public policy perspective." *Reconsideration Order* ¶ 13. Specifically, the Commission found that the *Repeal Order* "failed to provide a reasoned explanation for eliminating the discount"—and "substantially tightening the impact of the cap"—without "conducting a broader review of the cap" or "considering whether the cap should be raised to mitigate the regulatory impact of eliminating the UHF discount." *Id.* ¶ 14. The *Repeal Order* also "failed to consider" whether it was appropriate to tighten the audience reach cap in view of "current marketplace conditions," including "the greatly increased options for consumers in the selection and viewing of video programming" since the cap was last modified in 2004. *Id.* ¶ 15. "Accordingly," the Commission explained, "we find it necessary to rectify the Commission's error by reinstating the discount so that we can consider it as part of a broader reassessment of the national audience reach cap, which we will begin later this year." *Id.*

## ARGUMENT

Petitioners cannot obtain the extraordinary remedy of a stay unless they show that: (1) they are likely to prevail on the merits; (2) they will suffer irreparable harm without a stay; (3) a stay will not harm other parties; and (4) the public interest favors a stay. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). Petitioners have not satisfied any of these prerequisites.

## I. Petitioners Are Not Likely To Prevail On The Merits

Petitioners' challenge to the *Reconsideration Order* is not likely to succeed. The FCC reasonably explained that it reinstated the UHF discount because it determined that the Commission had erred in abolishing the discount "without conducting a broader review of the [audience reach] cap"—including an assessment of "whether the cap should be raised to mitigate the regulatory impact of eliminating the UHF discount." *Reconsideration Order* ¶ 14. In other words, the agency found that it was arbitrary and capricious as well as unwise to change the methodology for calculating compliance with an ownership cap without considering whether the cap itself might need to be adjusted. *Id.* ¶¶ 13-15. That determination was plainly correct and, at a minimum, a reasoned decision well within the agency's authority.

Indeed, the Third Circuit reached a similar conclusion last year when it vacated the FCC's rule attributing television joint sales agreements (JSAs) for purposes of evaluating compliance with the Commission's ownership restrictions. *See Prometheus Radio Project v. FCC*, 824 F.3d 33, 54-60 (3d Cir. 2016) (*Prometheus III*). The Third Circuit noted that the JSA attribution rule had the effect of "making [the FCC's television ownership caps] more stringent." *Id.* at 58. When the FCC adopted the attribution rule, however, it made no findings as to whether the ownership limits themselves remained in the public interest. *See id.* at

50-51. The Third Circuit held that the Commission could not "logically demonstrate" that the JSA rule's tightening of ownership caps was "in the public interest" without first determining whether the preexisting caps "are sound." *Id.* at 58.

More generally, this Court has repeatedly cautioned that "the Commission cannot 'restructure [an] entire industry on a piecemeal basis' through a rule that utterly fails to consider how the likely future resolution of crucial issues will affect the rule's rationale." *Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1210 (D.C. Cir. 1984) (quoting *ITT World Commc'ns, Inc. v. FCC*, 725 F.2d 732, 754 (D.C. Cir. 1984)).

Heeding this Court's admonition, and consistent with the Third Circuit's analysis of the television JSA rule, the Commission here concluded that it was arbitrary and capricious to eliminate the UHF discount "on a piecemeal basis"—thereby substantially tightening the national audience reach cap for UHF station owners—"without considering the national cap as a whole." *Reconsideration Order* ¶ 13. It made little sense to implement a methodological change that significantly tightened the cap if there was a chance that the agency might decide upon further review to loosen the cap—or, at a minimum, to consider these issues together. *See ITT World*, 725 F.2d at 754 ("an agency does not act rationally when it chooses and implements one policy and decides to consider the merits of a

potentially inconsistent policy in the very near future”). Recognizing the pitfalls of piecemeal reform in this context, the Commission on reconsideration sensibly decided “to review the [UHF] discount and [national audience reach] cap together as a matter of sound policy and logic.” *Id.* n.41.[7]

The Commission’s approach on reconsideration flows logically from its conclusion that the two components of the national audience reach rule—the cap and the UHF discount—are “inextricably linked” and should therefore be analyzed in tandem. *Reconsideration Order* ¶ 1. The agency’s reading of the way its own rules operate and interact with each other is entitled to great deference. *See Minn. Christian Broadcasters v. FCC*, 411 F.3d 283, 285 (D.C. Cir. 2005) (“we defer to an agency’s reading of its own regulation, unless that reading is plainly erroneous or inconsistent with the regulation”) (internal quotation marks omitted).

The Commission also reasonably explained in the *Reconsideration Order* why it believed the *Repeal Order* was arbitrary and capricious as well as unwise. It noted that the *Repeal Order* “never explained why tightening the cap was in the

---

[7] Petitioners wrongly assert (Mot. 10) that the *Reconsideration Order* “did not identify any legal or factual errors in the *Repeal Order*.” To the contrary, the FCC concluded on reconsideration that the *Repeal Order*’s elimination of the UHF discount “on a piecemeal basis, without considering the national cap as a whole, was arbitrary and capricious.” *Reconsideration Order* ¶ 13. A broadcaster raised this very issue in a petition for review of the *Repeal Order*. *See Twenty-First Century Fox, Inc. v. FCC*, D.C. Cir. No. 16-1375, Petition for Review at 3 (filed Oct. 28, 2016) (currently held in abeyance).

public interest or justified by current marketplace conditions." *Reconsideration Order* ¶ 13. This error was compounded by the *Repeal Order*'s failure to account for significant changes in the market, including "the greatly increased options for consumers in the selection and viewing of video programming since Congress directed the Commission to modify the cap in 2004." *Id.* ¶ 15.

Petitioners argue that it was arbitrary and capricious for the FCC to reinstate the UHF discount now that the discount has become "obsolete" and "no longer serves any purpose." Mot. 12. But the *Reconsideration Order* directly addressed this point. It readily acknowledged that the UHF discount may no longer have "a sound technical basis following the [DTV] transition." *Reconsideration Order* ¶ 14. The FCC's point in the *Reconsideration Order* was that the discount operates in tandem with the national cap. The problem with the *Repeal Order* was that it changed the discount without considering the cap. Indeed, there can be no dispute that eliminating the discount in 2016 "had the effect of substantially tightening the national [audience reach] cap." *Id.*; *see also Prometheus Radio Project v. FCC*, 373 F.3d 372, 396 (3d Cir. 2004) (*Prometheus I*). But in the *Repeal Order*, "the Commission never explained why tightening the cap was in the public interest or justified by current marketplace conditions." *Reconsideration Order* ¶ 13.

On reconsideration, the Commission reasonably concluded that it should not have abolished the discount—and effectively tightened the cap—"without

conducting a broader review of the cap" to consider "whether the cap should be raised to mitigate the regulatory impact of eliminating the UHF discount." *Id.* ¶ 14. "To rectify [this] error," and to ensure that any changes to the discount would be made "as part of a broader reassessment of the national audience reach cap," the Commission reinstated the discount and committed to reviewing the two aspects of the cap in tandem later this year. *Id.* ¶ 15.

Petitioners also contend that this rationale for reinstating the discount is flawed because the agency lacks authority to raise the cap. Mot. 16-17.[8] To the contrary, the Commission reasonably found in the *Repeal Order* that it had authority to modify both the cap and the discount. *Repeal Order*, 31 FCC Rcd at 10222-24 ¶¶ 21-24. That finding—which the FCC left "undisturbed" on reconsideration, *see Reconsideration Order* n.60—is based on a reasonable reading

---

[8] Although petitioners now contend that the FCC lacks authority to modify the cap, some of the petitioners took the opposite position in comments filed with the FCC in this proceeding. *See, e.g.*, Reply Comments of Free Press *et al.* at 7 (Jan. 13, 2014) ("Broadcast commenters argue at length – and incorrectly – that the Commission doesn't have authority even to change the cap absent express Congressional mandate.") (available at https://ecfsapi.fcc.gov/file/7521065470.pdf); *id.* at 5; *see also* Opposition of Free Press *et al.* at 3 (Jan. 10, 2017) ("As the Commission rightly contemplated in 2013, it 'has the authority to modify the national television ownership rule, including the authority to revise or eliminate the UHF discount.'" (quoting *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, 28 FCC Rcd 14324, 14329 ¶ 13 (2013)) (available at https://ecfsapi.fcc.gov/file/1011012537141/Final%20Opposition%20to%20UHF%20Discount%20Reconsideration%20Petition.pdf).

of statutory language, which directed the FCC to change its rules to specify a national audience reach cap of 39 percent, but did not enact that limit into the statute. *See* Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(c)(1)(B), 110 Stat. 56, 111 (Mot., Attachment B) (directing the FCC in 1996 to "modify its rules for multiple ownership" by "increasing the national audience reach limitation for television stations to 35 percent"); CAA, Pub. L. No. 108-199 § 629(1), 118 Stat. 99 (Mot., Attachment D) (amending the 1996 statute by striking "35 percent" and inserting "39 percent"). The Commission's statutory interpretation is entitled to deference. *See Chevron USA, Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837, 843 (1984).

In any event, if petitioners were correct that the FCC lacks authority to change the cap, "then it follows that the Commission does not have authority to eliminate the discount, which [is] part of the cap." *Reconsideration Order* n.60; *see also id.* ¶ 1 (the cap and the discount are "inextricably linked"). As such, petitioners' argument about the agency's lack of authority only underscores that the Commission erred in the *Repeal Order* by eliminating the discount—an error the agency corrected in the *Reconsideration Order*.[9]

[9] Petitioners claim that the "plain language" of the CAA indicates that the FCC had authority to modify the discount but not the cap. Mot. 16-17. Not so. The discount has long been an integral component of the methodology for calculating compliance with the cap. *See* 47 C.F.R. § 73.3555(e)(2)(ii) (2015) (for purposes of

Petitioners also assert that it was arbitrary and capricious for the FCC to reinstate the discount based on the promise that the Commission will conduct a future proceeding because "today's Commission majority cannot predict how a future FCC might proceed." Mot. 15. Petitioners appear to assume that the reasonableness of the discount's reinstatement hinges on whether the FCC ultimately decides to make further revisions to the national cap. To the contrary, regardless of whether the FCC makes any additional adjustments to the cap, it was eminently reasonable, as precedent makes clear, for the Commission to decide that it was arbitrary and capricious as well as unwise for the agency to eliminate the UHF discount in the *Repeal Order* without at least assessing whether such a significant modification would leave the cap at a level consistent with the public interest.

---

calculating the cap, "UHF television stations shall be attributed with 50 percent of the television households in their … market"); *Prometheus I*, 373 F.3d at 396. The FCC adopted the UHF discount and the original audience reach cap in the same order, *see 1985 Order*, 100 FCC 2d at 93 ¶¶ 43-44; and for more than three decades, until the *Repeal Order* in 2016, it consistently applied the discount in conjunction with the cap. In light of the language of the rule and its regulatory history, the Commission justifiably found that the discount and the cap "are closely linked" and should be reviewed together. *Reconsideration Order* ¶ 10.

## II. Petitioners Have Failed To Demonstrate Irreparable Injury

In addition, petitioners do not show that they would likely suffer irreparable injury without a stay. This failure is also fatal to their stay request. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008).

"This Court has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "Such injury must be both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks omitted). "Bare allegations" will not suffice to establish irreparable harm; petitioners "must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

The harm alleged by petitioners falls far short of meeting this stringent standard. Petitioners do not even try to claim that the *Reconsideration Order* itself causes them *any* injury, let alone irreparable injury. Rather, they hypothesize that reinstatement of the UHF discount will lead broadcasters thereafter to seek regulatory approval for "numerous" transactions that would not be permissible without the discount. Mot. 17. Any such applications will trigger separate

adjudicatory proceedings at the agency that include numerous procedural and substantive protections. Petitioners further speculate that, "absent a stay," each of "these transactions will likely be approved" by the FCC after the 30-day public notice period for each transaction has passed. Mot. 19. This purported harm is speculative at best, not irreparable, and arguably not even a harm at all.

Petitioners' harm depends on Commission approval of license-transfer applications that would violate the national cap but for the UHF discount. Petitioners' assumption that the Commission will approve any such acquisitions—and will do so swiftly (Mot. 18)—rests on a misreading of relevant FCC law. The Communications Act grants any interested party the right to file a petition to deny any application to transfer broadcast licenses. 47 U.S.C. § 309(d)(1). Nothing prevents petitioners—or other interested parties—from opposing FCC approval of any transaction that relies on the UHF discount to establish compliance with the audience reach cap. As even the policy director for Free Press has observed, when such transactions are opposed, they "can take several months for resolution." Mot., Attachment G, Declaration of Matthew F. Wood at 3. And even if a transaction is unopposed, the FCC remains obligated to evaluate it to ensure that approval of the transaction serves "the public interest, convenience and necessity." 47 U.S.C. § 310(d). Given the uncertainty surrounding the contingencies that must occur

before petitioners suffer the harm they allege, petitioners have failed to show the sort of imminent harm that would warrant a stay of the *Reconsideration Order*.[10]

Furthermore, a stay is unwarranted because the harm alleged by petitioners is not "beyond remediation." *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958). In this case, in the unlikely event that petitioners prevail on the merits, the Court could order the Commission not only to rescind the reinstatement of the UHF discount, but also to re-examine any transactions that may have been approved during this litigation to ensure that they remain in compliance with the audience reach cap after the discount is repealed. Indeed, petitioners recognize that while this case is pending, the Commission could "condition approval" of transactions "upon the outcome of judicial review." Mot.

---

[10] Moreover, if petitioners are aggrieved by FCC authorization of any future transaction, they will have an opportunity to seek judicial review of the Commission order approving that transaction. *See, e.g.*, *ADX Commc'ns of Pensacola v. FCC*, 794 F.3d 74 (D.C. Cir. 2015) (reviewing FCC order approving broadcaster's acquisition of additional radio stations); *SBC Commc'ns Inc. v. FCC*, 56 F.3d 1484 (D.C. Cir. 1995) (reviewing FCC order approving the transfer of radio licenses in connection with the AT&T-McCaw Cellular merger). The availability of this remedy further counsels against a stay of the *Reconsideration Order*.

19. The agency has the authority to require divestiture to ensure compliance with its ownership restrictions. *See Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1053 (D.C. Cir. 2002). It has exercised that authority in the past. *See, e.g., FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978).[11]

Finally, the Third Circuit's grant of a stay in *Prometheus Radio Project v. FCC*, 2003 WL 22052896 (3d Cir. 2003) (Mot., Attachment C), does not support a stay here. Mot. 11-12. The court in *Prometheus* granted a stay without making *any* finding regarding likelihood of success on the merits. Subsequently, the Supreme Court made clear that a party seeking a stay must demonstrate *both* a likelihood of success on the merits *and* irreparable harm. *See Nken v. Holder*, 556 U.S. 418, 433-36 (2009); *id.* at 438 (Kennedy, J., concurring) ("When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other."). Petitioners in this case have made neither of these required showings. Moreover, the Third Circuit's subsequent decision in *Prometheus III* underscored what the Commission later recognized in the *Reconsideration Order*: It is arbitrary and capricious for the Commission to amend its media ownership rules in this case in such a piecemeal fashion. *See Prometheus III*, 824 F.3d at 54-60.

---

[11] The Commission's past use of divestiture undermines petitioners' claim (Mot. 19) that the agency will not enforce conditions on previously approved transactions.

In addition, the court in *Prometheus* was confronted with an FCC order that would have implemented "a comprehensive overhaul of [the Commission's] broadcast media ownership rules," including restrictions on cross-ownership of broadcast stations and newspapers as well as caps on ownership of radio and television stations, which would have indisputably—and substantially—altered the status quo. *See Prometheus I*, 373 F.3d at 381. The order at issue here is much narrower in scope. It modifies a single FCC rule that applies solely to television station ownership; and it simply reinstates a methodology that (until last November) had been in place for more than three decades. Given the significant differences between the orders on review in these cases, the Third Circuit's analysis of irreparable harm in *Prometheus* is wholly inapposite here.

## III. A Stay Would Harm Other Parties And The Public Interest.

The balance of harms and the public interest also weigh decidedly against a stay.

As the Commission has noted, many broadcasters "reli[ed] on the UHF discount to develop long-term business strategies." *Reconsideration Order* ¶ 15. Those plans would be undermined if a stay is granted and the restoration of the UHF discount is postponed.

A stay would also disserve the public interest. The courts "have repeatedly emphasized that the Commission's judgment regarding how the public interest is

best served is entitled to substantial judicial deference." *Syracuse Peace Council v. FCC*, 867 F.2d 654, 660 (D.C. Cir. 1989) (quoting *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596 (1981)). A stay in this case would leave in place the *Repeal Order*—an order that, on reconsideration, the Commission found to be unlawful and "unwise from a public policy perspective" because it eliminated the UHF discount "on a piecemeal basis, without considering the national cap as a whole." *Reconsideration Order* ¶ 13. There is no good reason to block the FCC from undoing a decision that the Commission itself had previously made but that on reconsideration it found to be premature, unwarranted, and unlawful.

## CONCLUSION

The motion for stay pending review should be denied.

Respectfully submitted,

Brendan Carr
General Counsel

David M. Gossett
Deputy General Counsel

Jacob M. Lewis
Associate General Counsel

/s/James M. Carr

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C. 20554
(202) 418-1740

June 1, 2017

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Free Press, *et al.*, Petitioners, | ) | |
| v. | ) | No. 17-1129 |
| Federal Communications Commission and United States of America, Respondents. | ) | |

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1. This document complies with the word limit requirements of Fed. R. App. P. 27(d)(2)(a) because the document contains 5,182 words, as determined by the word-count function of Microsoft Word, excluding the parts of the motion exempted by Fed. R. App. P. 32(f); and

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ James M. Carr

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C. 20554
(202) 418-1762

June 1, 2017

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Free Press, *et al.*, Petitioners, | ) | |
| v. | ) | No. 17-1129 |
| Federal Communications Commission and United States of America, Respondents. | ) | |

**CERTIFICATE OF SERVICE**

I, James M. Carr, hereby certify that on June 1, 2017, I electronically filed the foregoing Opposition of Federal Communications Commission to Emergency Motion for Stay Pending Review with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Andrew J. Schwartzman
Angela J. Campbell
Drew Simshaw
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC 20001
*Counsel for: Free Press, et al.*

Robert J. Wiggers
Kristen C. Limarzi
U.S. Dep't of Justice
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
*Counsel for: USA*

David E. Mills
Cooley LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
*Counsel for: ION Media Networks, Inc.*

Colby M. May
American Center for Law and Justice
201 Maryland Avenue, NE
Washington, DC 20002
*Counsel for: Trinity Christian Center of Santa Ana, Inc.*

Robert Allen Long, Jr.
Mace J. Rosenstein
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
*Counsel for: 21st Century Fox, Inc., et al.*

Matthew J. MacLean
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
*Counsel for: Sinclair Broadcast Group, Inc.*

Richard A. Kaplan
Jerianne Timmerman
National Association of Broadcasters
1771 N Street, NW
Washington, DC 20036
*Counsel for: NAB*

*/s/ James M. Carr*

James M. Carr
Counsel

Federal Communications Commission
Washington, D. C. 20554