**IN THE**
**UNITED STATES COURT OF APPEALS FOR**
**THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Free Press, et al. | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | |
| Federal Communications Commission and the United States of America | ) | **Case No. 17-1129** |
| | ) | |
| *Respondents* | ) | |
| | ) | |

**SINCLAIR BROADCAST GROUP, INC.'S OPPOSITION TO EMERGENCY MOTION FOR STAY**

Matthew J. MacLean
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
(202) 663-8000

*Counsel for Sinclair Broadcast Group, Inc.*

June 1, 2017

# TABLE OF CONTENTS

**STANDARD OF REVIEW** .... 3

**ARGUMENT** .... 3

1. **Petitioners Are Not Likely to Succeed on the Merits** .... 3

   a) **The UHF Discount is not "concededly obsolete."** .... 5

   b) **Failure to consider the UHF Discount in tandem with the national audience reach cap was material error or omission warranting reconsideration.** .... 9

   c) **Reinstatement of the UHF Discount pending a more comprehensive rulemaking is not arbitrary and capricious.** .... 12

2. **Petitioners Fail to Identify Any Concrete Harm, Let Alone Irreparable Harm, That They Would Suffer Absent a Stay** .... 13

3. **A Stay Will Harm Sinclair and Other Interested Parties** .... 18

4. **The Public Interest Does Not Favor Grant of the Stay** .... 21

**CONCLUSION** .... 22

**IN THE**
**UNITED STATES COURT OF APPEALS FOR**
**THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Free Press, et al. *Petitioners*, v. Federal Communications Commission and the United States of America *Respondents* | ) ) ) ) ) ) ) ) | **Case No. 17-1129** |

**SINCLAIR BROADCAST GROUP, INC.'S OPPOSITION TO EMERGENCY MOTION FOR STAY**

Pursuant to Federal Rule of Appellate Procedure 27(a)(3)(A), Intervenor Sinclair Broadcast Group, Inc. opposes Free Press et al.'s ("Petitioners") Emergency Motion for Stay Pending Judicial Review (the "Motion").

This Court should deny the Motion in full because it does not meet any of the criteria required for a stay. Petitioners are unlikely to prevail on the merits because the Commission rationally interpreted its rules and governing statute to determine that (a) the regulation that attributes UHF stations with 50% percent of a market's audience for purposes of calculating compliance with the national audience reach cap (the "UHF Discount") is inextricably intertwined with the national audience reach cap, and (b) its failure to consider whether a *de facto* tightening of the national audience reach cap was in the public interest prior to eliminating the UHF Discount constituted material error or omission warranting reconsideration. *See Amendment of Section 73.3555(e) of the Commission's Rules,*

*National Television Multiple Ownership Rule*, 31 FCC Rcd 10213 (2016) ("*Discount Elimination Order*").

In an attempt to side-step the Commission's reasoned decisionmaking, the Motion works from the flawed premise that the UHF Discount is "concededly obsolete," primarily relying on an inaccurate technical argument that VHF is no longer superior to UHF. But the *Reconsideration Order* does not concede this, and neither does Sinclair. Rather, the Commission explained that because the scope of its original inquiry was too narrow, its decision to eliminate the UHF Discount was unsupported by substantial evidence. The *Reconsideration Order* abrogated the Commission's earlier conclusions, and properly reserved any technical or policy analysis of the UHF Discount for a future rulemaking where it will be able to consider all relevant factors.

The Motion also fails to identify any actual harm, irreparable or otherwise, that Petitioners would suffer absent a stay. It is therefore doubtful that Petitioners even have standing to challenge the *Reconsideration Order*, or that they have exhausted their administrative remedies such that the agency action is ripe for review. Moreover, the Motion fails to address the significant and concrete harms a stay would cause Sinclair and other third parties, and ultimately fails to demonstrate how the public interest would be served by a stay.

Additionally, Petitioners incorrectly frame the Motion as a request to maintain the *status quo*. But the reality is that the *Reconsideration Order* itself is a return to the *status quo* existing for decades prior to the Commission's arbitrary and capricious decision to eliminate the UHF Discount late last year. Accordingly, Sinclair urges this Court to deny the Motion in full.

## STANDARD OF REVIEW

To warrant the extraordinary remedy of a stay, the moving party must show: (1) it is likely to prevail on the merits of its appeal; (2) it will be irreparably injured absent a stay; (3) issuance of a stay would not harm other interested parties; and (4) a stay would benefit the public interest. *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) ("*WMATC*"); *Virginia Petroleum Jobbers Association v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958). Here, Petitioners have entirely failed to satisfy the "stringent standards required for a stay." *Melcher v. F.C.C.*, No. 93-1110, 1997 WL 529059, at *1 (D.C. Cir. July 30, 1997) (citing *WMATC* at 843).

## ARGUMENT

### 1. Petitioners Are Not Likely to Succeed on the Merits

This Court has long recognized that absent "a substantial indication of probable success, there [is] no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Virginia Petroleum*

*Jobbers Ass'n*, 259 F.2d. at 925. And, it is well-settled that a reviewing court must "give[] deference to the agency's interpretation so long as that interpretation is not arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). Further, under the Administrative Procedure Act's ("APA") arbitrary and capricious standard "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); 5 U.S.C. § 706(2)(A). "Under this deferential standard of review [the Court] must affirm the Commission's decision if it examined the relevant information and gave a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *PLMRS Narrowband Corp. v. F.C.C.*, 182 F.3d 995, 999 (D.C. Cir. 1999).

Petitioners fail to explain how reinstatement of the UHF Discount—which was in place when Congress directed the Commission to set the national audience reach cap at 39%—is "arbitrary, capricious, or manifestly contrary to the statute." Instead, Petitioners cling to the false argument that there is no longer a technical need for the discount, and therefore there was nothing to review on reconsideration.

In any event, to have standing to appeal the *Reconsideration Order*, Petitioners must have suffered an (1) "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," (2) that is "fairly traceable" to the challenged act, and (3) "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (applying standard to request for injunctive relief); *Common Cause v. Fed. Election Comm'n*, 108 F.3d 413, 417 (D.C. Cir. 1997). Because Petitioners have not alleged any such harm, it is doubtful Petitioners have Article III standing to challenge the *Reconsideration Order*—another reason they are unlikely to prevail on the merits of their appeal.[1]

Accordingly, the Motion should be denied.

**a) The UHF Discount is not "concededly obsolete."**

Petitioners' basis for contending the *Reconsideration Order* is arbitrary and capricious revolves around the erroneous assertion that the Commission reinstated a rule that is "concededly obsolete and does not serve the public interest." Motion at 12. This is not true, and the *Reconsideration Order* does not purport to reinstate an obsolete rule. Rather, it properly sets aside the Commission's earlier

[1] Sinclair expects to present a more detailed standing analysis in a Motion to Dismiss to be filed later in this proceeding.

assumptions about the validity of the UHF Discount, which were "unsupported by substantial evidence." 5 U.S.C. § 706.

Indeed, the *Reconsideration Order* explains that elimination of the UHF Discount "was unwise from a public policy perspective" and that the Commission's failure to consider whether its elimination "was in the public interest and justified by current marketplace conditions" was a "mistake [that] renders [the Commission's] past action arbitrary and capricious." *Reconsideration Order* ¶ 1. In focusing principally on one misapplied technical basis for the UHF Discount, the Motion ignores the technical and operational realities of the two standards and the Commission's policy reasons for the discount.[2] Petitioners offer no evidence to suggest that these realities or policy reasons have been eliminated by the transition to digital TV such that the Commission would be wrong to consider them before modifying the UHF Discount.

---

[2] In reality, the UHF discount is not an inherently technical rule, but rather a policy decision to attribute half of the population of a market to each UHF station while attributing 100% of the market population to each VHF station. The audience reach attributed to a VHF station does not generally reflect the actual percentage of the population the VHF station covers. The Commission's rule attributes to a VHF station 100% of the population in a station's "Designated Market Area" (as determined by a TV ratings agency), whether a station covers the entire market or only a fraction of it. *See* 47 C.F.R. §73.3555(e)(2)(i). And the choice of how to calculate coverage for purposes of the national ownership cap is not binary—to have a 50% UHF "discount" or no UHF "discount" at all.

Moreover, the *Discount Elimination Order* erred by accepting, without substantial evidence or sufficient explanation, that the transition to digital TV eliminated the technical disparity between UHF and VHF signals. But as the Commission has acknowledged, "VHF channels are likely always to remain somewhat superior to UHF for television broadcasting due to fundamental laws of physics over which we have no control." *Improvements to UHF Television Reception*, 90 FCC2d 1121, 1124 (1982); *Amendment of Section 73.3555 of the Commission's Rules*, 100 FCC2d 74, 93 (1985) (citing Comparability for UHF Television: Final Report, September 1980 at 2) ("Due to the physical nature of the UHF and VHF bands, delivery of television signals is inherently more difficult at UHF.").

The transition to digital did not change the laws of physics. UHF signals and VHF signals continue to have the same propagation characteristics as they did before: UHF stations in general still have smaller service areas than VHF stations; unlike VHF signals, UHF signals are line of sight and stop at the horizon; and UHF stations need far more power to reach the same distance. So even when it is theoretically possible for a UHF station to match a VHF station's service area, doing so can be prohibited by costs or the operating parameters of its license.

Although the *Discount Elimination Order* noted limitations VHF stations may face following the digital transition, it never explained how the transition

eliminated the "inherent physical limitations" of UHF. *Discount Elimination Order* ¶ 14. Instead, it skirted the required analysis by citing comments that claimed, without support, that "the disparity that UHF stations once faced has been eliminated." *See id.* ¶ 26 (citing Comments of Free Press, MB Docket No. 13-236 (Dec. 16, 2013) at 6. The *Discount Elimination Order* also "note[d] that as early as 1992, the Commission anticipated the possibility that the transition to digital television would obviate the need for the UHF discount." *Discount Elimination Order* ¶ 8 n.24, citing *Review of the Commission's Regulations Governing Television Broadcasting*, 7 FCC Rcd 4111, 4115 n.37 (1992). But the footnote cited only tentatively concluded that "As the broadcast industry makes a transition to ATV [advanced TV] technology . . . such distinctions ultimately may disappear (e.g., in the event that all ATV stations are eventually moved to one band or another)." Knowing now that the digital transition did not move all UHF and VHF stations to the same band, such earlier predictions do not constitute "substantial evidence."

Regardless of whether the historical technical justification for the UHF Discount survived the digital transition, the Commission is obligated to "consider all relevant comments and material of record before taking final action in a rulemaking proceeding." 47 C.F.R. § 1.425. The *Discount Elimination Order* failed to do this, justifying reconsideration.

**b) Failure to consider the UHF Discount in tandem with the national audience reach cap was material error or omission warranting reconsideration.**

The Communications Act authorizes the Commission "in its discretion, to grant [a petition for] reconsideration if sufficient reason therefor be made to appear." 47 U.S.C. § 405(a). Reconsideration is warranted where the original order contains a material error or omission. 47 C.F.R. § 1.429(l)(1). An order granting reconsideration need only provide a concise statement of the Commission's reasons for the action taken. 47 C.F.R. § 1.429(i).

Petitioners fail to demonstrate that the *Reconsideration Order* was an abuse of the Commission's discretion, or that the Commission failed to state its reasons for granting reconsideration. Instead, the Motion incorrectly asserts that the *Reconsideration Order* "did not identify any legal or factual errors in the [*Discount Elimination Order*]." Motion at 10.

In reality, the Commission did identify a significant "legal error" in the *Discount Elimination Order*: failure to consider the UHF Discount in the context of the national audience reach cap rendered the *Discount Elimination Order* arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("A decision is arbitrary and capricious if the agency 'has . . . entirely failed to consider an important aspect of the problem.'"). As the Commission explained:

> The UHF discount allows commercial broadcast television station owners to discount the audience reach of UHF stations when calculating their

> compliance with the national television ownership rule. It is thus inextricably linked to the national ownership cap. When the Commission voted to get rid of the discount, however, it failed to consider whether this *de facto* tightening of the national cap was in the public interest and justified by current marketplace conditions. This mistake renders our past action arbitrary and capricious.

*Reconsideration Order* ¶ 1; *see also id.* ¶¶ 12 ("the Commission has always considered the discount together with the National Cap"), 13 ("eliminating the UHF discount on a piecemeal basis, without considering the national cap as a whole, was arbitrary and capricious."), 14 ("Reliance on the self-imposed narrow scope of the *UHF Discount NPRM* was not a sound basis for the Commission to conclude that it could not consider the broader public interest issues posed by retaining the national cap while eliminating the UHF discount, which had the effect of substantially tightening the national cap."), and 17 ("the Commission failed to fully consider important arguments and lacked a reasoned basis for its conclusion that action on the discount should not be combined with a broader review of the national cap.").

This determination is consistent with the Third Circuit's findings in *Prometheus Radio Project v. FCC*, 373 F.3d 372, 396 (2004). There, the court concluded that the 39% cap and the UHF Discount were inseparably linked for purposes of review:

> Congress instructed the Commission to "increase the national audience reach limitation for television stations to 39%." Since 1985 the Commission has defined "national audience reach" to mean "the

> total number of television households" reached by an entity's stations, except that "UHF stations shall be attributed with 50 percent of the television households" reached. We assume that when Congress uses an administratively defined term, it intended its words to have the defined meaning. Furthermore . . . we cannot entertain challenges to the Commission's decision to retain the 50% UHF discount. Any relief we granted on these claims would undermine Congress's specification of a precise 39% cap.

*Id.*

More recently, the Third Circuit vacated a Commission rulemaking for adopting an amendment that effectively tightened local ownership limits before completing a public interest review of the local ownership rules as a whole. *See Prometheus Radio Project v. FCC*, 824 F.3d 33, 58 (3rd Cir. 2016). The court held that "unless the Commission determines that the preexisting ownership rules are sound, it cannot logically demonstrate that expansion is in the public interest." *Id.*

Considering this precedent, the Commission rationally interpreted the 39% cap to include the UHF Discount. As such, it was reasonable to conclude that the *Discount Elimination Order* could not stand because, "[w]hen the Commission voted to get rid of the discount . . . it failed to consider whether this *de facto* tightening of the national cap was in the public interest and justified by current marketplace conditions." *Reconsideration Order* ¶ 1.

**c) Reinstatement of the UHF Discount pending a more comprehensive rulemaking is not arbitrary and capricious.**

Petitioners contend that the Commission's decision to reinstate the UHF Discount pending a future rulemaking is arbitrary and capricious because the Commission does not have authority to modify the 39% cap. But this wrongly assumes the rulemaking would be limited to the choice between raising or eliminating the 39% cap. Motion at 14-15. It ignores myriad options available to the Commission that would leave the 39% cap in place. After all, accepting Petitioners' argument that the Commission has authority to eliminate the UHF Discount, it follows that the Commission has authority to otherwise modify how it calculates audience reach.

In a future rulemaking the Commission could consider, among other things, (1) whether a station's reach for purposes of the national ownership cap should be limited to the portion of the population that a station actually covers rather than imputing coverage that does not actually exist; (2) whether all stations, UHF and VHF, should be attributed less than 100% coverage of their DMAs, because in many or most cases stations do not cover their entire markets; (3) whether certain technical advantages of VHF, such as signal propagation, costs to obtain similar coverage, and other coverage characteristics, exist to retain the UHF Discount; (4) whether marketplace considerations or other policy reasons warrant retention of the UHF Discount; or (5) whether there is some other method of calculating

audience reach that might appropriately balance elimination of the UHF Discount with other technological and public interest factors.

Petitioners also contend that reinstatement of the UHF Discount pending a "broader reassessment of the national audience reach cap," is arbitrary and capricious because "today's Commission majority cannot predict how a future FCC might proceed." *Id.* But there is no requirement that the Commission know the outcome before launching a rulemaking. Indeed, as Petitioners acknowledge, "the APA contemplates that the Commission approach each case with an open mind." *Id.* at 15. That "there is currently no factual record on whether national limits serve the public interest," *id.*, is all the more reason that the Commission should solicit comments on the subject before modifying its rules.

**2. Petitioners Fail to Identify Any Concrete Harm, Let Alone Irreparable Harm, That They Would Suffer Absent a Stay**

To warrant a stay, Petitioners must demonstrate that the harms they would suffer are "'certain,' rather than speculative," and that "the 'alleged harm[s] will directly result from the action[s] which the movant[s] seeks to enjoin.'" *Coal. for Responsible Regulation, Inc. v. E.P.A.*, No. 09-1322, 2010 WL 5509187, at *1 (D.C. Cir. Dec. 10, 2010) (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir .1985) (per curiam)). Under even the most generous reading of the Motion, Petitioners fail to identify any non-speculative harm that would result in the absence of a stay.

Instead, Petitioners merely observe that reinstatement of the UHF Discount could enable broadcast transactions that might be prohibited without the UHF Discount. *See* Motion at 17. Specifically, Petitioners (1) note that Sinclair filed applications to acquire Bonten Media stations that collectively account for about 1% of U.S. TV households, and (2) speculate that Sinclair's planned acquisition of Tribune Media Company "is the beginning of what is likely to be a wave of consolidation." *Id.* at 18. But the Motion fails to explain how these pending and planned transactions, or any other yet-to-be announced transaction, will cause Petitioners to any suffer imminent, concrete, and irreparable harm.

Notably, until elimination of the UHF Discount went into effect on November 23, 2016, the Commission's rules allowed station owners to buy stations that, without the discount, would place them over the 39% audience reach cap. In other words, everything Sinclair or any other broadcaster would be able to do upon restoration of the UHF Discount, it could have done legally for many years prior to the Commission's repeal of the UHF Discount late last year. Thus, the entire basis for the Motion—that allowing broadcasters to benefit from the UHF Discount will bring sudden and irreparable harm—has been the *status quo* since the UHF Discount was adopted in 1985, or since the first digital UHF station commenced operations in 1996, or—taking an even more conservative approach—since 2004 when the cap (with the discount) was raised to 39%.

And indeed, several broadcasters *already* exceed a 39% national audience reach—and have exceeded it for years—but for application of the UHF Discount. Petitioners can point to no harm suffered as a result of these groups owning stations that (without the discount) reach 64.8% (ION), 44.1% (Univision) and 43.7% (Tribune) of U.S. TV households. *See FCC Takes Lid of National Station Ownership*, Motion at Attachment F. And comments to the underlying proceeding show just the opposite.[3] It therefore strains credulity to claim restoration of the UHF Discount will now suddenly cause Petitioners to suffer immediate and irreparable harm.

Petitioners' attempt to draw analogies to the Third Circuit's stay of new ownership rules adopted in the Commission's 2002 Biennial Regulatory Review is, therefore, misplaced. Motion at 11. There, the court found that the "changes adopted by the FCC . . . *would significantly alter the agency's ownership rules*[.]" *Prometheus*, 2003 WL 22052896 *1 (3rd Cir. 2003) (emphasis added).

---

[3] *See, e.g.*, Univision Reply Comments, MB Docket 13-236, at 3 (Jan. 23, 2017) ("The many benefits of Univision's existing UHF station combination for Hispanic viewers are clear. . . . [it] has enabled the Univision Network to compete with the established English-language networks, making it one of the top five networks in the United States, regardless of language. It has enabled Univision to launch Unimás, a second, over-the-air Spanish-language network. And it has allowed Univision to introduce new Spanish language local news services."); ION Notice of Ex Parte, MB Docket 13-236 (Jan. 11, 2017) ("ION relied on the UHF Discount to build America's last truly independent over-the-air broadcasting network . . . other companies like Trinity and Univision have followed similar paths to building competitive and independent networks.").

Consequently, the Third Circuit reasoned that "[g]ranting the stay pending judicial review would maintain the *status quo* in order to permit appellate review after briefing on the merits." *Id.* Here, in contrast, the *Reconsideration Order* does not adopt any change to the Commission's ownership rules, let alone a change that would "significantly alter" the regulatory landscape. Rather, consistent with the Third Circuit's reasoning in *Prometheus*, the *Reconsideration Order* marks a return to the *status quo*—reinstating the UHF Discount that has existed since 1985—in order to negate any potential harm of the recent *Discount Elimination Order* pending a proper rulemaking.

At bottom, Petitioners' argument rests on pointing to the *possibility* of future mergers and asserting—without any evidence—that they will suffer harm because "consolidation will reduce competition and diminish the diversity of voices in the marketplace of ideas." Motion at 19. But this alleged harm is purely speculative, and would result from *any* broadcast transaction between two current broadcasters—regardless of their size or whether the 39% cap or UHF Discount were implicated—and therefore does not "directly result" from the *Reconsideration Order*.

Additionally, Petitioners do not deny (nor can they) that the Commission could approve pending applications subject to the final resolution of UHF Discount, and could require station divestitures to comply with the ultimate rule.

Rather, Petitioners claim that "the Commission has repeatedly failed to enforce previously-mandated divestures." But the "harm" in this context stems from possible future Commission action, not the *Reconsideration Order*. And the cases Petitioners cite to support their claim are inapposite, as they relate to a long-standing Commission policy (not at issue here) of granting waivers of ownership rules where a station or newspaper could not viably sustain stand-alone operations.

For example, in *Counterpoint Communications Inc*., the Commission granted a temporary waiver to permit common ownership of stations WTXX and WTIC-TV and a newspaper in the Hartford, Connecticut market where "WTXX is at a real risk of failure if it operates alone." 20 FCC Rcd 8582, 8589 (2005). In *Fox Television Stations, Inc.*, the Commission denied a request for a permanent waiver of its newspaper-broadcast cross-ownership rule and gave the licensee 90 days after the effective date of an order that "either adopts a new [newspaper-broadcast cross-ownership] rule or upholds [the] existing rule to (1) comply with the rule in effect at that time or (2) file a new request for a waiver of such rule." 29 FCC Rcd 9564, 9578-79 (2014). These cases highlight the Commission's other ownership rules that remain operative regardless of the UHF Discount, and demonstrate the Commission's flexibility to conduct transaction-by-transaction reviews as the public interest requires.

Because Petitioners fail to identify and reasonably support any imminent, concrete, and irreparable harm they would suffer absent a stay, the Court should deny the Motion. As noted above, this failure to allege an injury-in-fact also calls into question whether Petitioners have standing to challenge the *Reconsideration Order* at all.

Similarly, Petitioners' failure to exhaust administrative remedies is another reason they are not likely to succeed on the merits of their appeal, another reason why there is no imminent irreparable harm (or any other concrete harm), and another reason why there is no "emergency" justifying their request for expedited consideration of a Motion filed the Friday before Memorial Day weekend. Petitioners imply that grant of Sinclair's pending applications will cause them immediate harm in the absence of a stay. But that transaction will not be ripe for grant on the June 5 reinstatement date (because the 30-day petition to deny period will not have expired), and Petitioners have not yet challenged it at the agency level. Petitioners' failure to exhaust their administrative remedies is therefore the cause of any alleged emergency harm, not the *Reconsideration Order*.

**3. A Stay Will Harm Sinclair and Other Interested Parties**

"Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents." *Virginia Petroleum Jobbers Ass'n*, 259 F.2d at 925. Petitioners do

not, and cannot, offer any evidence supporting their assertion that grant of a stay will not harm broadcasters. Motion at 20. As noted earlier, Petitioners' attempt to rely on the reasoning behind the Third Circuit's grant of a stay in *Prometheus* is misplaced. *Id.* at 20-21. Unlike that situation, reinstatement of the UHF Discount is the return to the *status quo*. And, unlike that situation, there are already pending transactions and existing broadcast groups that would be harmed by a stay.

Petitioners' baseless claim that a stay will not cause any harm signifies a naiveté not only with respect to the business of broadcasting, but with respect to business in general. It cannot be disputed that suspending a pending transaction for months while waiting for a judicial appeal to run its course would cause significant harm. Such a delay would inherently increase financing and other costs and perhaps jeopardize funding and consummation of the transaction completely.

The uncertainty caused by the delay would also harm the employees and shareholders of the companies involved, and would impact potential investments in new services. But the Motion entirely fails to expand its harm analysis beyond broadcasters to these other third parties, or to viewers who benefit from the increased resources and other synergies that generally accompany broadcast transactions. *See, e.g.*, *Applications for Consent to Transfer Control of License Subsidiaries of Media Gen., Inc., from Shareholders of Media Gen., Inc. to Nexstar Media Grp., Inc.*, 2017 WL 117616 ¶ 29 (Jan. 11, 2017) (concluding that merger

would enable increased local news operations, given that "establishing a news bureau requires significant technical infrastructure and staff and that the costs are not trivial.").

Petitioners' speculation that small broadcasters might benefit from the renewed availability of stations that larger broadcasters would have otherwise acquired absent a stay does not negate the harm to those broadcasters with pending transactions. *See* Motion at 20. Further, Petitioners assume, without any evidence, that those small broadcasters are willing and able to acquire these stations, and that all small broadcasters are *per se* good for the public while all large broadcasters are inherently harmful.

Further, a stay will harm existing companies that currently would exceed the 39% audience reach cap but for the UHF discount. Because the *Discount Elimination Order's* grandfathering relief given to station groups that exceed the cap does not apply in the event of a transfer of such stations, granting Petitioners' request would effectively freeze these companies in regulatory limbo, and any transactions these companies might consider could result in prematurely forced divestitures to comply with the 39% cap, when the UHF Discount might ultimately be restored or the cap otherwise modified.[4]

---

[4] *See, e.g.*, Univision Reply Comments in Support of Petition for Reconsideration, MB Docket 13-236 (Jan. 23, 2017) ("The result of the [Discount Elimination]

Because the harms that would accompany a stay are obvious and numerous, the Court should deny the Motion.

**4. The Public Interest Does Not Favor Grant of the Stay**

As the Petitioners acknowledge, "the *Virginia Petroleum* test places the greatest weight on the likelihood of success on the merits and the possibility of immediate and irreparable harm to the moving parties." Motion at 21. Petitioners have failed to satisfy either factor, and their Motion should accordingly be denied.

On top of this, the Motion does not identify any public interest benefit of a stay. It asserts that "a stay would prevent immediate consolidation in ownership" but ignores the reality that, even without the UHF Discount, many broadcasters have headroom under the 39% cap to acquire additional stations. *Id.*

The remainder of the Motion's public interest analysis consists of non-sequiturs with no connection to the UHF Discount. For example, the Motion does not explain how denial of a stay would threaten viewers' "First Amendment right

---

Order, which effectively doubled Univision's audience reach with the stroke of a pen, is that Univision can no longer acquire full power stations in new markets and, should it alter its ownership structure, may actually be forced to divest television stations, with the attendant risk of a reduction in service to an historically underserved community."); Notice of Ex Parte Communication, ION Media Networks (Jan. 11, 2017) ("the decision to eliminate the UHF Discount created an investment disincentive for companies like ION, threatened to undermine the capital structures of these companies, and weakened the very competitive networks that the Commission encouraged companies like ION to create. . . . ION relied on the UHF Discount to build America's last truly independent over-the-air broadcasting network.").

to receive suitable access to social, political, esthetic, moral, and other ideas and experiences. . . .” *Id.* Nor does it explain how reinstatement of a rule that has existed since 1985 would suddenly undermine the Commission’s entire regulatory framework such that its rules no longer promote competition, diversity, or “the public interest, convenience, and necessity.” *Id.* at 22.

In contrast, the public interest is served by the Commission’s adherence to the strictures of the APA and its decision to remedy the material errors of the *Discount Elimination Order*. A more fulsome rulemaking proceeding will strengthen public confidence in the administrative process and ensures that the ultimate rule adopted takes into consideration all important factors.

## CONCLUSION

For the reasons detailed above, Sinclair respectfully urges the Commission to deny the Motion for Stay.

Respectfully submitted,

/s/ *Matthew J. MacLean*

Matthew J. MacLean
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
(202) 663-8000
*Counsel for Sinclair Broadcast Group, Inc.*

June 1, 2017

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,075 words, as determined by the word count function of Microsoft Word, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman and 14 point font.

/s/ *Matthew J. MacLean*
Matthew J. MacLean
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 663-8000
*Counsel for Sinclair Broadcast Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 1, 2017, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Matthew J. MacLean*
Matthew J. MacLean
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 663-8000
*Counsel for Sinclair Broadcast Group, Inc.*